





IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

SOUTHERN TRUST INSURANCE COMPANY,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Petitioner,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　MDL Docket No. _____
　　　　　　　　　　　　　　　　　　　)
CAROL A. BECHTEL, PAULA YOCKEL,　　 )　4 03-CV· 157
ANTHONY SCHUCHMAN, ELEANOR KITTER )　　　　　　-HLM
DENT, LORIE ANN WALLEY, CARLTON　 )
DALE RICE, TIMOTHY TODD RICE,　　　)
DAMIAN WALLEY, VIRGINIA RICE　　　　)
ELLINGTON, TRI-STATE CREMATORY, INC., )
T. RAY BRENT MARSH, CLARA C. MARSH, )
RHAMES L. MARSH, SAMUEL MARSH,　　 )
BUCKNER-RUSH ENTERPRISES, INC.,　　)
PRIME SUCCESSION HOLDING, INC., PRIME )
SUCCESSION, INC., PRIME SUCCESSION　)
OF TENNESSEE, INC., BURT FUNERAL　　)
HOME, INC., EWTON FUNERAL HOME, INC., )
FRANKLIN-STRICKLAND FUNERAL HOME, )
INC., AVERY BRYAN FUNERAL HOME, INC., )
SERVICE CORPORATION INTERNATIONAL, )
SCI TENNESSEE FUNERAL SERVICES, INC., )
d/b/a CHATTANOOGA FUNERAL　　　　　)
HOME - WEST CHAPEL, SCI TENNESSEE　)
FUNERAL SERVICES, INC., d/b/a　　　　)
CHATTANOOGA FUNERAL HOME - EAST　 )
CHAPEL, SCI TENNESSEE FUNERAL　　　 )
SERVICES, INC., d/b/a CHATTANOOGA　　)
FUNERAL HOME – NORTH CHAPEL, SCI　 )
TENNESSEE FUNERAL SERVICES, d/b/a　 )
HOOPER FUNERAL HOMES, INC., KERBY　)
FUNERAL HOME, LLC, J.D. HILL FUNERAL )
HOME, INC., ERWIN PETTIT FUNERAL　　)
HOME, INC.,CARRIAGE SERVICES, INC.,　)
CARRIAGE FUNERAL HOLDINGS, INC.,　　)
d/b/a WILLIAMSON & SONS FUNERAL HOME, )
CARRIAGE FUNERAL HOLDINGS, INC.,　　)
d/b/a LANE FUNERAL HOME, JESSE JONES )

/

FUNERAL HOME, INC., KERBY FUNERAL )
HOME, INC., LAYNE FUNERAL HOME, INC., )
PUTNAM FUNERAL HOME, INC., )
SEQUATCHIE VALLEY MEMORIAL )
FUNERAL HOME & GARDENS, INC., TAYLOR )
FUNERAL HOME OF CHATTANOOGA, INC., )
WANN FUNERAL HOME, INC., LOVE )
FUNERAL HOME, INC., R.D. MOORE )
FUNERAL HOME, INC., WILLIS FUNERAL )
HOME, INC., W.L. WILSON & SONS, INC., )
WILSON FUNERAL HOME WALLIS )
STEWART CHAPEL, LLC, RYAN FUNERAL )
HOME, LLC, GILMORE FUNERAL HOME, )
LLC, VANDERWALL FUNERAL HOME, INC., )
TURNER FUNERAL HOME, INC., PIKEVILLE )
FUNERAL HOME, INC., PATTON'S FUNERAL )
HOME, PINKARD & MEE FUNERAL SERVICE, )
INC., JULIAN PEEPLES FUNERAL HOME, )
PEEPLES FUNERAL HOME, Does 1 to 100, )
inclusive, WALTER L. CROX, BARBARA )
CROX, JOE C. ODEN, JR., JAMES GREER, )
DAVID RANDOLPH SMITH, ALEX KITCHENS, )
ETTA LEE SMITH, KAREN PARTIN, JANICE )
BURCH RISLEY, HEATHER MARIE ROSS, )
ELOISE PHILLIPS, DAVID PELLETIER, )
NAOMI WEBB, THOMAS G. CONYERS, )
TOMMY RAY MARSH, BOB FOSTER, d/b/a )
FOSTER & SON FUNERAL HOME, CAGLE )
FUNERAL HOME, INC., CUMBERLAND )
FUNERAL SERVICES, INCORPORATED, )
CUMBERLAND FUNERAL HOME, )
CUMBERLAND FUNERAL HOME – TRACY )
CITY, FAMILY MORTUARY, INC., FOSTER & )
LAY FUNERAL HOME, HARDWICK & SONS )
FUNERAL HOME, INC., HOUSE OF )
OVERSTREET MORTUARY, INC., )
J. AVERY BRYAN FUNERAL HOME, INC., )
JULIAN PEEPLES MEMORIAL CHAPEL, INC., )
d/b/a JULIAN PEEPLES FUNERAL HOME, )
PEEPLES FUNERAL HOME, INC., d/b/a )
PEEPLES FUNERAL HOME, R. DUDLEY )
BARTON & SON FUNERAL HOME, INC., )
SCI ALABAMA FUNERAL SERVICES, INC., )
d/b/a KERBY FUNERAL HOME, SCI GEORGIA )

FUNERAL SERVICES, INC., d/b/a J. D. HILL )
FUNERAL HOME, SCI GEORGIA FUNERAL )
SERVICES, INC., d/b/a JENNINGS )
FUNERAL HOME, SCI GEORGIA FUNERAL )
SERVICES, INC., d/b/a JENNINGS HERITAGE )
CHAPEL FUNERAL HOME, SCI GEORGIA )
FUNERAL SERVICES, d/b/a PARNICK )
JENNINGS FUNERAL HOME, SCI GEORGIA )
FUNERAL SERVICES, d/b/a EDWIN PETTIT )
FUNERAL HOME, SCI GEORGIA FUNERAL )
SERVICES, INC., d/b/a J. AVERY BYRAN OF )
CHICKAMAUGA, SCI GEORGIA FUNERAL )
SERVICES, INC., a/k/a GREG KENEMER, d/b/a )
KENEMER BROTHER FUNERAL HOME, )
SCI GEORGIA FUNERAL SERVICES, INC., )
d/b/a WALLIS STEWART FUNERAL HOME, )
SCI TENNESSEE FUNERAL SERVICES, INC., )
d/b/a CHATTANOOGA FUNERAL HOME - )
VALLEY VIEW CHAPEL, SCI TENNESSEE )
FUNERAL SERVICES, INC., d/b/a FIKE )
FUNERAL HOME, THOMAS AND SON )
FUNERAL HOME, INC., WALLIS-WILBANKS )
FUNERAL HOME, LLC, WILSON FUNERAL )
HOME - LAFAYETTE CHAPEL, LLC, WILSON )
FUNERAL HOME – J. AVERY BRYAN )
CHAPEL, L.L.C., COVENANT FUNERAL )
SERVICE, WARREN N. COPPEDGE, JR., )
)
        Defendants. )

## COMPLAINT FOR DECLARATORY RELIEF

COMES NOW, Southern Trust Insurance Company (hereinafter referred to as "Southern Trust"), and herewith files its Complaint For Declaratory Relief, and shows the Court the following:

1.

Southern Trust is a Georgia corporation organized and existing under the laws of the State of Georgia, having its principal place of business in Macon, Georgia. Southern Trust is and

was an insurance company authorized to transact business in Georgia at all times relevant to this action.

2.

Defendant Carol A. Bechtel is a plaintiff in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

3.

Defendant Paula Yockel is a plaintiff in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

4.

Defendant Anthony Schuchman is a plaintiff in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

4

5.

Defendant Eleanor Kitter Dent is a plaintiff in the underlying matter designated as <u>In Re:</u> <u>Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

6.

Defendant Lorie Ann Walley is a plaintiff in the underlying matter designated as <u>In Re:</u> <u>Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

7.

Defendant Carlton Dale Rice is a plaintiff in the underlying matter designated as <u>In Re:</u> <u>Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

8.

Defendant Timothy Todd Rice is a plaintiff in the underlying matter designated as <u>In Re:</u> <u>Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. At

his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

9.

Defendant Damian Walley is a plaintiff in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. At his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

10.

Defendant Virginia Rice Ellington is a plaintiff in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. At his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

11.

Defendant Tri-State Crematory, Inc., a defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Liaison/Lead Counsel for Tri-State Crematory, Inc., McCracken Poston, Jr. at the Office of McCracken Poston, 62 Nance Lane, Ringgold, GA 30736.

12.

Defendant T. Ray Brent Marsh, defendant in the underlying matter designated as <u>In Re:</u> <u>Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Marshes' Liaison/Lead Counsel, Frank E. Jenkins, III at the office of Jenkins & Olson, P.C., 15 South Public Square, Cartersville, GA 30120.

13.

Defendant Clara C. Marsh, defendant in the underlying matter designated as <u>In Re: Tri-</u> <u>State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Marshes' Liaison/Lead Counsel, Frank E. Jenkins, III at the office of Jenkins & Olson, P.C., 15 South Public Square, Cartersville, GA 30120.

14.

Defendant Rhames L. Marsh, defendant in the underlying matter designated as <u>In Re:</u> <u>Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Marshes' Liaison/Lead Counsel, Frank E. Jenkins, III at the office of Jenkins & Olson, P.C., 15 South Public Square, Cartersville, GA 30120.

15.

Defendant Samuel Marsh, defendant in the underlying matter designated as <u>In Re: Tri-</u> <u>State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Marshes' Liaison/Lead Counsel, Frank E. Jenkins, III at the office of Jenkins & Olson, P.C., 15 South Public Square, Cartersville, GA 30120.

16.

Defendant Buckner-Rush Enterprises, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

17.

Defendant Prime Succession Holding, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

18.

Defendant Prime Succession, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

19.

Defendant Prime Succession of Tennessee, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

20.

Defendant Burt Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

21.

Defendant Ewton Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

22.

Defendant Franklin-Strickland Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

23.

Defendant Avery Bryan Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

24.

Defendant Service Corporation International, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

25.

Defendant SCI Tennessee Funeral Services, Inc., d/b/a Chattanooga Funeral Home – West Chapel, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

26.

Defendant SCI Tennessee Funeral Services, Inc., d/b/a Chattanooga Funeral Home – East Chapel, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

27.

Defendant SCI Tennessee Funeral Services, Inc., d/b/a Chattanooga Funeral Home – North Chapel, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and

Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

28.

Defendant SCI Tennessee Funeral Services, Inc., d/b/a Hooper Funeral Homes, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

29.

Defendant Kerby Funeral Home, LLC, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

30.

Defendant J. D. Hill Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

31.

Defendant Erwin Pettit Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467,

11

may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead

Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

32.

Defendant Carriage Services, Inc., defendant in the underlying matter designated as In

Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served

with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

33.

Defendant Carriage Funeral Holdings, Inc., d/b/a Williamson & Sons Funeral Home,

defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-

District Litigation Docket No. 1467, may be served with Summons and Complaint via the

Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615

West First Street, Rome, GA 30162.

34.

Defendant Carriage Funeral Holdings, Inc., d/b/a Lane Funeral Home, defendant in the

underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation

Docket No. 1467, may be served with Summons and Complaint via the Funeral Home

Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First

Street, Rome, GA 30162.

35.

Defendant Jesse Jones Funeral Home, Inc., defendant in the underlying matter designated

as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be

served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

36.

Defendant Kerby Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

37.

Defendant Layne Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

38.

Defendant Putnam Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

39.

Defendant Sequatchie Valley Memorial Funeral Home & Gardens, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home

Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

40.

Defendant Taylor Funeral Home of Chattanooga, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

41.

Defendant Wann Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

42.

Defendant Love Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

43.

Defendant R. D. Moore Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

14

44.

Defendant Willis Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

45.

Defendant W. L. Wilson & Sons, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

46.

Defendant Wilson Funeral Home Wallis Stewart Chapel, LLC, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

47.

Defendant Ryan Funeral Home, LLC, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

48.

Defendant Gilmore Funeral Home, LLC, defendant in the underlying matter designated

as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be

served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

49.

Defendant Vanderwall Funeral Home, Inc., defendant in the underlying matter designated

as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be

served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

50.

Defendant Turner Funeral Home, Inc., defendant in the underlying matter designated as

In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served

with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

51.

Defendant Pikeville Funeral Home, Inc., defendant in the underlying matter designated as

In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served

with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

52.

Defendant Patton's Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

53.

Defendant Pinkard & Mee Funeral Service, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

54.

Defendant Julian Peeples Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

55.

Defendant Peeples Funeral Home, Does 1 to 100, inclusive, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

56.

Defendant Walter L. Crox, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via J. Charles Wilson, Office of J. Charles Wilson, 2151 Government Street, Mobile, AL 36606.

57.

Defendant Barbara Crox, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via J. Charles Wilson, Office of J. Charles Wilson, 2151 Government Street, Mobile, AL 36606.

58.

Defendant Joe C. Oden, Jr., proposed intervenor in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

59.

Defendant James Greer, proposed intervenor in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

60.

Defendant David Randolph Smith, intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via David Randolph Smith, David Randolph Smith & Associates, 1910 Acklen Avenue, Nashville, TN 37212.

61.

Defendant Alex Kitchens, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

62.

Defendant Etta Lee Smith, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

63.

Defendant Karen Partin, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

64.

Defendant Janice Burch Risley, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

65.

Defendant Heather Marie Ross, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

66.

Defendant Eloise Phillips, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

67.

Defendant David Pelletier, proposed intervenor in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Proposed Intervenor's Liaison/Lead Counsel, Warren N. Coppedge, Jr., Coppedge & Leman, 508 South Thornton Avenue, Dalton, GA 30720.

68.

Defendant Naomi Webb is a plaintiff in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

69.

Defendant Thomas G. Conyers is a plaintiff in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, and may be served with the Summons and Complaint via the Plaintiffs' Liaison Counsel, Robert Smalley, Esq. at his office, located at the law firm of McCamy, Phillips, Tuggle and Fordham, P.O. Box 1105, 411 West Crawford Street, Dalton, Georgia, 30722.

70.

Defendant Tommy Ray Marsh, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Marshes' Liaison/Lead Counsel, Frank E. Jenkins, III at the office of Jenkins & Olson, P.C., 15 South Public Square, Cartersville, GA 30120.

71.

Defendant Bob Foster, d/b/a Foster & Son Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants

21

Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

72.

Defendant Cagle Funeral Home, Inc., defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

73.

Defendant Cumberland Funeral Services, Incorporated, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

74.

Defendant Cumberland Funeral Home, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

75.

Defendant Cumberland Funeral Home – Tracy City, defendant in the underlying matter designated as <u>In Re: Tri-State Crematory Litigation</u>, Multi-District Litigation Docket No. 1467,

may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead

Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

76.

Defendant Family Mortuary, Inc., defendant in the underlying matter designated as In Re:

Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with

Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson

Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

77.

Defendant Foster & Lay Funeral Home, defendant in the underlying matter designated as

In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served

with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

78.

Defendant Hardwick & Sons Funeral Home, Inc., defendant in the underlying matter

designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467,

may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead

Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

79.

Defendant House of Overstreet Mortuary, Inc., defendant in the underlying matter

designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467,

may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead

Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

80.

Defendant J. Avery Bryan Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

81.

Defendant Julian Peeples Memorial Chapel, Inc., d/b/a Julian Peeples Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

82.

Defendant Peeples Funeral Home, Inc., d/b/a Peeples Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

83.

Defendant R. Dudley Barton & Son Funeral Home, Inc., defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants

Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

84.

Defendant SCI Alabama Funeral Services, Inc., d/b/a Kerby Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

85.

Defendant SCI Georgia Funeral Services, Inc., d/b/a J. D. Hill Funeral Services, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

86.

Defendant SCI Georgia Funeral Services, Inc., d/b/a Jennings Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

87.

Defendant SCI Georgia Funeral Services, Inc., d/b/a Jennings Heritage Chapel Funeral

Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation,

Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the

Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615

West First Street, Rome, GA 30162.

88.

Defendant SCI Georgia Funeral Services, d/b/a Parnick Jennings Funeral Home,

defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-

District Litigation Docket No. 1467, may be served with Summons and Complaint via the

Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615

West First Street, Rome, GA 30162.

89.

SCI Georgia Funeral Services, d/b/a Edwin Pettit Funeral Home, defendant in the

underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation

Docket No. 1467, may be served with Summons and Complaint via the Funeral Home

Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First

Street, Rome, GA 30162.

90.

SCI Georgia Funeral Services, d/b/a J. Avery Bryan of Chickamauga, defendant in the

underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation

Docket No. 1467, may be served with Summons and Complaint via the Funeral Home

Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

91.

SCI Georgia Funeral Services, a/k/a Greg Kenemer, d/b/a Kenemer Brother Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

92.

SCI Georgia Funeral Services, Inc., d/b/a Wallis Stewart Funeral Home, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

93.

SCI Tennessee Funeral Services, Inc., d/b/a Chattanooga Funeral Home – Valley View Chapel, defendant in the underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

94.

SCI Tennessee Funeral Services, Inc., d/b/a Fike Funeral Home, defendant in the

underlying matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation

Docket No. 1467, may be served with Summons and Complaint via the Funeral Home

Defendants Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First

Street, Rome, GA 30162.

95.

Thomas and Son Funeral Home, Inc., defendant in the underlying matter designated as In

Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served

with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

96.

Wallis – Wilbanks Funeral Home, L.L.C., defendant in the underlying matter designated

as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be

served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J.

Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

97.

Wilson Funeral Home – Lafayette Chapel, L.L.C., defendant in the underlying matter

designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467,

may be served with Summons and Complaint via the Funeral Home Defendants Liaison/Lead

Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

98.

Wilson Funeral Home – J. Avery Bryan Chapel, L.L.C., defendant in the underlying

matter designated as In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No.

1467, may be served with Summons and Complaint via the Funeral Home Defendants

Liaison/Lead Counsel, J. Anderson Davis at the Omberg House, 615 West First Street, Rome,

GA 30162.

99.

Covenant Funeral Service, defendant in the underlying matter designated as In Re: Tri-

State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served with

Summons and Complaint via the Funeral Home Defendants Liaison/Lead Counsel, J. Anderson

Davis at the Omberg House, 615 West First Street, Rome, GA 30162.

100.

Defendant Warren N. Coppedge, Jr., intervenor in the underlying matter designated as In

Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467, may be served

with Summons and Complaint via Warren N. Coppedge, Jr., Coppedge & Leman, 508 South

Thornton Avenue, Dalton, GA 30720.

101.

This action is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. 2201 and 28

U.S.C. 2202 which Act specifically gives this Court jurisdiction over cases of actual controversy

to determine the rights and other legal relations of any party petitioning for such declaration.

102.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, 28 U.S.C. 1332(a) and 28 U.S.C. 1337.

103.

Venue is proper in this Court pursuant to 28 U.S.C. 1391.

104.

Southern Trust issued a Commercial General Liability policy of insurance to Cagle Funeral Home, Inc. (a Funeral Home Defendant In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467) on January 11, 1988, (hereinafter "the CGL policy"). This policy remained in effect and was renewed on various occasions until January 08, 1999 when it was cancelled due to non-payment of premiums. The Commercial General Liability policy issued to Cagle Funeral Home, Inc. in 1988 was originally issued as policy number CPP 558 but renumbered as policy number CPP 90345 on January 8, 1992. A true and correct copy of policy number CPP 90345 issued to Cagle Funeral Home, Inc. is attached hereto and incorporated herein as Exhibit "A."

105.

Southern Trust issued an Umbrella Liability policy to Cagle Funeral Home, Inc. on January 08, 1995, (hereinafter "the Umbrella policy"). This policy remained in effect and was renewed on various occasions until January 08, 1999 when it was cancelled due to non-payment of premiums. The Umbrella Liability policy issued to Cagle Funeral Home, Inc. in 1995 was issued as policy number ULC 90345. A true and correct copy of policy number ULC 90345 issued to Cagle Funeral Home, Inc. is attached hereto and incorporated herein as Exhibit "B."

30

106.

The CGL policy issue to Cagle Funeral Home, Inc. contained the following exclusion from coverage:

> **EXCLUSION – DESIGNATED PROFESSIONAL SERVICES**
>
> This endorsement modifies insurance provided under the following:
>
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
> SCHEDULE
>
> **Description of Professional Services**
>
> 1.    FUNERAL HOME
>
> *              *              *
>
> With respect to any professional services shown in the Schedule, this insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" due to the rendering or failure to render any professional service.

A true and correct copy of this CGL policy exclusion from coverage is attached hereto and incorporated herein by reference in Exhibit "A."

107.

The Umbrella policy issued to Cagle Funeral Home, Inc. contained the following exclusion from coverage:

> **<u>PROFESSIONAL LIABILITY</u>**
>
> This insurance does not apply to injury or damage arising out of the rendering or failure to render the professional services described below by any insured or by any person for whose acts or omission any insured is legally responsible.

31

Description of Professional Services:

1)    MORTICIANS SERVICES

2)    BODY PREPARATION

3)    FUNERAL DIRECTOR SERVICES

A true and correct copy of this Umbrella policy exclusion from coverage is attached hereto and incorporated herein by reference in Exhibit "B."

108.

A legal action has been brought against Cagle Funeral Home, Inc. in the underlying class action (In Re: Tri-State Crematory Litigation, Multi-District Litigation Docket No. 1467) seeking recovery of damages allegedly caused by Defendant Cagle Funeral Home, Inc.'s improper provision of funeral services.  A true and correct copy of the class action Complaint is attached hereto and incorporated herein by reference as Exhibit "C."

109.

Defendant Cagle Funeral Home, Inc. has demanded that Southern Trust provide a defense to and indemnify it against the claims made in the underlying class action litigation.

110.

The loss or damage alleged in the underlying class action arose from Cagle Funeral Home, Inc.'s alleged failure to provide proper funeral and body preparation services.

111.

The loss or damage alleged in the underlying class action is not "property damage" as that term is defined in the CGL and Umbrella policies.

32

112.

The loss or damage alleged in the underlying class action is not "bodily injury" as that term is defined in the CGL and Umbrella policies.

113.

The loss or damage alleged in the underlying class action was "intended or expected" by Defendant Cagle Funeral Home, Inc. as that term is defined in the CGL and Umbrella policies.

114.

The loss or damage alleged in the underlying class action resulted from the intentional act or omission of Defendant Cagle Funeral Home, Inc.

115.

The loss or damage alleged in the underlying class action resulted from an alleged breach of contract or agreement by Defendant Cagle Funeral Home, Inc.

116.

Based upon the allegations contained in the underlying class action Complaint, attached hereto as Exhibit "C," and the known facts surrounding the claims contained therein, Southern Trust believes that it is not obligated to provide a defense or indemnity to Defendant Cagle Funeral Home, Inc. for the claims made against it in the underlying class action litigation.

117.

Southern Trust's actions have at all times been pursuant to and in accordance with a full reservation of all rights found in the policy of insurance and under the laws of the State of Georgia.

118.

Southern Trust brings this action in good faith showing the Court that there exists a substantial controversy as to the rights, duties and obligations under the CGL and Umbrella policies of insurance issued to Cagle Funeral Home, Inc.

119.

An immediacy of choice has been placed upon Southern Trust to determine the proper course of action and to avoid the accrual of damages and penalties.

120.

Southern Trust shows that the adjudication of its rights, duties and obligations under the policies is necessary to relieve it from the risk of taking undirected action pursuant to the claim and demand for coverage submitted by Defendant Cagle Funeral Home, Inc.

121.

Southern Trust shows this Honorable Court that all parties are interested in a determination of their respective rights and liabilities of each party and respectfully submits that the ends of justice require declaratory relief.

**WHEREFORE**, Plaintiff and Petitioner, Southern Trust Insurance Company, prays for the following relief:

(a)     That process issue as required by law and that the Defendants, including Defendant Cagle Funeral Home, Inc. be served with a copy of this Petition and all attachments and exhibits, by and through their Liaison/Lead Counsel and designated class representatives;

(b)    That a Declaratory Judgment be rendered by this Honorable Court to determine

the rights, duties and obligations of Southern Trust to Defendant Cagle Funeral Home, Inc., if

any;

(c)    A trial by jury on all issues of fact; and

(d)    Such other relief as this Honorable Court may deem just and proper.

Respectfully submitted,

WEBB, ZSCHUNKE, NEARY
& DIKEMAN, LLP

By: _____
MARVIN D. DIKEMAN
Georgia State Bar No. 221760

By: _____
ERIC J. SHARON
Georgia State Bar No.  637948

Fifteen Piedmont Center
Suite 1020
3575 Piedmont Road
Atlanta, Georgia 30305
(404) 264-1080
(404) 264-4520 / fax

**Southern Trust**
Southern Trust Insurance Company

# AUDIT REPORT AND PREMIUM ADJUSTMENT ENDORSEMENT

Attached to and forming a Part of:

Policy Number CPP 90345

Date 3/4    1997

Policy Period 1/8/96 - 1/8/97

Audit Report Period 1/1/96 - 1/1/97

Insured

| CAGLE FUNERAL HOME, INC. & |
| DBA SUNRISE MEMORIAL GARDENS |
| 665 CHURCH ST. |
| JASPER, GA  30143 |

[ ] Interim Premium Adjustment

[ ] Final Premium Adjustment

[ ] Workmen's Compensation

[X] General Liability

[ ] [                                              ]

| Description of Work and Locations | State | Code | Premium Basis | [X] Premises/ Operations(334) | | [ ] Products/Comp. Oper. (336) [ ] Workmen's Comp | |
|---|---|---|---|---|---|---|---|
| | | | | Rate | Earned Premiums | Rate | Earned Premium |
| FUNERAL HOMES | GA | 43889 | 1,049,978 | 1.638 | 1,720.00 | | |
| | | | (a) Area (Sq. Ft.) (b) Frontage (c) Remuneration (d) Receipts (e) Units (f) Cost (g) Sales (h) | | | | |

Type of Audit-Report

[ ] Voluntary

[X] Physical

| | Premises/Operations | | |
|---|---|---|---|
| Total Earned Premiums | 1,720.00 | | |
| Deposit and/or Reported Premiums | 888.00 | | |
| Additional Premiums | 832.00 | | |
| Return Premiums | | | |
| Net Premium Adjustment | | Add'l | 832.00 |
| | | Return | |

Agency

| 0019-HAMRICK INSURANCE AGENCY |
| |
| 3/7/97 CVR |

*Scot D Deagan*

Authorized Representative

ST-1047



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

# CPP 90345
# January 1995-1998

EXHIBIT A

**Southern Trust**
Southern Trust Insurance Company

AUDIT REPORT AND PREMIUM ADJUSTMENT ENDORSEMENT

Attached to and forming a Part of:

Policy Number CPP 90345

Date 3/4    1997

Policy Period 1/8/97 – 1/8/98

Audit Report Period 1/1/96 – 1/1/97

Insured

CAGLE FUNERAL HOME, INC. &

DBA SUNRISE MEMORIAL GARDENS

665 CHURCH ST.

JASPER, GA  30143

[ ] Interim Premium Adjustment

[ ] Final Premium Adjustment

[ ] Workmen's Compensation

[X] General Liability

[ ] [                                    ]

| Description of Work and Locations | State | Code | Premium Basis | [X] Premises/ Operations(334) | | [ ] Products/Comp. Oper. (336) [ ] Workmen's Comp | |
|---|---|---|---|---|---|---|---|
| | | | | Rate | Earned Premiums | Rate | Earned Premium |
| FUNERAL HOMES | GA | 43889 | 1,049,978 | 1.215 | 1,275.00 | | |
| | | | (a) Area (Sq. Ft.) (b) Frontage (c) Remuneration (d) Receipts (e) Units (f) Cost (g) Sales (h) | | | | |

| | | | |
|---|---|---|---|
| Total Earned Premiums | 1,275.00 | | |
| Deposit and/or Reported Premiums | 659.00 | | |
| Additional Premiums | 616.00 | | |
| Return Premiums | | | |
| Net Premium Adjustment | Add'l | 616.00 | |
| | Return | | |

Type of Audit-Report

[ ] Voluntary

[X] Physical

Agency

0019-HAMRICK INSURANCE AGENCY

3/7/97 CVR

*Scot D Deagan*
Authorized Representative

ST-1047

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLICY CHANGES

Policy Change
Number  4

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| CPP 90345 | 02/20/97 | SOUTHERN TRUST INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| CAGLE FUNERAL HOME, INC. & DBA SUNRISE MEMORIAL GARDENS 665 CHURCH STREET JASPER, GA  30143 | 0019- HAMRICK INSURANCE AGENCY |

COVERAGE PARTS AFFECTED
COMMERCIAL PROPERTY     COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE

### CHANGES

It is hereby understood and agreed that Sign Coverage is
added to the policy as per the attached.

The pro-rata additional premium is $313.11.

The new annual premium is $6,281.00.

MORTG/

ATLANTA POSTAL CREDIT UNION
3900 CROWN ROAD
ACT. #35148
ATLANTA, GA  30334                          3/7/97   CVR

Authorized Representative Signature

IL 12 01 11 85

**SIGNS DECLARATIONS**

**POLICY NO. CPP 90345**                              **EFFECTIVE DATE 02/20/97**

**PREMIUM FOR THIS COVERAGE FORM $ INCL**            **RATE $ INCL**

**LIMITS OF INSURANCE**

---

| Type of Sign | Lettering | Location | Limit of Insurance |
|---|---|---|---|
| | | 665 CHURCH ST.,JASPER, GA | $ 8,000.00 |
| | | | $ |
| | | | $ |
| | | | $ |
| | | Total | $ 8,000.00 |

**DEDUCTIBLE**

---

The Deductible amount is $100 unless otherwise stated                     $

**SPECIAL PROVISIONS (if any)**

---

## POLICY CHANGES

Policy Change
Number 3

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| CPP 90345 | 01/08/97 | SOUTHERN TRUST INSURANCE COMPANY |

NAMED INSURED                          AUTHORIZED REPRESENTATIVE

CAGLE FUNERAL HOME, INC. &             0019-
DBA SUNRISE MEMORIAL GARDENS           HAMRICK INSURANCE AGENCY
665 CHURCH STREET
JASPER, GA  30143

COVERAGE PARTS AFFECTED
COMMERCIAL PROPERTY      COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE

### CHANGES

It is hereby understood and agreed that the policy is
amended to reflect current rates.

There is no change in premium.

MORTG/

ATLANTA POSTAL CREDIT UNION
3900 CROWN ROAD
ACT. #35148
ATLANTA, GA  30334                     12/10/96 CVR

_Sist D. Deagan_

Authorized Representative Signature

IL 12 01 11 85

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.



**Amended**

## POLICY CHANGES

Policy Change
Number  2

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| CPP 90345 | 01/08/96 | SOUTHERN TRUST INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| CAGLE FUNERAL HOME, INC. & DBA SUNRISE MEMORIAL GARDENS 665 CHURCH STREET JASPER, GA  30143 | 0019- HAMRICK INSURANCE AGENCY |

COVERAGE PARTS AFFECTED
COMMERCIAL PROPERTY    COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE

### CHANGES

It is hereby understood and agreed that the policy is
amended to reflect current rates.

Location 2-1, HWY. 53 WEST, JASPER, GA, is added to the
policy with $340,000 Building Coverage, Special Form,
Replacement Cost, $1,000 Deductible, 90% Coinsurance,
$20,000 Extra Expense, NC Construction and occupied as
Mausoleum.  Forms CP0050 and CP1030 are added to the policy
as per the attached.

Form CG2144 is added to Location 2 as per the attached.

The new annual premium is $5,310.00.

MORTG/

ATLANTA POSTAL CREDIT UNION
3900 CROWN ROAD
ACT. #35148
ATLANTA, GA  30334                          11/14/96 CVR

_Scot D. Deagan_
Authorized Representative Signature

IL 12 01 11 85

POLICY NUMBER: CPP ..  45                          CC.  RCIAL GENERAL LIABILITY

**.THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

### SCHEDULE

Premises:

**665 CHURCH STREET
JASPER, GA**

**HWY, 53 WEST
JASPER, GA**

Project:

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury","property damage","personal injury","advertising inury" and medical expenses arising out of:

1. The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

2. The project shown in the Schedule.

CG 21 44 11 85                    Copyright. Insurance Services Office, Inc., 1984

THIS ENDORSEME__ : ANGES THE POLICY. PLEAS_ ' \D IT CAREFULLY.

## POLICY CHANGES

Policy Change
Number 2

-------------------------------------------------------------------------

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
| --- | --- | --- |
| CPP 90345 | 01/08/96 | SOUTHERN TRUST INSURANCE COMPANY |

-------------------------------------------------------------------------

NAMED INSURED                          AUTHORIZED REPRESENTATIVE

CAGLE FUNERAL HOME, INC. &             0019-
DBA SUNRISE MEMORIAL GARDENS           HAMRICK INSURANCE AGENCY
665 CHURCH STREET
JASPER, GA  30143

-------------------------------------------------------------------------

COVERAGE PARTS AFFECTED
COMMERCIAL PROPERTY     COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE

-------------------------------------------------------------------------

### CHANGES

It is hereby understood and agreed that the policy is
amended to reflect current rates.

The new annual premium is $5,310.00.

MORT./

ATLANTA POSTAL CREDIT UNION
3900 CROWN ROAD
ACT. #35148
ATLANTA, GA  30334

1/11/96 CVR

------------------------------------------------------

_Sut D Deagan_
Authorized Representative Signature

IL 12 01 11 85

**THIS ENDORSEME _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _**

THIS ENDORSEME `HANGES THE POLICY. PLEAS` `AD IT CAREFULLY.`

Amended

**POLICY CHANGES**

Policy Change
Number 1

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| CPP-90345 | 01/08/95 | SOUTHERN TRUST INSURANCE COMPANY |

NAMED INSURED

CAGLE FUNERAL HOME, INC. &
DBA SUNRISE MEMORIAL GARDENS
665 CHURCH ST.
JASPER, GA 30143

AUTHORIZED REPRESENTATIVE

0019-
HAMRICK INSURANCE AGENCY

COVERAGE PARTS AFFECTED
COMMERCIAL PROPERTY   COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE

### CHANGES

It is hereby understood and agreed that Premises 1 Building
1 is increased to $500,000, Contents Coverage is increased
to $250,000. Premises 1 Building 2 is deleted from the
policy, it is connected to Building 1. The property
deductible is amended to $1,000. The General Aggregate
Limit is amended to $1,000,000, the Each Occurrence Limit
is amended to $500,000, Products & Completed Operations
Limit is amended to $1,000,000 and Personal Advertising
Limit is amended to $500,000.

The manufacturer for the backhoe listed on ST1298 is amended
to JOHN DEERE. The valuation is amended to replacement
cost. The Business Income Coverage is $60,000.

The new annual premium is $4,608.00.

ATLANTA POSTAL CREDIT UNION
3900 CROWN ROAD ACT. 35148
ATLANTA, GA 30334                    12/10/96 CVR

_Sct D Deagan_

Authorized Representative Signature

IL 12 01 11 85

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

POLICY CHANGES

Policy Change
Number  1

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

POLICY NUMBER      POLICY CHANGES      COMPANY
                   EFFECTIVE

CPP-90345          01/08/95            SOUTHERN TRUST INSURANCE COMPANY

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

NAMED INSURED                          AUTHORIZED REPRESENTATIVE

CAGLE FUNERAL HOME, INC. &             0019--
DBA SUNRISE MEMORIAL GARDENS           HAMRICK INSURANCE AGENCY
665 CHURCH ST.
JASPER, GA  30143

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

COVERAGE PARTS AFFECTED
COMMERCIAL PROPERTY      COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

CHANGES

It is hereby understood and agreed that Premises 1 Building
1 is increased to $500,000, Contents Coverage is increased
to $250,000.  Premises 1 Building 2 is deleted from the
policy, it is connected to Building 1.  The property
deductible is amended to $1,000.  The General Aggregate
Limit is amended to $500,000 and the Each Occurrence Limit
is amended to $500,000.


The manufacturer for the backhoe listed on ST1298 is amended
to JOHN DEERE.  The valuation is amended to replacement
cost.  The Business Income of Coverage is $60,000.

The new annual premium is $4,608.00.


2/27/95 cvr


++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

                                       _____
                                       Authorized Representative Signature

IL 12 01 11 85

RENEWAL                                          FACSIMILE
Renewal of Number

## COMMERCIAL LINES POLICY
## COMMON POLICY DECLARATIONS

Policy No.  CPP 90345                0019- HAMRICK INS. AGENCY

Named Insured and Mailing Address  (No.,Street,Town or City,County,State, Zip Code)
   CAGLE FUNERAL HOME, INC. &
   DBA SUNRISE MEMORIAL GARDENS
   665 CHURCH STREET
   JASPER, GA  30143

   Policy Period: From  01/08/95  to 01/08/98  at 12:01 A.M. Standard Time at
                                          your mailing address shown above.

Business  escription :FUNERAL HOME
IN RETURN FOR THE  MENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS
INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  |  | PREMIUM |
|---|---|---|
| Commercial Property Coverage Part | $ | INCL |
| Commercial General Liability Coverage Part | $ | INCL |
| Commercial Crime Coverage Part | $ |  |
| Commercial Inland Marine Coverage Part | $ | INCL |
| Commercial Auto Coverage Part | $ |  |
|  | $ |  |
|  | $ |  |
| TOTAL | $ | 3,317.00 |

Premium shown is payable: $ 3,317.00  at inception; $   TBD 1st Anniversary;
                                                      TBD 2nd Anniversary

Form(s) and Endorsement(s) made a part of this policy at time of issue*:
IL0017(1185)  IL0003(0689)  IL0262(1193)

11/22/94 CVR

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersigned:                      By _____
                                          Authorized Representative
THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE
FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.
JDL 190(0)-O(Ed.11-85) Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright,Insurance Services Office,Inc.,1983, 1984.

# Southern Trust Insurance Company

RENEWAL
Renewal of Number ·

**COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS**

FACSIMILIE

Policy No. CPP 90345

**Named Insured and Mailing Address** (No., Street, Town or City, County, State, Zip Code)*
CAGLE FUNERAL HOME, INC. &
DBA SUNRISE MEMORIAL GARDENS
665 CHURCH STREET
JASPER, GA 30143

XX Supplemental Declarations is attached.

**Policy Period: From** 01/08/95 **to** 01/08/98 at 12:01 A.M. Standard Time at your mailing address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**BUSINESS DESCRIPTION\***

**DESCRIPTION OF PREMISES**

| PREM. NO. | BLDG. NO. | LOCATION, CONSTRUCTION AND OCCUPANCY |
|---|---|---|
| 1 | 1 | 665 CHURCH STREET, JASPER, GA BRICK/VEN. FUNERAL HOME, |

**COVERAGES PROVIDED** –INSURANCE AT THE DESCRIBED PREMISES APPLIES ONLY FOR COVERAGES FOR WHICH A LIMIT OF INSURANCE IS SHOWN

| PREM. NO. | BLDG. NO. | COVERAGE | LIMIT OF INSURANCE | COVERED CAUSES OF LOSS | COINSURANCE | RATES |
|---|---|---|---|---|---|---|
| 1 | 1 | BUILDING | 300,000 | BROAD FORM | 90% | INCL. |
| 1 | 1 | CONTENTS | 100,000 | BROAD FORM | 90% | INCL. |

**OPTIONAL COVERAGES** — APPLICABLE ONLY WHEN ENTRIES ARE MADE IN THE SCHEDULE BELOW   IF EXTRA EXPENSE COVERAGE , LIMITS ON LOSS PAYMENT

| PREM. NO. | BLDG. NO. | AGREED VALUE EXPIRATION DATE | COVERAGE | REPLACEMENT COST AMOUNT BUILDING | PERSONAL PROPERTY INCLUDING "STOCK" |
|---|---|---|---|---|---|
| 1 | 1 | / / / / | BI & EE CP0030 | | |

| PREM. NO. | BLDG. NO. | BUILDING | INFLATION GUARD (Percentage) PERSONAL PROPERTY | MONTHLY LIMIT OF INDEMNITY (Fraction) | MAXIMUM PERIOD OF INDEMNITY (X) | EXTENDED PERIOD OF INDEMNITY (Days) |
|---|---|---|---|---|---|---|

**MORTGAGE HOLDER(S)**   APPLIES TO BUSINESS INCOME ONLY

| PREM. NO. | BLDG. NO. | MORTGAGE HOLDER NAME AND MAILING ADDRESS |
|---|---|---|
| 1 | 1 | ATLANTA POSTAL CREDIT UNION  3900 CROWN ROAD, ACT.# 35148  ATLANTA, GA 30334 |

**DEDUCTIBLE**

$250 EXCEPTIONS:

**FORMS AND ENDORSEMENTS** – APPLYING TO THIS COVERAGE PART AND MADE PART OF THIS POLICY AT TIME OF ISSUE**:

APPLICABLE TO ALL COVERAGES:
CP0010(1091)  CP0090(0788)  CP1020(0788)  CP0030(1091)  CP1205(1185)

| APPLICABLE TO SPECIFIC PREMISES/COVERAGES: | PREM NO. | BLDG NO. | COVERAGES | FORM NUMBERS |
|---|---|---|---|---|

**PREMIUM FOR THIS COVERAGE PART**

| TOTAL $ | Payable at inception $ | 1st Anniversary $ | 2nd Anniversary $ |
|---|---|---|---|

Countersigned: *

By _____
Authorized Representative

*Entry optional if shown in Common Policy Declaration
**Forms and Endorsements applicable to this Coverage Part omitted if shown elsewhere in the policy.
THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF. COMPLETE THE ABOVE NUMBERED POLICY.
JDL 190(1)-0 (Ed. 11-85) Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright, Insurance Services Office Inc 1983, 1984.

COMMERCIAL PROPERTY

## COMMERCIAL PROPERTY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

POLICY NO.   CPP 90345          COMPANY   SOUTHERN TRUST INSURANCE COMPANY
++++++++++++++++++++++++++++++++

NAMED INSURED
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
CAGLE FUNERAL HOME, INC. & DBA

DESCRIPTION OF PREMISES
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
PREM. NO. BLDG. NO.   LOCATION, CONSTRUCTION AND OCCUPANCY
1         2           665 CHURCH ST., JASPER, GA          BRICK VENEER                    FUNERAL HOME

COVERAGES PROVIDED
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
PREM. NO. BLDG. NO.   COVERAGE          LIMIT OF INSURANCE   COVERED CAUSES OF LOSS   COINSURANCE*   RATES
                                                                                                    INCL.
1         2           BUILDING          $10,000              SPECIAL FORM             90%            INCL

                        * IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENT

OPTIONAL COVERAGES
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
PREM. NO. BLDG. NO.   AGREED VALUE                        REPLACEMENT COST(x)
                      EXPIRATION DATE COVERAGE     AMOUNT   BUILDING   PERSONAL PROPERTY   INCLUDING "STOCK"
                      / /
                      / /
                      / /

                      INFLATION GUARD(Percentage)    *MONTHLY LIMIT OF   *MAXIMUM PERIOD *EXTENDED PERIOD
                      BUILDING   PERSONAL PROPERTY   INDEMNITY(FRACTION) OF INDEMNITY(X) OF INDEMNITY (DAYS)

                                         *APPLIES TO BUSINESS INCOME ONLY.

MORTGAGE HOLDERS
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
PREM. NO. BLDG. NO.   MORTGAGE HOLDER NAME AND MAILING ADDRESS
1         2           ATLANTA POSTAL CREDIT UNION  3900 CROWN ROAD  ATLANTA, GA 30334 ACCT 35148

FORMS APPLICABLE TO SPECIFIC PREMISES/COVERAGES
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
PREM. NO. BLDG. NO.   COVERAGES               FORM NUMBER

Southern Trust Insurance Company
Macon, Georgia

RENEWAL
Renewal of Number*

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## DECLARATIONS

Policy No.    CPP 90345

**Named Insured and Mailing Address**  (No., Street,Town or City, County,State,Zip Code)*
CAGLE FUNERAL HOME, INC.
& DBA SUNRISE MEMORIAL GARDENS
665 CHURCH STREET
JASPER, GA  30143

**Policy Period*: From** 01/08/95  to 01/08/98  at 12:01 A.M. Standard Time at
your mailing address shown above.
IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
**LIMITS OF INSURANCE**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+

| | |
|---|---|
| General Aggregate Limit (Other Than Products - Completed Operations) | $   300,000 |
| Products -- Completed Operations Aggregate Limit | $   300,000 |
| Personal and Advertising Injury Limit | $   300,000 |
| Each Occurrence Limit | $   300,000 |
| Fire Damage Limit | $    50,000  Any One Fire |
| Medical Expense Limit | $     5,000  Any One Person |

+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
**RETROACTIVE DATE (CG 00 02 only)**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date,
if any, shown here:                                    /  /
                    +=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
                    (Enter Date or "none" if no Retroactive Date applies)
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
**DESCRIPTION OF BUSINESS AND LOCATION OF PREMISES**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
Form of Business:
  Individual     Joint Venture     Partnership    X Organization (Other than Partnership or Joint Venture)
Business Description *:
  FUNERAL HOME


Location of All Premises You Own, Rent or Occupy:
  665 CHURCH STREET          , JASPER, GA
                             .


+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
**PREMIUM**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+

| | | | | Rate | | Advance Premium | |
|---|---|---|---|---|---|---|---|
| Classification | Code No. | Premium Basis | Pr/Co | All Other | Pr/Co | All Other | |
| FUNERAL HOME | 43889 | S)578,846 | INCL | INCL | $INCL | $INCL | |


                              Total Advance Premium  $ Incl.
Premium shown is payable*: $        at inception;$        1st Anniversary;$        2nd Anniversary
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
**FORMS AND ENDORSEMENTS**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
CG0001(1188)  CG2141(1185)  CG2146(0187)  IL0021(1185)  CG2147(0989)  CG2136(1185)
CG2137(1185)  CG2139(1185)  CG2142(1185)  CG2116(1185)


+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+
Countersigned:*
                                   By _____*
                                        Authorized Representative
* Entry optional if shown in Common Policy Declarations.
* Forms and Endorsements applicable to this Coverage Part omittted if shown elsewhere in the policy.
   THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE

## Southern Trust Insurance Company
### Macon, Georgia

**RENEWAL**
**Renewal of Number\***

## COMMERCIAL INLAND MARINE COVERAGE PART
### DECLARATIONS

Policy No.  CPP 90345

**Named Insured and Mailing Address**  (No., Street,Town or City, County,State, Zip Code)\*
CAGLE FUNERAL HOME, INC.
& DBA SUNRISE MEMORIAL GARDENS
665 CHURCH STREET
JASPER, GA  30143

**Policy Period\*: From** 01/08/95  to 01/08/98  at 12:01 A.M. Standard Time at
your mailing address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=
**BUSINESS DESCRIPTION\***
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=
FUNERAL HOME

+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=
**PREMIUM**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=

Premium for this Coverage Part $   Incl.

Premium shown is payable\*: $          at inception; $   TBD  1st Anniversary;$ TBD  2nd Anniversary

+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=
**FORMS AND ENDORSEMENTS**
+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
CM0001(0695)  CM0201(0695)  ST1298

+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=+=

Countersigned:\*

By _____ \*
Authorized Representative

\*Entry optional if shown in Common Policy Declarations.
Forms and Endorsements applicable to this Coverage Part omitted if shown elsewhere in the policy.

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE
FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

JDL 190(4)-0 (Ed.11-85) Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office,Inc., 1983, 1984.

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations

## E. PREMIUMS

The first Named Insured shown in the Declarations

1. Is responsible for the payment of all premiums, and

2. Will be the payee for any return premiums we pay

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was is-
sued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the
premium in accordance with our rates and rules then in effect.

**IL 00 03 06 89**          Copyright, Insurance Services Office, Inc.,  1983, 1988          **Page 1 of 1**     □
                                Copyright, ISO Commercial Risk Services, Inc.,  1983, 1988

IL 02 62 11 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    BUSINESSOWNERS POLICY
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL CRIME COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **A.1.** of the CANCELLATION Common Policy Condition is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation, subject to the following:

    a. If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later.

    b. If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

    Our notice will state the effective date of cancellation, which will be the later of the following:

    (1) 10 days from the date of mailing or delivering our notice, or

    (2) The effective date of cancellation stated in the first Named Insured's notice to us.

**B.** The following is added to the CANCELLATION Common Policy condition and supersedes any other provisions to the contrary:

If we decide to:

1. Cancel or nonrenew this policy; or

2. Increase current policy premium by more than 15% (other than any increase due to change in risk, exposure or experience modification or resulting from an audit of auditable coverages); or

3. Change any policy provision which would limit or restrict coverage;

Then:

We will mail or deliver notice of our action (including the dollar amount of any increase in renewal premium of more than 15%) to the first Named Insured and lienholder, if any, at the last mailing address known to us. Except as applicable as described in Paragraph **C.** below, we will mail or deliver notice at least:

1. 10 days before the effective date of cancellation if this policy has been in effect less than 60 days or if we cancel for nonpayment of premium; or

2. 45 days before the effective date of cancellation if this policy has been in effect 60 or more days and we cancel for a reason other than nonpayment of premium; or

3. 45 days before the expiration date of this policy if we decide to nonrenew, increase the premium or limit or restrict coverage.

Copyright, Insurance Services Office, Inc., 1993
Copyright, ISO Commercial Risk Services, Inc., 1993

CP 00 10 10 91

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H — **DEFINITIONS.**

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:

**a. Building**, meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Permanently installed:

**(a)** Fixtures;

**(b)** Machinery; and

**(c)** Equipment;

**(3)** Outdoor fixtures;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property—Separation of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

**c. Personal Property of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

### 2. Property Not Covered

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;



**1**

Copyright, ISO Commercial Risk Services, Inc., 1990

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

   **(1)** The lowest basement floor; or

   **(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of the building described in the Declarations;

**m.** Underground pipes, flues or drains;

**n.** The cost to research, replace or restore the information on valuable papers and records, including those which exist on electronic or magnetic media, except as provided in the Coverage Extensions;

**o.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

   **(1)** Are licensed for use on public roads; or

   **(2)** Are operated principally away from the described premises.

   This paragraph does not apply to:

   **(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

   **(b)** Vehicles or self-propelled machines, other than autos, you hold for sale; or

   **(c)** Rowboats or canoes out of water at the described premises;

**p.** The following property while outside of buildings:

   **(1)** Grain, hay, straw or other crops;

   **(2)** Fences, radio or television antennas, including their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or

plan... all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

  **a. Debris Removal**

   **(1)** We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

   **(2)** The most we will pay under this Additional Coverage is 25% of:

    **(a)** The amount we pay for the direct physical loss of or damage to Covered Property; plus

    **(b)** The deductible in this policy applicable to that loss or damage.

    But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

   **(3)** This Additional Coverage does not apply to costs to:

    **(a)** Extract "pollutants" from land or water; or

    **(b)** Remove, restore or replace polluted land or water.

  **b. Preservation of Property**

  If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

   **(1)** While it is being moved or while temporarily stored at another location; and

   **(2)** Only if the loss or damage occurs within 10 days after the property is first moved.

  **c. Fire Department Service Charge**

  When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

   **(1)** Assumed by contract or agreement prior to loss; or

   **(2)** Required by local ordinance.

  No Deductible applies to this Additional Coverage.

  **d. Pollutant Clean Up and Removal**

  We will pay your expense to extract "pollutants" from land or water at the described

premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

## 5. Coverage Extensions

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

### a. Newly Acquired or Constructed Property

(1) You may extend the insurance that applies to Building to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is 25% of the Limit of Insurance for Building shown in the Declarations, but not more than $250,000 at each building.

(2) You may extend the insurance that applies to Your Business Personal Property to apply to that property at any location you acquire other than at fairs or exhibitions.

The most we will pay for loss or damage under this Extension is 10% of the Limit of Insurance for Your Business Personal Property shown in the Declara-

tions, but not more than $100,000 at each building.

(3) Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days expire after you acquire or begin to construct the property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date construction begins or you acquire the property.

### b. Personal Effects and Property of Others

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1) Personal effects owned by you, your officers, your partners or your employees. This extension does not apply to loss or damage by theft.

(2) Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

### c. Valuable Papers and Records — Cost of Research

You may extend the insurance that applies to Your Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $1,000 at each described premises.

### d. Property Off-Premises

You may extend the insurance provided by this Coverage Form to apply to your Covered Property, other than "stock", that is temporarily at a location you do not own, lease, or operate. This Extension does not apply to Covered Property:

(1) In or on a vehicle;

(2) In the care, custody or control of your salespersons; or

(3) At any fair or exhibition.

The most we will pay for loss or damage under this Extension is $5,000.

### e. Outdoor Property

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas, signs

(other than signs attach to buildings), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant.

Each of these Extensions is additional insurance. The Additional Condition, Coinsurance, does not apply to these Extensions.

### B. EXCLUSIONS

See applicable Causes of Loss Form as shown in the Declarations.

### C. LIMITS OF INSURANCE

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.** Preservation of Property; or

**2.** Debris Removal; but if:

**a.** The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

**b.** The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;

we will pay up to an additional $5,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

### D. DEDUCTIBLE

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance, after any deduction required by the Coinsurance condition or the Agreed Value Optional Coverage.

### E. LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In The Event Of Loss Or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

4

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**e.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**f.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if:

(1) You have complied with all of the terms of this Coverage Part; and

(2) (a) We have reached agreement with you on the amount of loss; or

(b) An appraisal award has been made.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt

notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage, we will:

**a.** Not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(1) Vandalism;

(2) Sprinkler leakage, unless you have protected the system against freezing;

(3) Building glass breakage;

(4) Water damage;

(5) Theft; or

(6) Attempted theft.

**b.** Reduce the amount we would otherwise pay for the loss or damage by 15%.

A building is vacant when it does not contain enough business personal property to conduct customary operations.

Buildings under construction are not considered vacant.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e.** and **f.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

This provision does not apply to the following even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety glazing material if required by law.

**e.** Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**f.** Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

**(1)** Blank materials for reproducing the records; and

**(2)** Labor to transcribe or copy the records when there is a duplicate.

## F. ADDITIONAL CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in step **(2)**; and

**(4)** Subtract the deductible from the figure determined in step **(3)**.

We will pay the amount determined in step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1** (Underinsurance):

| When: | The value of the property is | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $100,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $ 40,000 |

Step (1): $250,000 × 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 ÷ $200,000 = .50

Step (3): $ 40,000 × .50 = $20,000

Step (4): $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2** (Adequate Insurance):

| When: | The value of the property is: | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $200,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $ 40,000 |

Step (1): $250,000 × 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $200,000 ÷ $200,000 = 1.00

Step (3): $40,000 × 1.00 = $40,000

Step (4): $40,000 − $250 = $39,750

We will cover the $39,750 loss in excess of the Deductible. No penalty applies.

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

| When: | The value of the property is: | |
|---|---|---|
| | Bldg. at Location No. 1 | $ 75,000 |
| | Bldg. at Location No. 2 | $100,000 |
| | Personal Property at Location No. 2 | $ 75,000 |
| | | $250,000 |
| | The Coinsurance percentage for it is | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $180,000 |
| | The Deductible is | $1,000 |
| | The amount of loss is Bldg. at Location No. 2 | $30,000 |

Personal Property at
Location No. 2        $20,000
                     ‾‾‾‾‾‾‾‾
                     $50,000

Step (1): $250,000 × 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $50,000 × .80 = $40,000

Step (4): $40,000 − $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgage Holders**

  **a.** The term "mortgage holder" includes trustee.

  **b.** We will pay for covered loss of or damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear.

  **c.** The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure.

  **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

    **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

    **(2)** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

    **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

All of the terms of this Coverage Part will then apply directly to the mortgage holder.

  **e.** If we pay the mortgage holder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

    **(1)** The mortgage holder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

    **(2)** The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

  **f.** If we cancel this policy, we will give written notice to the mortgage holder at least:

    **(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

  **g.** If we elect not to renew this policy, we will give written notice to the mortgage holder at least 10 days before the expiration date of this policy.

**G. OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

**1. Agreed Value**

  **a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

  **b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

  **c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

    **(1)** On or after the effective date of this Optional Coverage; and

    **(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

  **a.** The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

  **b.** The amount of increase will be:

    **(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

    **(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

    **(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

If: The applicable Limit
      of Insurance is        $100,000

The annual percentage
      increase is              8%

The number of days
      since the beginning
      of the policy year
      (or last policy
      change) is               146

The amount of increase is
      $100.000 x .08 x 146 ÷ 365 =
                              $3,200

## 3. Replacement Cost

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition. Valuation, of this Coverage Form.

**b.** This Optional Coverage does not apply to:

   **(1)** Property of others;

   **(2)** Contents of a residence;

   **(3)** Manuscripts;

   **(4)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

   **(5)** "Stock", unless the including "Stock" option is shown in the Declarations.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value ba-

sis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

   **(1)** Until the lost or damaged property is actually repaired or replaced; and

   **(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of:

   **(1)** The Limit of Insurance applicable to the lost or damaged property;

   **(2)** The cost to replace, on the same premises, the lost or damaged property with other property:

      **(a)** Of comparable material and quality; and

      **(b)** Used for the same purpose; or

   **(3)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

## H. DEFINITIONS

**1.** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**2.** **"Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in *Commercial Property Coverage Forms*.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

**1.** We cover loss or damage commencing:

    **a.** During the policy period shown in the Declarations; and

    **b.** Within the coverage territory.

**2.** The coverage territory is:

    **a.** The United States of America (including its territories and possessions);

    **b.** Puerto Rico; and

    **c.** Canada.

 Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

COMMERCIAL PROPERTY

# CAUSES OF LOSS – BROAD FORM

## A. COVERED CAUSES OF LOSS

When Broad is shown in the Declarations, Covered Causes of Loss means the following:

**1. Fire.**

**2. Lightning.**

**3. Explosion,** including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by:

   **a.** Rupture, bursting or operation of pressure relief devices; *or*

   **b.** Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

**4. Windstorm or Hail,** but not including:

   **a.** Frost or cold weather;

   **b.** Ice (other than hail), snow or sleet, whether driven by wind or not; or

   **c.** Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.

**5. Smoke** causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.

**6. Aircraft or Vehicles,** meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, *a vehicle or an object thrown* up by a vehicle with the described property or with the building or structure containing the described property. This cause of loss includes loss or damage by objects falling from aircraft.

We will not pay for loss or damage caused by or resulting from vehicles you own or which are operated in the course of your business.

**7. Riot or Civil Commotion,** including:

   **a.** Acts of striking employees while occupying the described premises; and

   **b.** Looting occurring at the time and place of a riot or civil commotion.

**8. Vandalism,** meaning willful and malicious damage to, or destruction of, the described property.

We will not pay for loss or damage:

   **a.** To glass (other than glass building blocks) that is part of a building, structure, or an outside sign; but we will pay for loss or damage to other property caused by or resulting from breakage of glass by vandals.

   **b.** Caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

**9. Sprinkler Leakage,** meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

If the building or structure containing the Automatic Sprinkler System is Covered Property, we will also pay the cost to:

   **a.** Repair or replace damaged parts of the Automatic Sprinkler System if the damage:

      **(1)** Results in sprinkler leakage; or

      **(2)** Is directly caused by freezing.

   **b.** Tear out and replace any part of the building or structure to repair damage to the Automatic Sprinkler System that has resulted in sprinkler leakage.

Automatic Sprinkler System means:

   **(a)** Any automatic fire protective or extinguishing system, including connected:

      **(i)** Sprinklers and discharge nozzles;

      **(ii)** Ducts, pipes, valves and fittings;

      **(iii)** Tanks, their component parts and supports; and

      **(iv)** Pumps and private fire protection mains.

(b) When supplied from an automatic fire protective system:

    (i) Non-automatic fire protective systems; and

    (ii) Hydrants, standpipes and outlets.

10. **Sinkhole Collapse,** meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

    **a.** The cost of filling sinkholes; or

    **b.** Sinking or collapse of land into man-made underground cavities.

11. **Volcanic Action,** meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    **a.** Airborne volcanic blast or airborne shock waves;

    **b.** Ash, dust or particulate matter; or

    **c.** Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

This cause of loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

12. **Breakage of Glass** that is a part of a building or structure. This cause of loss does not include breakage of neon tubing attached to the building or structure.

We will not pay more than:

    **a.** $100 for each plate, pane, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter; or

    **b.** $500 in any one occurrence.

13. **Falling Objects.**

But we will not pay for loss or damage to:

    **a.** Personal property in the open; or

    **b.** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

14. **Weight of Snow, Ice or Sleet.**

But we will not pay for loss or damage to:

    **a.** Gutters and downspouts; or

    **b.** Personal property outside of buildings or structures.

15. **Water Damage,** meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam, other than an Automatic Sprinkler System. If the building or structure containing the system or appliance is Covered Property, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or steam escapes.

We will not pay:

    **a.** The cost to repair any defect that caused the loss or damage;

    **b.** For loss or damage caused by or resulting from continuous or repeated seepage or leakage that occurs over a period of 14 days or more; or

    **c.** For loss or damage caused by or resulting from freezing, unless:

        **(1)** You do your best to maintain heat in the building or structure; or

        **(2)** You drain the equipment and shut off the water supply if the heat is not maintained.

**B. EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    **a. Ordinance or Law**

    The enforcement of any ordinance or law:

        **(1)** Regulating the construction, use or repair of any property; or

        **(2)** Requiring the tearing down of any property including the cost of removing its debris.

    **b. Earth Movement**

        **(1)** Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if loss or damage by fire or explosion results, we will pay for that resulting loss or damage.

(2) Volcanic eruption, explosion or effusion. But if loss or damage by fire, breakage of glass or volcanic action results, we *will pay for that resulting loss or damage.*

#### c. Governmental Action

Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

#### d. Nuclear Hazard

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if loss or damage by fire results, we will pay for that resulting loss or damage.

#### e. Power Failure

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

#### f. War and Military Action

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

#### g. Water

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up from a sewer or drain; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

    (a) Foundations, walls, floors or paved surfaces;

    (b) Basements, whether paved or not; or

    (c) Doors, windows or other openings.

But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that resulting loss or damage.

**2.** We will not pay for loss or damage caused by or resulting from:

#### a. Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires. But if loss or damage by fire results, we will pay for that resulting loss or damage.

#### b. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if loss or damage by fire or combustion explosion results, we will pay for that resulting loss or damage.

#### c. Mechanical breakdown, including rupture or bursting caused by centrifugal force.

But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

**3. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

#### a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form

We will not pay for:

(1) Any loss caused by or resulting from:

    (a) Damage or destruction of "finished stock"; or

    (b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

(2) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas, including their lead-in wiring, masts or towers.

(3) Any increase of loss caused by or result-ing from:

    (a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

    (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business In-come during the "period of restora-tion".

(4) Any Extra Expense caused by or result-ing from suspension, lapse or cancella-tion of any license, lease or contract be-yond the "period of restoration".

(5) Any other consequential loss.

**b. Leasehold Interest Coverage Form**

(1) Paragraph B.1.a., Ordinance or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

    (a) Your cancelling the lease;

    (b) The suspension, lapse or cancella-tion of any license; or

    (c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following Exclusions do not apply to insurance under this Coverage Form:

    (a) Paragraph B.1.a., Ordinance or Law;

    (b) Paragraph B.1.c., Governmental Action;

    (c) Paragraph B.1.d., Nuclear Hazard;

    (d) Paragraph B.1.e., Power Failure; and

    (e) Paragraph B.1.f., War and Military Action.

(2) **Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally li-able to pay, solely by reason of your as-sumption of liability in a contract or agreement.

(3) **Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reac-tion or radiation, or radioactive contami-nation, however caused.

**C. ADDITIONAL COVERAGE – COLLAPSE**

We will pay for loss or damage caused by or re-sulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

1. Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil com-motion; vandalism; leakage from fire extin-guishing equipment; sinkhole collapse; vol-canic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; all only as insured against in this Coverage Part;

2. Hidden decay;

3. Hidden insect or vermin damage;

4. Weight of people or personal property;

5. Weight of rain that collects on a roof;

6. Use of defective material or methods in con-struction, remodeling or renovation if the col-lapse occurs during the course of the con-struction, remodeling or renovation.

We will not pay for loss or damage to the following types of property, if otherwise covered in this Coverage Part, under items 2., 3., 4., 5. and 6. unless the loss or damage is a direct result of the collapse of a building:

outdoor radio or television antennas, including their lead-in wiring, masts or towers; awnings; gutters and downspouts; yard fixtures; outdoor swimming pools; fences; piers, wharves and docks; beach or diving platforms or appurte-nances; retaining walls; walks, roadways and other paved surfaces.

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

This Additional Coverage will not increase the Limits of Insurance provided in this Coverage Part.

    Copyright, ISO Commercial Risk Services, Inc., 1987, 1991    CP 10 20 07 88    ☐

CF 126
(10-91)

CP 00 30 10 91

# BUSINESS INCOME COVERAGE FORM (AND EXTRA EXPENSE)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION G—DEFINITIONS.

## A. COVERAGE

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

(i) Business Income including "Rental Value".

(ii) Business Income other than "Rental Value".

(iii) "Rental Value".

If option (i) above is selected, the term Business Income will include "Rental Value". If option (iii) above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

### 2. Covered Causes Of Loss.

See applicable Causes of Loss Form as shown in the Declarations.

### 3. Additional Coverages

**a. Extra Expense.**

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

(1) We will pay any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

(a) At the described premises; or

(b) At replacement premises or at temporary locations, including:

(i) Relocation expenses; and

(ii) Costs to equip and operate the replacement or temporary locations.

(2) We will pay any Extra Expense to minimize the suspension of business if you cannot continue "operations".

(3) We will pay any Extra Expense to:

(a) Repair or replace any property; or

(b) Research, replace or restore the lost information on damaged valuable papers and records;

to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**b. Civil Authority.** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to two consecutive weeks from the date of that action.

**c. Alterations and New Buildings.** We will pay for the actual loss of Business Income you sustain due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

(1) New buildings or structures, whether complete or under construction;

(2) Alterations or additions to existing buildings or structures; and

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

(a) Used in the construction, alterations or additions; or



**1**

Copyright, ISO Commercial Risk Services, Inc., 1990

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**d. Extended Business Income.** We will pay for the actual loss of Business Income you incur during the period that:

**(1)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(2)** Ends on the earlier of:

**(a)** The date you could restore your "operations", with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

**(b)** 30 consecutive days after the date determined in **(1)** above.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**4. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income Coverage to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay for loss under this Extension is 10% of the Limit of Insurance for Business Income shown in the Declarations, but not more than $100,000 at each location.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**B. EXCLUSIONS**

See applicable Causes of Loss Form as shown in the Declarations.

**C. LIMITS OF INSURANCE**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

**1.** Alterations and New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

**D. LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

2

**(5)** As often as ~~y be~~ reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Limitation—Electronic Media And Records**

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

**a.** 60 consecutive days from the date of direct physical loss or damage; or

**b.** The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace, with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

**(1)** Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

**(2)** Data stored on such media; or

**(3)** Programming records used for electronic data processing or electronically controlled equipment.

This limitation does not apply to Extra Expense.

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to restore the data that was lost when the ~~page~~ occurred. We will only pay for the Business Income loss sustained during the period June 1—September 1. Loss during the period September 2—October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1—September 29 (60 consecutive days). Loss during the period September 30—October 15 is not covered.

**4. Loss Determination**

**a.** The amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no loss or damage occurred;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** All necessary expenses that reduce the Business Income loss that otherwise

3

would have been incurred.

### c. Resumption Of Operations

We will reduce the amount of your:

(1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

### d.
If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

## 5. Loss Payment

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if:

a. You have complied with all of the terms of this Coverage Part; and

b. (1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

# E. ADDITIONAL CONDITION

### Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any loss if the Limit of Insurance for Business Income is less than:

a. The Coinsurance percentage shown for Business Income in the Declarations; times

b. The sum of:

(1) The Net Income (Net Profit or Loss before income taxes), and

(2) All operating expenses, including payroll expenses,

that would have been earned (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

1. Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

2. Divide the Limit of Insurance for the described premises by the figure determined in step 1; and

3. Multiply the total amount of loss by the figure determined in step 2.

We will pay the amount determined in step 3. or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1** (Underinsurance):

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been    $400,000

The Coinsurance percentage is    50%

The Limit of Insurance is    $150,000

The amount of loss is    $ 80,000

Step 1: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $150,000 ÷ $200,000 = .75

Step 3: $ 80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example No. 2** (Adequate Insurance):

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been    $400,000

The Coinsurance percentage is    50%

The Limit of Insurance is    $200,000

The amount of loss is    $ 80,000

Step 1: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2: $200,000 ÷ $200,000 = 1.00

Step 3: $ 80,000 x 1.00 = $80,000

We will cover the $80,000 loss. No penalty applies.

This condition does not apply to the Extra Expense Additional Coverage.

# F. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

## 1. Maximum Period Of Indemnity

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income is the lesser of:

4

**(1)** The amount of loss sustained during the 120 days immediately following the direct physical loss or damage; or

**(2)** The Limit of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**b.** The most we will pay for loss of Business Income in each period of 30 consecutive days after the direct physical loss or damage is:

**(1)** The Limit of Insurance, multiplied by

**(2)** The fraction shown in the Declarations for this Optional Coverage.

**Example:**

When:  The Limit of Insurance

    is                                          $120,000

    The fraction shown in
    the Declarations for
    this Optional Cover-
    age is                                           ¼

The most we will pay for loss in each period of 30 consecutive days is:

$120,000 x ¼ = $30,000

If, in this example, the actual amount of loss is:

| | |
|---|---|
| Days  1-30 | $40,000 |
| Days 31-60 | 20,000 |
| Days 61-90 | 30,000 |
| | $90,000 |

We will pay:

| | |
|---|---|
| Days  1-30 | $30,000 |
| Days 31-60 | 20,000 |
| Days 61-90 | 30,000 |
| | $80,000 |

The remaining $10,000 is not covered.

**3. Agreed Value**

**a.** To activate this Optional Coverage:

**(1)** A Business Income Report/Work Sheet must be made a part of this policy and must show financial data for your "operations":

**(a)** During the 12 months prior to the date of the Work Sheet; and

**(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

**(2)** An Agreed Value must be shown in the Declarations or on the Work Sheet. The Agreed Value should be at least equal to:

**(a)** The Coinsurance percentage shown in the Declarations; multiplied by

**(b)** The amount of Net Income and Operating Expenses for the following 12 months you report on the Work Sheet.

**b.** The Additional Condition, Coinsurance, is suspended until:

**(1)** 12 months after the effective date of this Optional Coverage; or

**(2)** The expiration date of this policy;

whichever occurs first.

**c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

**(1)** Within 12 months of the effective date of this Optional Coverage; or

**(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

**(1)** The Business Income Limit of Insurance; divided by

**(2)** The Agreed Value.

**Example:**

When:  The Limit of Insurance

    is                                          $100,000
    The Agreed Value is                         $200,000
    The amount of loss is                       $ 80,000

Step (a): $100,000 ÷ $200,000 = .50

Step (b):  .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under paragraph **A.3.d.**, Extended Business Income, the number "30" in subparagraph **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**G. DEFINITIONS**

**1.** "Finished Stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

**3.** "Period of Restoration" means the period of time that:

**a.** Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the date when the property at the

described premises should repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

(1) Regulates the construction, use or repair, or requires the tearing down of any property; or

(2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

4. "Pollutants" means any solid, liquid, gaseous or thermal irritan' contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means the:

a. Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and

b. Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and

c. Fair rental value of any portion of the described premises which is occupied by you.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement.**

  **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

    **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

  **b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

    **(2)** The "bodily injury" or "property damage" occurs during the policy period.

  **c.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

**2. Exclusions.**

  This insurance does not apply to:

  **a.** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

  **b.** "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)** Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

    **(2)** That the insured would have in the absence of the contract or agreement.

  **c.** "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    **(1)** Causing or contributing to the intoxication of any person;

    **(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    **(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

    This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. "Bodily injury" to:

(1) An employee of the insured arising out of and in the course of employment by the insured; or

(2) The spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

g. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

   Copyright, Insurance Services Office, Inc., 1982, 1991   CG 00 01 11 88   □

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment" (Section V.8.).

**h.** "Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

**i.** "Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.** "Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.** "Property damage" to "your product" arising out of it or any part of it.

**l.** "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.** "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.** Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product;"

(2) "Your work;" or

(3) "Impaired property;"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises rented to you. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions.

This insurance does not apply to:

a. "Personal injury" or "advertising injury:"

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

Copyright, Insurance Services Office, Inc., 1982, 1991

□

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

### 1. Insuring Agreement.

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions.

We will not pay expenses for "bodily injury:"

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard."

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

We will pay, with respect to any claim or "suit" we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

5. All costs taxed against the insured in the "suit."

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

### SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you. However, no employee is an insured for:

      (1) "Bodily injury" or "personal injury" to you or to a co-employee while in the course of his or her employment, or the spouse, child, parent, brother or sister of that co-employee as a consequence of such "bodily injury" or "personal injury," or for any obligation to share damages with or repay someone else who must pay damages because of the injury; or

      (2) "Bodily injury" or "personal injury" arising out of his or her providing or failing to provide professional health care services; or

      (3) "Property damage" to property owned or occupied by or rented or loaned to that employee, any of your other employees, or any of your partners or members (if you are a partnership or joint venture).

   b. Any person (other than your employee), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-employee of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

     Copyright, Insurance Services Office, Inc., 1982, 1991     CG 00 01 11 88   □

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits."

**2.** The General Aggregate Limit is the most we will pay for the sum of:

    **a.** Medical expenses under Coverage C;

    **b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard;" and

    **c.** Damages under Coverage B.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

**4.** Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

**5.** Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    **a.** Damages under Coverage A; and

    **b.** Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

**6.** Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises rented to you arising out of any one fire.

**7.** Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy.**

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Claim Or Suit.**

    **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        **(1)** How, when and where the "occurrence" or offense took place;

        **(2)** The names and addresses of any injured persons and witnesses; and

        **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.** If a claim is made or "suit" is brought against any insured, you must:

        **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

        **(2)** Notify us as soon as practicable.

        You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a.** Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected

unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

**b.** Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

**(2)** That is Fire insurance for premises rented to you; or

**(3)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.** Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

   Copyright, Insurance Services Office, Inc., 1982, 1991   CG 00 01 11 88   ☐

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit.**

   **a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

   **b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

   **c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree:

   **a.** The statements in the Declarations are accurate and complete;

   **b.** Those statements are based upon representations you made to us; and

   **c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

   **a.** As if each Named Insured were the only Named Insured; and

   **b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage

Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertising injury" means injury arising out of one or more of the following offenses:

   **a.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **b.** Oral or written publication of material that violates a person's right of privacy;

   **c.** Misappropriation of advertising ideas or style of doing business; or

   **d.** Infringement of copyright, title or slogan.

**2.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   **c.** All parts of the world if:

     **(1)** The injury or damage arises out of:

       **(a)** Goods or products made or sold by you in the territory described in a. above; or

**(b)** The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

**(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

**5.** "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work;" or

**b.** Your fulfilling the terms of the contract or agreement.

**6.** "Insured contract" means:

**a.** A lease of premises;

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

An "insured contract" does not include that part of any contract or agreement:

**a.** That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**b.** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(1)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(2)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**c.** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in b. above and supervisory, inspection or engineering services; or

**d.** That indemnifies any person or organization for damage by fire to premises rented or loaned to you.

**7.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto;"

**b.** While it is in or on an aircraft, watercraft or "auto;" or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**8.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   (1) Power cranes, shovels, loaders, diggers or drills; or

   (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

   (1) Equipment designed primarily for:

     (a) Snow removal;

     (b) Road maintenance, but not construction or resurfacing;

     (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

9. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

10. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

11. a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned.

b. "Your work" will be deemed completed at the earliest of the following times:

   (1) When all of the work called for in your contract has been completed.

   (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

   (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c. This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials;

**(3)** Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

**12.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

**13.** "Suit" means a civil proceeding in which damage because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**14.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**15.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

**b.** The providing of or failure to provide warnings or instructions.

POLICY NUMBER:  CPP 90⁚ ⌐                                    COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

**SCHEDULE**

**Description of Professional Services:**

1.   FUNERAL HOME

2.

3.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, this insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" due to the rendering or failure to render any professional service.

                       Copyright, Insurance Services Office, Inc., 1984                        ☐

**COMMERCIAL GENERAL LIABILITY**

THIS ENDORSEMENT CHANGES THE POLICY   PLEASE READ IT CAREFULLY

# EXCLUSION – INTERCOMPANY PRODUCTS SUITS

This endorsement modifies insurance provided under the following

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to any claim for damages by any Named Insured against another Named Insured because of "bodily injury" or "property damage" arising out of "your products" and included within the "products-completed operations hazard "

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury," "property damage," "advertising injury" or "personal injury" arising out of:

**(a)** the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

**(b)** the negligent:

　(i)  employment;

　(ii)  investigation;

　(iii) supervision;

　(iv) reporting to the proper authorities, or failure to so report; or

　(v)  retention;

　of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by (a) above.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage:"

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material," if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste " at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured;" or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material," "Special nuclear material" or "by-product material."

   "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**1.** The following exclusion is added to COVERAGE A (Section I):

**o.** "Bodily injury" arising out of any:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** *Coercion, demotion, evaluation, reassignment,* discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or

**(4)** Consequential "bodily injury" as a result of (1) through (3) above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

**2.** The following exclusion is added to COVERAGE B (Section I):

**c.** "Personal injury" arising out of any:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or

**(4)** Consequential "personal injury" as a result of (1) through (3) above.

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

Part 4. of WHO IS AN INSURED (Section II) does not apply.

**COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EMPLOYEES AS INSUREDS

*This endorsement modifies insurance provided under the following:*

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

Part 2.a. of WHO IS AN INSURED (Section II) does not apply.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Definition 6. "insured contract" of the DEFINITIONS section is replaced by the following:

"Insured Contract" means any written:

1. Lease of premises;

2. Easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad;

3. Indemnification of a municipality as required by ordinance, except in connection with work for the municipality;

4. Sidetrack agreement or any easement or license agreement in connection with vehicle or pedestrian private railroad crossings at grade; or

5. Elevator maintenance agreement.

An "insured contract" does not include that part of any contract or agreement that indemnifies any person or organization for damage by fire to premises rented or loaned to you.

 Copyright, Insurance Services Office, Inc., 1984 ☐

POLICY NUMBER: CPP 90  5                                    COMM  CIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCLUSION — EXPLOSION, COLLAPSE AND
### UNDERGROUND PROPERTY DAMAGE HAZARD
### (SPECIFIED OPERATIONS)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.
PRODUCTS/COMPLETED OPERATION LIABILITY COVERAGE PART

### SCHEDULE

| Location & Description of Operations | Excluded Hazard(s) |
|---|---|
| 665 CHURCH STREET<br>JASPER, GA<br><br>FUNERAL HOME | EXPLOSION<br>COLLAPSE<br>UNDERGROUND<br>PROPERTY DAMAGE |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

1. The following explusion is added to COVERAGE A (Section I):

This insurance does not apply to "property damage" included within the "explosion hazard," the "collapse hazard" or the " underground property damage hazard" if any of these hazards is entered as an excluded hazard on the Schedule

This exclusion does not apply to:

a. Operations performed for you by others; or
b. "Property damage" included within the "pro-ducts completed operation hazard: "

2. The following additional definitions apply:

"Explosion hazard" includes property damage arising out of blasting or explosion. The "explosion hazard" does not include "property damage" arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power trans-mitting equipment.
"Collapse hazard" includes "structural property damage" and any resulting "property damage" to any other property at any time.

"Structural property damage" means the collapse of or structural injury to any building or structure due to:

(1) Grading of land, excavation, borrowing, filling, back-filling, tunnelling, pile driving, coffer-dam work or caission work; or

(2) Moving, shoring, underpinning, raising or demolition of any building or structure or removal or building of any structural sup-port of that building or structure.

"Underground property damage hazard" includes "underground property damage" and any resulting "property damage" to any other property at any time.

"Underground property damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus used with them beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grad-ing land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving.

CG 21 42 11 85                    Copyright. Insurance Services Office, Inc., 1984

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. ABANDONMENT

There can be no abandonment of any property to us.

### B. APPRAISAL

If we and you disagree on the value of the property or the amount of "loss," either may make written demand for an appraisal of the "loss." In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of "loss." If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. DUTIES IN THE EVENT OF LOSS

You must see that the following are done in the event of "loss" to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the "loss." Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the "loss" occurred.

4. Take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss. Also if feasible, set the damaged property aside and in the best possible order for examination.

5. Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our consent.

6. Permit us to inspect the property and records proving "loss."

7. If requested, permit us to question you under oath, at such times as may be reasonably required, about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

8. Send us a signed, sworn statement of "loss" containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Promptly send us any legal papers or notices received concerning the "loss."

10. Cooperate with us in the investigation or settlement of the claim.

### D. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same "loss," we will not pay more than the actual amount of the "loss."

### E. LOSS PAYMENT

We will pay or make good any "loss" covered under this Coverage Part within 30 days after:

1. We reach agreement with you;

2. The entry of final judgment; or

3. The filing of an appraisal award.

We will not be liable for any part of a "loss" that has been paid or made good by others.

### F. OTHER INSURANCE

If you have other insurance covering the same "loss" as the insurance under this Coverage Part, we will pay only the excess over what you should have received from the other insurance. We will pay the excess whether you can collect on the other insurance or not.

### G. PAIR, SETS OR PARTS

1. **Pair or Set.** In case of "loss" to any part of a pair or set we may:

   a. Repair or replace any part to restore the pair or set to its value before the "loss"; or

   b. Pay the difference between the value of the pair or set before and after the "loss."

2. **Parts.** In case of "loss" to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

### H. PRIVILEGE TO ADJUST WITH OWNER

In the event of "loss" involving property of others in your care, custody or control, we have the right to:



(over)

Copyright, Insurance Services Office, Inc., 1994

INLAND MARINE

MISCELLANEOUS INLAND MARINE FORM
(ALL RISKS)



**Southern Trust**
Southern Trust Insurance Company

Attached to and forming part of Policy No. _____CPP 90345_____

of the _____Southern Trust_____ Insurance Company.

1. **PROPERTY COVERED**

| Description of Property | Year Built | Manufacturer | Identifying Marks or Numbers | Amount of Insurance |
|---|---|---|---|---|
| 3 Funeral Tents | | | @ $1,000.00 | $3,000.00 |
| 1 Graveside Grass | | | | $ 400.00 |
| Backhoe | 90 | John Doe | | $3,000.00 |

Which property the Insured warrants to be in sound condition at the time of attachment of this insurance. Each article of interest is to be deemed separately insured.

2. **DEDUCTIBLE CLAUSE**
Each claim for loss or damage shall be adjusted separately and from the amount of each such adjusted claim, or the amount of insurance, whichever is less, the sum of $___100.00____ shall be deducted.

3. **TERRITORY**
This insurance covers only within the limits of the Continental United States and the Dominion of Canada.

4. **PERILS INSURED**
This policy insures against all risks of direct and accidental physical loss of or damage to the insured property from any external cause except as hereinafter provided.

5. **PERILS EXCLUDED**
This policy does not insure against:
(a) Loss or damage to electrical equipment or devices of any kind, including wiring, arising from electrical injury or disturbance to the said electrical equipment or devices or wiring, from artificial causes, unless fire ensues and then only for direct loss or damage caused by such ensuing fire;
(b) Loss or damage caused by the neglect of the Insured to use all reasonable means to protect the property insured; (a) during and after any disaster insured against, (b) when the property is endangered by fire in neighboring premises, or (c) when the Insured has notice of any impending disaster;
(c) Loss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act on the part of the Insured or other party or interest, his or their employees or agents, while working or otherwise, or any person or persons to whom the insured property may be entrusted, (carriers for hire excepted);
(d) Loss or damage due to marring, scratching, wear and tear, gradual deterioration, rust, corrosion, extremes of temperature, insects, vermin, inherant vice, or damage due to any process while actually being worked upon and resulting therefrom;
(e) Loss or damage due to breakage, unless caused by fire, lightning, windstorm, theft, earthquake, flood (meaning rising navigable waters), explosion; or by collision, derailment or overturning of a transporting conveyance;
(f) Loss or damage caused by theft or pilferage of the insured property while left unattended in or on any automobile unless such automobile is equipped with a fully enclosed body, or compartment, and the loss be a direct result of violent forcible entry (of which there shall be visible evidence) from the fully enclosed body, the doors and windows of which shall have been securely locked, or from a compartment which shall have been securely locked;

ST 1298                                    (over)

COMMERCIAL INLAND MARINE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES – CANCELLATION

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART

Paragraph 6. of the CANCELLATION Common Policy Condition is replaced by the following:

**6.** If notice is mailed, a receipt provided by, or such other evidence of mailing as prescribed or accepted by, the United States Postal Service will be sufficient proof of notice.

CM 02 01 11 85                    Copyright, ISO Commercial Risk Services, Inc., 1985                    **Page 1 of 1**

# COMMERCIAL LINES POLICY

STOCK COMPANY



**Southern Trust**
Southern Trust Insurance Company

**SOUTHERN TRUST**
**INSURANCE COMPANY**
**MACON, GEORGIA**

ing or delivering to us advance written not
of cancellation.

2. We may cancel this policy by mailing c
delivering to the first Named Insured writte
notice of cancellation at least:

a. 10 days before the effective date c
cancellation if we cancel for nonpaymen
of premium; or



**THIS POLICY CONSISTS OF:**

— **DECLARATIONS**
— **COMMON POLICY CONDITIONS**
— **ONE OR MORE COVERAGE PARTS.  A COVERAGE PART CONSISTS OF:**
   • **ONE OR MORE COVERAGE FORMS**
   • **APPLICABLE FORMS AND ENDORSEMENTS**

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 85

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

*Richard H. Botto* Secretary                    *W H Anderson* President

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1983





EXHIBIT / ATTACHMENT

$B$

(To be scanned in place of tab)

# ULC 90345
# January 1998-1999

EXHIBIT 

# Southern Trust

Southern Trust Insurance Company

## COMMERCIAL EXCESS UMBRELLA POLICY
### RENEWAL
### DECLARATIONS

FACSIMILE

Agency:019-HAMRICK INSURANCE AGENCY, INC

Policy No.:ULC 90345

1. NAMED INSURED: CAGLE FUNERAL HOME, INC BOB CAGLE

2. MAILING ADDRESS: Street 364 E. CHURCH ST.
   City,State,Zip JASPER, GA 30143

3. POLICY PERIOD: From 1/8/98 to 1/8/99
   at 12:01 A.M Standard Time at your mailing address above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, **WE** AGREE WITH **YOU** TO PROVIDE THE INSURANCE COVERAGE STATED IN THIS POLICY.

4. LIMIT OF INSURANCE:

   Policy Aggregate Limit $1,000,000
   Self-Insured Retention $ 10,000 (Each *Occurrence or Offense*
   not Covered by **Underlying Insurance**)

5. SCHEDULE OF UNDERLYING INSURANCE

| Type of Insurance | Auto Liability | General Liability | Employers Liability |
|---|---|---|---|
| Company: | SOUTHERN TRUST | SOUTHERN TRUST | SOUTHERN TRUST |
| Policy No.: | AEV 90345 | CPP 90345 | WC 90345 |
| Policy Period: | From: 1/8/98 To: 1/8/99 | From: 1/8/98 To: 1/8/99 | From: 1/8/98 To: 1/8/99 |
| Limits of Liability | Each Accident $ 500,000 | General Aggregate $1,000,000 Products/Completed Operations Aggregate $1,000,000 Personal and Advertising Injury $ 500,000 Each Occurrence $ 500,000 | Bodily Injury Each Accident $500,000 Bodily Injury by Disease Policy Limit $500,000 Bodily Limit By Disease Each Employee $500,000 |

6. Form of Business: ___Individual ___Partnership ___Joint Venture
   _X_Organization (Other than Partnership or Joint Venture)

   Business Description: FUNERAL HOME AND CEMETERY

7. Advance Premium: $1,073.00
   Premium Adjustable At Rate of $_____per_____of_____
   Subject to Minimum Premium of $1,073.00

8. ENDORSEMENTS ATTACHED TO THE POLICY: IL0262(1295), A-000, A-012, C-003 P-003, ST1443, A-011, P-005
   COUNTERSIGNED 1/2/98 CVR BY:_____
   (Date)                    (Authorized Representative)

IL 02 62 12 95

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES - CANCELLATION
# AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraph A.1. of the CANCELLATION Common Policy Condition is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

    a. If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

    b. If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

Our notice will state the effective date of cancellation, which will be the later of the following:

(1) 10 days from the date of mailing or delivering our notice, or

(2) The effective date of cancellation stated in the first Named Insured's notice to us.

B. Paragraph A.5. of the CANCELLATION Common Policy Condition is replaced by the following:

5. Premium Refund

    a. If this policy is cancelled, we will send the first Named Insured any premium refund due.

    b. If we cancel, the refund will be pro rata, except as provided in c. below.

    c. If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

    d. If the first Named Insured cancels, the refund may be less than pro rata.

    e. The cancellation will be effective even if we have not made or offered a refund.

Copyright, Insurance Services Office, Inc., 1995
Copyright, ISO Commercial Risk Services, Inc., 1995

## ABUSE OR MOLESTATION EXCLUSION

This insurance does not apply to "bodily injury", "property damage", "advertising injury", or "personal injury" arising out of:

(a)   the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured or

(b)   The negligent:

      (i)     employment;
      (ii)    investigation;
      (iii)   supervision;
      (iv)   reporting to the proper authorities, or failure to so report; or
      (v)    retention of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by (a) above.

A-000
(01/88)

ASBESTOS
<u>EXCLUSION</u>
(10/18/90)

# <u>ASBESTOS</u>

This insurance does not apply to:

    1.    Bodily injury, property damage, personal injury or advertising injury arising out of, resulting from, caused or contributed to by asbestos or exposure to asbestos; or

    2.    The costs of abatement, mitigation, removal or disposal of asbestos.

This exclusion also includes:

    a.    Any supervision, instruction, recommendations, warnings or advice given or which should have been given in connection with the above; and

    b.    Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

A-012

CARE, CUSTODY OR CONTROL
<u>EXCLUSION</u>
(10/18/90)

# <u>CARE, CUSTODY OR CONTROL</u>

This insurance does not apply to property damage to:

1.  Property rented or occupied by an insured;
2.  Property loaned to any insured; or
3.  Personal property in the care, custody or control of any insured.

C-003

POLLUTION
EXCLUSION
(06/18/91)

# **POLLUTION**

This insurance does not apply to:

1) Bodily injury, personal injury or property damage which arises out of or would not have occurred in whole or in part but for the actual, alleged or threatened discharge seepage, migration, release or escape of pollutants at any time.

2) Any loss, cost or expense arising out of any:

   a. Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or asses the effects of pollutants; or

   b. Claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycle, reconditioned or reclaimed.

This exclusion applies whether or not such injury or damage may be included within the products/completed operations hazard.

P-003

# AMENDATORY ENDORSEMENT

## COMMERCIAL EXCESS UMBRELLA POLICY

This endorsement amends the policy as follows:

**Coverage B:** **Exclusion 2a (1) is deleted from the policy.**

*Must be attached to all umbrella policies.

# AUTO LIABILITY

Except to the extent coverage is provided in underlying insurance, this insurance does not apply to bodily injury or property damage arising out of the ownership, maintenance use, or entrustment of any auto:

1.     While away from premises you own, rent, or occupy; or

2.     Owned by or rented or loaned to any insured.

Use includes operation and loading or unloading.

A-011

PROFESSIONAL LIABILITY
<u>EXCLUSION</u>
(08/13/91)

## **PROFESSIONAL LIABILITY**

This insurance does not apply to injury or damage arising out of the rendering of or failure to render the professional services described below by any insured or by any person for whose acts or omissions any insured is legally responsible.

Description of Professional Services:

1)    MORTICIANS SERVICES
2)    BODY PREPARATION
3)    FUNERAL DIRECTOR SERVICES

P-005

STOCK COMPANY



**Southern Trust**
Southern Trust Insurance Company



# COMMERCIAL

# EXCESS UMBRELLA

# POLICY

# COMMERCIAL EXCESS UMBRELLA POLICY

## QUICK REFERENCE

### READ YOUR POLICY CAREFULLY

**DECLARATIONS PAGE**

> Named Insured and Mailing Address
> Policy Period
> Description of Business and Location
> Coverages and Limits of Insurance

**SECTION I - COVERAGES** — Beginning on Page

**Insuring Agreements** — 1

**Coverage A. Bodily Injury and Property Damage Liability** — 1

    **Exclusions** — 2

**Coverage B. Personal and Advertising Injury Liability** — 6

    **Exclusions** — 7

**SECTION II - DEFENSE** — 7

**SECTION III - WHO IS AN INSURED** — 8

**SECTION IV - LIMIT OF INSURANCE** — 10

**SECTION V - CONDITIONS** — 10

> 1. Appeals
> 2. Bankruptcy
> 3. Cancellation
> 4. Changes
> 5. Duties In The Event of Occurrence, Claim or Suit
> 6. Examination of Your Books and Records
> 7. Inspections and Surveys
> 8. Legal Action Against Us
> 9. Maintenance of Underlying Insurance
> 10. Other Insurance
> 11. Premium Audit
> 12. Premiums
> 13. Representations
> 14. Separation of Insureds
> 15. Sole Agent
> 16. Transfer of Rights of Recovery Against Others To Us
> 17. Transfer of Your Rights and Duties under this Policy
> 18. When Loss Payable
> 19. When We Do Not Renew

**SECTION VI - DEFINITIONS** — 14

**ENDORSEMENTS (If Any)**

THIS POLICY IS NOT DESIGNED FOR USE WITH CLAIMS MADE UNDERLYING POLICIES. PLEASE READ THIS POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, COVERAGE AND COVERAGE RESTRICTIONS. WE HAVE NO DUTY TO PROVIDE COVERAGE UNLESS THERE HAS BEEN FULL COMPLIANCE WITH ALL THE CONDITIONS – SECTION V – OF THIS POLICY.

The words you and your in this policy refer to the named insured shown in the Declarations and all other persons or organizations qualifying as named insureds under this policy. The words we, us, and our refer to the company providing this insurance.

The word insured means any person or organization qualifying as such under SECTION III – WHO IS AN INSURED, beginning on page 8.

All highlighted words and phrases have special meaning. Refer to SECTION VI – DEFINITIONS, beginning on page 14.

## SECTION I - INSURING AGREEMENTS

In consideration of the payment of premium and in reliance upon representations you made to us during the process of obtaining this insurance and subject to the Limit of insurance shown in Item 4 of the Declarations, and all the exclusions, terms and conditions of this policy, we agree with you as follows:

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

    a. We will indemnify the insured for ultimate net loss in excess of the retained limit because of bodily injury or property damage to which this insurance applies. We will have the right to associate with the underlying insurer and the insured to defend any claim or suit seeking damages for bodily injury or property damage to which this insurance applies. But:

        (1) The amount we will indemnify for ultimate net loss is limited as described in SECTION IV – LIMIT OF INSURANCE;

        (2) We have a duty to defend any claims or suits to which this insurance applies but which are not covered by any underlying insurance shown in the Declarations; we also have the duty to defend such claims or suits if the applicable limit of underlying insurance is exhausted;

        (3) At our discretion, we may investigate any occurrence and settle any claim or suit that we have a duty to defend; and

        (4) Both our right and duty to defend any existing or future suits end when we have exhausted the applicable Limit of Insurance in indemnification of judgments or settlements under Coverages A and B.

No other obligation or liability to indemnify or perform acts or services is covered unless explicitly provided for under SECTION II - DEFENSE.

    b. It is agreed that:

        (1) The bodily injury or property damage must occur during the policy period of this policy;

        (2) With respect to your liability (other than under a contract or agreement) for bodily injury to your employees arising out of and in the course of their employment by you:

            (a) Bodily injury by disease must be caused or aggravated by the conditions of that employment; and

            (b) An employee's last day of last exposure to conditions causing or aggravating such a disease must occur during the policy period of this policy;

        (3) Damages because of bodily injury include damages sought by any person or organization for care or loss of services resulting at any time from the bodily injury;

        (4) The bodily injury or property damage must be caused by an occurrence; and

(i) Being moved from the      ace where such property or **pollutants** a.      ccepted by the **insured** for movement into or onto an **auto**;.

(ii) Being transported or towed by an **auto**;

(iii) Otherwise in the course of transit by anyone;

(iv) Being stored, disposed of, treated or processed in or upon an **auto**; or

(v) Being moved from an **auto** to the place where such property or **pollutants** are finally delivered, disposed of or abandoned by the **insured**;

(b) At or from any premises, site or location which is or was at any time, owned or occupied by, or rented or loaned to, any **insured**;

(c) At or from any premises, site or location which is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing or treatment of **waste**;

(d) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as **waste** by or for any **insured** or any person or organization for whom any insured may be legally responsible; or

(e) At or from any premises, site or location on which any **insured** or any contractors or subcontractors working directly or indirectly on any **insured's** behalf are performing operations:

(i) if the **pollutants** are brought on or to the premises, site or location in connection with such operations by such **insured**, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of **pollutants**.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

(b) Claim or suit by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Paragraphs (1)(a) (iv) and (1)(b) through (1)(e) do not apply to fuels, lubricants, fluids, exhaust gases or other similar pollutants that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered auto or its parts, if the pollutants escape or are discharged, dispersed or released directly from an auto part designed by its manufacturer to hold, store, receive or dispose of such pollutants.

Paragraphs (1)(b) through (1)(e) do not apply to pollutants not in or upon an auto if:

(1) The pollutants or any property in which the pollutants are contained are upset, overturned or damaged as a result of the maintenance or use of an auto;

(2) The discharge, dispersal, release or escape of the pollutants is caused directly by such upset, overturn or damage; and

(3) The **bodily injury** or **property damage** is not otherwise excluded under paragraph (1)(a) of this exclusion.

Paragraphs (1)(b) and (1)(e)(i) of this exclusion do not apply to **bodily injury** or **property damage** arising out of heat, smoke or fumes from a hostile fire. As used herein, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

p. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) **Your product,**

(2) **Your work,** or

(3) **Impaired property;**

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

q. **Bodily injury or property damage:**

(1) With respect to which an **insured** under this policy is also an **insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an **insured** under any such policy but for its termination upon exhaustion of its limit of liability;

(2) Resulting from the **hazardous properties** of **nuclear material** and with respect to which:

(a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or

(b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

(3) Resulting from the **hazardous properties** of **nuclear material,** if:

(a) The **nuclear material:**

(i) Is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured,** or

(ii) Has been discharged or dispersed therefrom;

(b) The **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **insured;** or

(c) The **bodily injury** or **property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility,** but if such facility is located within the United States of America, its territories or possessions or Canada, this subparagraph (3) applies only to **property damage** to such **nuclear facility** and any property thereat.

As used in this exclusion:

(1) **Hazardous properties** include radioactive, toxic or explosive properties;

(2) **Nuclear material** means **source material, special nuclear material** or **by-product material;**

(3) **Source material, special nuclear material,** and **by-product material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(4) **Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor;**

(5) **Waste** means any waste material,

(a) Containing **by-product material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **source material** content, and

Page 5

but only if the offense was cor  itted in the **coverage territory** during the ,  .icy period.

## 2. Exclusions

This insurance does not apply to:

a. **Personal injury or advertising injury:**

(1) For which coverage is provided by **underlying insurance** written on a claims made basis, including any renewal or replacement of such policy;

(2) Arising out of oral or written publication of material, if done by or at the direction of the **insured** with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the **insured**; or

(5) For which the **insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

b. **Advertising injury** arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

c. **Personal injury** arising out of any:

(1) Refusal to employ;

(2) Termination of employment;

(3) Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or

(4) Consequential **personal injury** as a result of (1) through (3) above.

## SECTION II - DEFENSE

When **we** have the duty to defend, **we** will indemnify the **insured** for:

1. Up to $250 for cost of bail bonds required because of accidents or traffic law violations related to an accident arising out of the use of any vehicle to which this policy applies. **We** do not have to furnish these bonds.

2. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. **We** do not have to furnish these bonds.

3. All reasonable expenses incurred by the **insured** at **our** request to assist **us** in the investigation or defense of any **claim** or **suit**, including actual loss of earnings up to $250 a day because of time off from work.

4. All costs taxed against the **insured** in any **suit we** defend.

5. **Pre-judgment interest** awarded against the **insured** on that part of any judgment covered under this policy. If **we** offer the applicable Limit of Insurance in settlement of a **claim** or **suit**, **we** will not indemnify the **insured** for any **pre-judgment interest** imposed or earned after the date of such offer.

Page 7

This policy shall not afford such person or organization limits of insurance in excess of:

(1) the minimum limit of insurance **you** agreed to provide; or

(2) the limit of insurance under this policy

whichever is less.

f. Any person or organization for whom **you** have agreed in writing prior to any **occurrence or offense** to provide insurance such as is afforded by this policy, but only with respect to operations performed by **you** or on **your** behalf, or facilities owned or used by **you**. This policy shall not afford such person or organization limits of insurance in excess of:

(1) the minimum limit of insurance **you** agreed to provide; or

(2) the limit of insurance under this policy

whichever is less.

3. With respect to:

a. any **auto**; or

b. **mobile equipment** registered in **your** name under any motor vehicle registration law;

any person is an **insured** while driving such **auto** or **mobile equipment** with **your** permission. Any other person or organization responsible for the conduct of such person is also an **insured**, but only with respect to liability arising out of the operation of the **auto** or registered **mobile equipment**.

However, except with respect to **your** partners, employees, or members of their households, the owner or anyone else from whom **you** hire or borrow an **auto** is an **insured** only if that **auto** is a trailer connected to an **auto you** own.

But no person or organization is an **insured** under this paragraph 3 for:

a. **Bodily injury** to a co-employee of the person driving the **auto** or **mobile equipment**;

b. **Property damage** to property owned by the employer of any person who is an **insured** under this provision;

c. Any **auto you** hire or borrow from one of **your** partners, employees or members of their households, if they are the owner of such **auto**, unless:

(1) Insurance is afforded for such **auto** by **underlying insurance**, or would be afforded under such **underlying insurance** but for exhaustion of such policy's limits of liability; or

(2) Such **auto** is a trailer connected to an **auto you** own;

d. any **auto** being used by a person employed in the business of selling, servicing, repairing, or parking **autos** unless they are **your** employee, or

e. the movement of property to or from an **auto** except **you**, **your** employees, the partners, lessees or borrowers of such **auto**, and any employees of the lessees or borrowers.

4 Any organization **you** newly acquire or form, other than a partnership or joint venture, and over which **you** maintain ownership or majority interest, will qualify as a **named insured** if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after **you** acquire or form the organization or the end of the policy period set forth in Item 3 of the Declarations, whichever is earlier;

a. The first named insured shown in the Declarations may cancel this policy by delivering it to us or any of our authorized agents or by sending us written notice stating when the future cancellation will take effect. Cancellation will become effective the date of delivery of the policy to us or upon such future date requested by the first named insured.

b. We may cancel this policy by mailing or delivering to the first named insured written notice of cancellation at least:

(1) Ten (10) days before the effective date of cancellation if we cancel because of nonpayment of premium whether payable directly to us or payable to our agents or others under any installment payment plan, premium finance plan, extension of credit or other payment plan; or

(2) Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

c. We will mail or deliver our notice to the first named insured's last mailing address known to us.

d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

e. If this policy is cancelled, we will send the first named insured any premium refund due. If we cancel, the refund will be pro rata. If the first named insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered any refund of unearned premium.

f. If notice is mailed, proof of mailing will be sufficient proof of notice.

## 4. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first named insured shown in the Declarations is authorized to make changes in the terms of this policy upon our giving written consent. This policy's terms can be amended or waived only by endorsement to this policy issued by us.

We shall not be bound by any assignment of interest by any insured unless our consent to such assignment is endorsed onto this policy.

## 5. Duties In The Event Of Occurrence, Claim Or Suit

a. You must see to it that we or our authorized representative are notified as soon as practicable of an occurrence or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when, and where the occurrence or alleged offense took place;

(2) The insured's name and address;

(3) The names and addresses of any injured persons or witnesses; and

(4) The nature and location of any injury or damage arising out of the occurrence or offense.

Notice of an occurrence or an offense is not notice of a claim.

b. If a claim is made or suit is brought against any insured, you must:

(1) Immediately record the specifics of the claim or suit and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we also receive written notice of the claim or suit as soon as practicable.

c. You and any other insured involved in such claim or suit must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

Page 11

b. You must notify us immediately of any changes to the terms of any underlying **insurance policies. We** may adjust premium charges under this policy from the effective date of such changes to the terms of any underlying insurance.

c. Your failure to comply with the foregoing paragraphs a. and b. will not invalidate this policy, but in the event of such failure. we shall be liable under this policy only to the extent that we would have been liable had you complied with these obligations.

### 10. Other insurance

If other valid and collectible insurance is available to the insured for **ultimate net loss** we cover under this policy, our obligations under this policy are limited as follows:

a. As this insurance is excess over any other insurance. whether primary, excess, contingent or on any other basis. except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance, we will indemnify only our share of the amount of **ultimate net loss**, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under this or any other insurance.

b. **We** will have no duty under Coverages A or B to defend any claim or **suit** that any other insurer has a duty to defend. If no other insurer defends. we may undertake to do so. but we will be entitled to the **insured's** rights against all other insurers.

### 11. Premium Audit

a. **We** will compute all premiums for this policy in accordance with our rules and rates.

b. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period. we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first **named insured**. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, **we** will return the excess to the first **named insured**. but not if such audit premium is less than the Minimum Premium shown in the Declarations.

c. The first **named insured** must keep records of the information we need for premium computation. and send us copies at such times as **we** may request.

### 12. Premiums

The first **named insured** shown in the Declarations:

a. Is responsible for the payment of all premiums; and

b. Will be the payee for any return premiums **we** pay.

### 13. Representations

By accepting this policy. **you** agree that:

a  The information shown on the Declarations is accurate and complete;

b. The information is based upon representations you made to **us** in your application(s) for this policy;

c. We have issued this policy in reliance upon your representations; and

d. Except as otherwise provided in this policy or by law. this policy is void in any case of fraud or if **you** intentionally conceal or misrepresent any material facts concerning this policy. in **your** application for this policy or otherwise

### 14  Separation of Insureds

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

2. **Auto** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. However, **auto** does not include **mobile equipment**.

3. **Automobile hazard** means liability arising out of the ownership, use (including maintenance or repair), **loading or unloading** of any **auto**.

4. **Bodily injury** means bodily injury, sickness, or disease sustained by a natural person. This includes death, shock, fright, mental anguish, mental injury, or disability which results from any of these at any time.

5. **Claim** means any demand upon the **insured** for damages or services alleging liability of the **insured** as the result of an **occurrence** or **offense**.

6. **Coverage territory** means anywhere in the world if the **insured's** responsibility to pay damages is determined in a suit on the merits, in the United States of America (including its territories and possessions), Puerto Rico or Canada, or in a settlement **we** agree to.

7. **Impaired property** means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because:

a. It incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or

b. **You** have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of **your product** or **your work**; or

b. **Your** fulfilling the terms of the contract or agreement.

8. **Insured contract** means:

a. A lease of premises;

b. A railroad sidetrack agreement;

c. Any easement or license agreement except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement; or

f. That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. Tort liability means a liability that would be imposed by law for injury to persons or property in the absence of any contract or agreement

An **insured contract** does not include that part of any contract or agreement:

(b) Road maintenance, but  .t construction or resurfacing; or

(c) *Street cleaning;*

(2) *Cherry pickers and similar devices* mounted on automobiles or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

11. **Occurrence** means

a. With respect to **bodily injury** or **property damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. This does not apply to **your** liability (other than under a contract or agreement) for **bodily injury** to **your** employees arising out of and in the course of **employment by you**; or

b. With respect to your liability (other than under a contract or agreement) for **bodily injury** to **your** employees arising out of and in the course of employment by **you, bodily injury** caused by accident or disease.

12. **Offense** *means any of the* **offenses** *included in the definitions of* **advertising injury** or **personal injury.**

13. **Personal injury** means injury, other than **bodily injury**, *arising out of one or more of the following* **offenses**:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private ocupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. *Oral or written publication of material that violates a person's right of privacy.*

14. **Pre-judgment interest** means interest added to a settlement, verdict, award or judgment based on the amount of time prior to the settlement, verdict, award or judgment whether or not made part of the settlement, verdict, award or judgment.

15. a. **Products-completed operations hazard** includes all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of **your product** or your **work** except:

(1) *Products that are still in* **your** physical possession; or

(2) Work that has not yet been completed or abandoned.

b. **Your work** will be deemed completed at the earliest of the following times.

(1) When all of the work called for in **your** contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed

c  This hazard does not include **bodily injury** or **property damage** arising out of.

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your product; and

b. The providing of or failure to provide warnings or instructions.

Your product does not include vending machines or other property rented to or located for the use of others but not sold.

24. Your work means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your work; and

b. The providing of or failure to provide warnings or instructions.

In Witness Whereof, we have caused this policy to be excuted and attested, and, if required by state law this policy shall not be valid unless coountersigned by our authorized representatives



President                    Chairman

Includes copyright material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1993



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

IN RE: TRI-STATE                                    MDL DOCKET NO. 1467
CREMATORY LITIGATION

This Order relates to:

4:02-CV-168-HLM (1:02-CV-149 (S.D. Ala.))
WALLEY, ET AL. v. TRI-STATE CREMATORY, INC., ET AL.

4:02-CV-032-HLM
DENT v. TRI-STATE CREMATORY, INC., ET AL.

4:02-CV-041-HLM
BECHTEL, ET AL. v. TRI-STATE CREMATORY, INC., ET AL.

## ORDER

This proposed diversity class action involves claims of breach of contract, breach of

the covenant of good faith, breach of fiduciary duty, fraud, negligence, interference with

remains,[1] mishandling of corpses, infliction of emotional distress, and unjust enrichment,

as well as claims for equitable relief.  The case is before the Court on Plaintiffs' Motion to

Certify Class Action [176],[2] Plaintiffs' Motion for Designation of Additional Proposed Class

Representative [177],[3] and Plaintiffs' Amended Motion to Certify Class Action [271].

---

[1]

Throughout this Order, unless otherwise noted, the Court follows the convention of the parties, and sometimes uses the word "remains" as synonymous with the words "human remains."

[2]

The Court denies as moot Plaintiffs' Motion to Certify Class Action in view of Plaintiffs' Amended Motion to Certify Class Action, which the Court considers in this Order.

123968.1

**EXHIBIT** 1 

I.      Background

In February 2002, the Georgia Bureau of Investigation began an investigation of the events surrounding the finding of human corpses on the property of Defendant Tri-State Crematories, Inc. (Aff. of Kris Sperry, M.D. ¶ 4.) In May 1905, Justice Joseph H. Lumpkin began his scholarly treatment of the law having to do with the handling of the dead with this passage:

> Death is unique.  It is unlike aught else in its certainty and its incidents.  A corpse in some respects is the strangest thing on earth.  A man who but yesterday breathed and thought and walked among us has passed away.  Something has gone.  The body is left still and cold, and is all that is visible to mortal eye of the man we knew.  Around it cling love and memory.  Beyond it may reach hope.  It must be laid away.  And the law--that rule of action which touches all human things--must touch also this thing of death. It is not surprising that the law relating to this mystery of what death leaves behind cannot be precisely brought within the letter of all the rules regarding corn, lumber and pig iron.  And yet the body must be buried or disposed of.  If buried, it must be carried to the place of burial.  And the law, in its all-sufficiency, must furnish some rule, by legislative enactment or analogy,

---

[3]

The Court grants Plaintiffs' Motion for Designation of Additional Proposed Class Representative.

or based on some sound legal principle, by which to determine between the living questions of the disposition of the dead and rights surrounding their bodies.  In doing this the courts will not close their eyes to the customs and necessities of civilization in dealing with the dead and those sentiments connected with decently disposing of the remains of the departed which furnish one ground of difference between men and brutes.

Louisville & Nashville R.R. Co. v. Wilson,?51 S.E. 24, 25?(Ga. 1905).  With Justice Lumpkin's solemn observations in mind, the Court provides the following background for this case before turning to analysis of Plaintiffs' Amended Motion to Certify Class Action.

 A. Parties

 Plaintiff Carol A. Bechtel is a citizen and resident of Idaho. (Master 1st Am. Class Action Compl. ¶ 4.)  She is the daughter and the next of kin of Robert Gladstone Swofford and Willie Florence Swofford.  (Id.)

 Plaintiff Paula Yockel is a citizen and resident of Pittsburgh, Pennsylvania.  (Master 1st Am. Class Action Compl. ¶ 5.)  She is the daughter, and the next of kin, of Gilbert Schuchman.  (Id.)

 Plaintiff Naomi Webb is a citizen and resident of Brooksville, Florida.  (Master 1st Am. Class Action Compl. ¶ 6.)  She is the mother, and next of kin, of Samantha Webb Swinney.  (Id.)

 Plaintiff Thomas G. Conyers, is a citizen and resident of Cincinnati, Ohio.  (Master 1st Am. Class Action Compl. ¶ 7.)  He is the son and next of kin of Thomas J. Conyers.  (Id.)

 Defendant Tri-State Crematory, Inc. ("Defendant Tri-State") is a Georgia Corporation

with its principal place of business in Noble, Georgia. (Master 1st Am. Class Action Compl. ¶ 9.) Defendant Tri-State was apparently administratively dissolved by the Georgia Secretary of State in 1995 for failure to file appropriate administrative returns. (Id.)

Defendant T. Ray Brent Marsh is a natural person who is a resident of Walker County, Georgia. (Master 1st Am. Class Action Compl. ¶ 10.) Defendant T. Ray Brent Marsh is the operator and secretary of Defendant Tri-State. (Id.)

Defendant Clara C. Marsh is a natural person who is a resident of Walker County, Georgia. (Master 1st Am. Class Action Compl. ¶ 11.) Clara Marsh is the chief financial officer of Defendant Tri-State. (Id.)

Defendant Rhames L. Marsh is a natural person who is a resident of Walker County, Georgia. (Master 1st Am. Class Action Compl. ¶ 12.) Rhames Marsh is the chief executive officer of Defendant Tri-State. (Id.)

Defendant Tommy Ray Marsh is a natural person who is a resident of Walker County, Georgia. (Master 1st Am. Class Action Compl. ¶ 13.) Tommy Ray Marsh is the registered agent and former owner and operator of Defendant Tri-State. (Id.)

Defendants T. Ray Brent Marsh, Clara C. Marsh, Rhames L. Marsh, and Tommy Ray Marsh are collectively referred to as the "Tri-State Defendants."

Defendant Bob Foster d/b/a Foster & Son Funeral Home is a Tennessee sole proprietorship with its principal place of business in Tracy City, Tennessee. (Master 1st Am. Class Action Compl. ¶ 15.)

Defendant Burt Funeral Homes, Inc. is an Alabama Corporation with its principal place of business in Ft. Payne, Alabama. (Master 1st Am. Class Action Compl. ¶ 16.)

Defendant Cagle Funeral Home, Inc. is a Georgia Corporation with its principal

123968.1                                    4

place of business in Jasper, Georgia. (Master 1st Am. Class Action Compl. ¶ 17.)

Defendant Cumberland Funeral Services, Incorporated is a Tennessee Corporation with its principal place of business in Monteagle, Tennessee. (Master 1st Am. Class Action Compl. ¶ 18.)

Defendant Cumberland Funeral Home is a Tennessee Company with its principal place of business in Monteagle, Tennessee. (Master 1st Am. Class Action Compl. ¶ 19.)

Defendant Cumberland Funeral Home – Tracy City is a Tennessee Company with its principal place of business in Tracy City, Tennessee. (Master 1st Am. Class Action Compl. ¶ 20.)

Defendant Covenant Funeral Service has its principal place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 21.)

Defendant Erwin-Petitt Funeral Home, Inc. is a Georgia Corporation with its principal place of business in Summerville, Georgia. (Master 1st Am. Class Action Compl. ¶ 22.)

Defendant Ewton Funeral Home, Inc. is a Tennessee Corporation with its principal place of business in Dunlap, Tennessee. (Master 1st Am. Class Action Compl. ¶ 23.)

Defendant Family Mortuary, Inc. is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 24.)

Defendant Foster & Lay Funeral Home is a Tennessee Company with its principal place of business in Tracy City, Tennessee. (Master 1st Am. Class Action Compl. ¶ 25.)

Defendant Franklin-Strickland Funeral Home, Inc. is a Tennessee Corporation with a business located in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 26.)

Defendant Gilmore Funeral Home, LLC is a Tennessee Limited Liability Company

with its principal place of business in Manchester, Tennessee. (Master 1st Am. Class Action Compl. ¶ 27.)

Defendant Hardwick & Sons Funeral Home, Inc. is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 28.)

The House of Overstreet Mortuary, Inc. is a Georgia Corporation with its principal place of business in Dalton, Georgia. (Master 1st Am. Class Action Compl. ¶ 29.)

Defendant J. Avery Bryan Funeral Home, Inc. is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 30.)

Jesse Jones Funeral Home, Inc. is a Georgia Corporation with its principal place of business in Tunnel Hill, Georgia. (Master 1st Am. Class Action Compl. ¶ 31.)

Defendant Julian Peeples Memorial Chapel Inc., d/b/a Julian Peeples Funeral Home, is a Georgia Corporation with its principal place of business in Dalton, Georgia. (Master 1st Am. Class Action Compl. ¶ 32.)

Defendant Kerby Funeral Home, Inc. is an Alabama Corporation with its principal place of business in Henagar, Alabama. (Master 1st Am. Class Action Compl. ¶ 33.)

Defendant Kerby Funeral Home LLC is an Alabama Limited Liability Corporation with its principal place of business in Albertville, Alabama. (Master 1st Am. Class Action Compl. ¶ 34.)

Defendant Layne Funeral Home, Inc. is a Tennessee Corporation with its principal place of business in Palmer, Tennessee. (Master 1st Am. Class Action Compl. ¶ 35.)

Defendant Love Funeral Home, Inc. is a Georgia Corporation with its principal place

of business in Dalton, Georgia.  (Master 1st Am. Class Action Compl. ¶ 36.)

Defendant Patton's Funeral Home is a Tennessee business with its principal place of business in Cleveland, Tennessee.  (Master 1st Am. Class Action Compl. ¶ 37.)

Defendant Peeples Funeral Home, Inc., d/b/a Peeples Funeral Home, is a Georgia Corporation (Master 1st Am. Class Action Compl. ¶ 38.)

Defendant Pinkard & Mee Funeral Service, Inc. is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee.  (Master 1st Am. Class Action Compl. ¶ 39.)

Defendant Prime Succession, Inc. is a Delaware corporation with its principal place of business in Erlanger, Kentucky.  (Master 1st Am. Class Action Compl. ¶ 40.)  Plaintiffs allege that Defendant Prime Succession, Inc. owns, operates, and controls, directly or through subsidiary corporations, Defendant Prime Succession Holdings, Inc, Defendant Prime Succession of Tennessee, Inc., and Defendant Buckner-Rush Enterprises, Inc. (Id.)

Defendant Prime Succession Holdings, Inc. is a Delaware Corporation with its principal place of business in Erlanger, Kentucky.  (Master 1st Am. Class Action Compl. ¶ 41.)

Defendant Prime Succession of Tennessee, Inc. is a Delaware Corporation with its principal place of business in Erlanger, Kentucky.  (Master 1st Am. Class Action Compl. ¶ 42.)

Defendant Buckner-Rush Enterprises, Inc. is a Tennessee Corporation with a place of business in Cleveland, Tennessee.  (Master 1st Am. Class Action Compl. ¶ 43.)

Plaintiffs allege that Defendant Prime Succession, Inc. wholly-owns, controls,

123968.1                                                    7

operates, and uses its subsidiaries, Defendants Prime Succession Holdings, Inc. and Prime Succession of Tennessee, Inc. as alter-egos and mere instrumentalities (collectively, the "Prime Succession Defendants").   (Master 1st Am. Class Action Compl. ¶ 44.) Plaintiffs further allege that the Prime Succession Defendants wholly own, control, and are the alter-egos of Defendant Buckner-Rush Enterprises, Inc., which they use as a mere instrumentality and alter-ego.  (Id.)

Defendant Putnam Funeral Home, Inc. is a Tennessee Corporation doing business as Putnam-Reed Funeral Home and Putnam-Standefer-Reed Funeral Home, with business locations in Pikeville, Dunlap, and Whitwell, Tennessee. (Master 1st Am. Class Action Compl. ¶ 45.)

Defendant R. D. Moore Funeral Home, Inc. is a Georgia Corporation with its principal place of business in Trenton, Georgia.  (Master 1st Am. Class Action Compl. ¶ 46.)

Defendant R. Dudley Barton & Son Funeral Home, Inc.  is a Georgia Corporation with its principal place of business in Adairsville, Georgia.  (Master 1st Am. Class Action Compl. ¶ 47.)

Defendant Ryan Funeral Home, Inc. was a Georgia Corporation with its principal place of business in Trenton, Georgia.  (Master 1st Am. Class Action Compl. ¶ 48.)

Defendant SCI Alabama Funeral Services, Inc. is a Alabama Corporation with its principal place of business in Birmingham, Alabama.  (Master 1st Am. Class Action Compl. ¶ 49.)

Defendant SCI Georgia Funeral Services, Inc., is a Delaware corporation with its principal place of business in Atlanta, Georgia.  (Master 1st Am. Class Action Compl. ¶ 50.)

Defendant SCI Tennessee Funeral Services, Inc. d/b/a Chattanooga Funeral Home-East Chapel, SCI Tennessee Funeral Services, Inc. d/b/a Chattanooga Funeral Home-North Chapel, SCI Tennessee Funeral Services, Inc. d/b/a Chattanooga Funeral Home-Valley View Chapel, Defendant SCI Tennessee Funeral Services, Inc. d/b/a Chattanooga Funeral Home-West Chapel, SCI Tennessee Funeral Services, Inc. d/b/a Fike Funeral Home, and SCI Tennessee Funeral Services, Inc. f/d/b/a Hooper Funeral Homes, Inc. is a Tennessee Corporation with its principal place of business in Cookeville, Tennessee. (Master 1st Am. Class Action Compl. ¶ 51.)

Defendant Sequatchie Valley Memorial Funeral Home & Gardens, Inc. is a Tennessee Corporation with its principal place of business in Kimball, Tennessee. (Master 1st Am. Class Action Compl. ¶ 52.)

Defendant Taylor Funeral Home of Chattanooga, Incorporated is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 53.)

Defendant Thomas and Son Funeral Home, Inc. is a Georgia Corporation with its principal place of business in Calhoun, Georgia. (Master 1st Am. Class Action Compl. ¶ 54.)

Defendant Turner Funeral Home, Inc. is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 55.)

Defendant Wallis-Wilbanks Funeral Home, LLC is a Georgia Limited Liability Company with its principal place of business in Lafayette, Georgia. (Master 1st Am. Class Action Compl. ¶ 56.)

Defendant Wann Funeral Home, Inc. is a Tennessee Corporation with its principal

place of business in Chattanooga, Tennessee. (Master 1st Am. Class Action Compl. ¶ 57.)

Defendant Willis Funeral Home, Inc. is a Georgia Corporation with its principal place of business in Dalton, Georgia. (Master 1st Am. Class Action Compl. ¶ 58.)

Defendant Wilson Funeral Home Lafayette Chapel, LLC is a Georgia Limited Liability Company with its principal place of business in Lafayette, Georgia. (Master 1st Am. Class Action Compl. ¶ 59.)

Defendant Wilson Funeral Home J. Avery Bryan Chapel, LLC is a Georgia Limited Liability Company with its principal place of business in Chickamauga, Georgia. (Master 1st Am. Class Action Compl. ¶ 60.)

Defendant Wilson Funeral Home Wallis Stewart Chapel, LLC is a Georgia Limited Liability Company with its principal place of business in Ft. Oglethorpe, Georgia. (Master 1st Am. Class Action Compl. ¶ 61.)

Defendant W.L. Wilson & Sons, Inc. is a Georgia Corporation with its principal place of business in Ft. Oglethorpe, Georgia. (Master 1st Am. Class Action Compl. ¶ 62.)

B.     Factual Background

      1.     Facts Related to the Plaintiff Class

            a.     Discovery of Corpses in 2002

In February 2002, the Georgia Bureau of Investigation ("GBI") began an investigation of the events surrounding the finding of human corpses on the property of Defendant Tri-State or on the property surrounding Defendant Tri-State. (Aff. of Kris Sperry, M.D. ¶ 4.) Kris Sperry, M.D., Chief Medical Examiner for the State of Georgia, served in this investigation in the role of identification of the human corpses found. (Id. ¶ 5.) Dr. Sperry determined that 339 human corpses or partial corpses were on the property of Defendant Tri-State or on the property surrounding Defendant Tri-State. (Id. ¶ 6.) As of Thursday, February 27, 2003, 222 of the 339 corpses found had been conclusively identified by the Georgia Emergency Management Agency ("GEMA"). (Gary W. McConnell - Director, GEMA, Crematory Operations Update, Crematory Investigation Body Recovery Information, GEMA Website (2003), at http://www2.state.ga.us/GEMA/.)

            b.     Events Prior to 2002

Plaintiffs allege that:

> for years Tri-State Crematory has failed to follow basic industry practices and acted in total disregard of human decency and the rights and feeling of the decedent's families by improperly cremating bodies, commingling the remains of the bodies in its custody, and fraudulently returning to families non-human materials such as concrete dust that were represented as being human remains.

(Master 1st Am. Class Action Compl. ¶ 2.) Plaintiffs have adduced evidence that is sufficient to support this allegation for purposes of the class certification issue.[4] (Aff. of

---

[4]

Gretchen Edmiston ¶¶ 9-10; Aff. of Kerry Oliver ¶¶ 10-11; Aff. of James J. Jaconetti ¶¶ 9, 13; Aff. of Adolphus Mitchell ¶ 10.)  Plaintiffs have not adduced any evidence indicating that the Tri-State Defendants returned non-human materials to families prior to 1988. (Pls.' Proposed Findings Fact & Conclusions Law at 21.)

Plaintiffs further allege that Funeral Home Defendants "failed to ensure that [cremations performed by Defendant Tri-State pursuant to contracts with Funeral Home Defendants] were carried out in accordance with human dignity, and all applicable laws and regulations." (Master 1st Am. Class Action Compl. ¶ 3.)  In support of this allegation, Plaintiffs produced evidence that Defendants' conduct fell below the standard of care for funeral service providers.  (Dec. 16, 2002, Hr'g Tr. at 90, 92-97; Aff. of Donald E. Douthit ¶¶ 10-20.)

---

The Court duly notes that Funeral Home Defendants object to much of this evidence.   The Court, however, has overruled, without prejudice, Funeral Home Defendants' objections at this stage of the litigation.  (Order of Mar. 6, 2003.)

2.      Facts Related to the Named Plaintiffs

a.      Plaintiff Bechtel

Plaintiff Carol A. Bechtel is a resident of Idaho. (Master 1st Am. Class Action Compl. ¶ 4.) Plaintiff Bechtel's father, Robert Gladstone Swofford, died in April 1993, and Plaintiff Bechtel's mother, Willie Florence Swofford, died in April 1995. (Id. ¶¶ 89-90.) Plaintiff Bechtel contracted with Defendant W.L. Wilson & Sons for both funeral-related services. (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. Ex. M.) In both cases, Defendant W.L. Wilson & Sons contracted with Defendant Tri-State to cremate the bodies. (Master 1st Am. Class Action Compl. ¶¶ 89, 90.) Defendant W.L. Wilson & Sons presented the cremated remains of Plaintiff Bechtel's father and mother in sealed boxes at their respective memorial services in April 1993 and May 1995. (Pl. Bechtel's Responses Funeral Home Defs.' 1st Master Interrogs. ("Bechtel's Interrog. Resps.") No. 17.) The cremated remains subsequently were buried at the Collegedale Cemetery. (Id.)

On approximately February 20, 2002, the cremated remains were exhumed, and Florence Evalynn Swofford Buttermore, Plaintiff Bechtel's sister, took possession of the cremated remains of her father and mother. (Bechtel's Interrog. Resps. Nos. 12, 17.) On the following day, Ms. Buttermore took the remains to the GEMA site for testing and inspection. (Id. No. 17.) Authorities at the GEMA site tested both cremated remains and found that the remains were human, but could not extract DNA from the remains. (Bechtel's Interrog. Resps. Nos. 17, 18.)

Plaintiff Bechtel contends that she does not know whether the remains exhumed were the remains of her mother and father. (Bechtel's Interrog. Resps. No. 26.) Bechtel alleges that this uncertainty has caused her "much emotional distress." (Id.; see also Dep.

of Carol Bechtel at 23, 125.)

               b.     Plaintiff Yockel

Plaintiff Paula Yockel is a resident of Pennsylvania. (Master 1st Am. Class Action Compl. ¶ 5.) She asserts claims based on the handling of the remains of her father, Gilbert Schuchman. (Id. ¶ 88.) Plaintiff Yockel's father died on December 29, 1992. (Id.) According to Plaintiff Yockel, at the time of his death, Gilbert Schuchman was married to, but separated from, Doreen Cornett Schuchman. (Pl. Yockel's Resps. Funeral Home Defs.' 1st Master Interrogs. ("Yockel's Interrog. Resps.") No. 10.)[5]

At the time of his death, Mr. Shuchman was living with Doreen Willhite. (Aff. of Doreen Willhite ¶ 8.) Ms. Willhite had been living with Mr. Shuchman for eight years, and believes that she was Mr. Shuchman's common law wife. (Id. ¶ 10.) Ms. Willhite contracted with Defendant W.L. Wilson & Sons to handle the funeral arrangements for Mr. Schuchman. (Yockel's Interrog. Resps. Nos. 13, 16.) Defendant W.L. Wilson & Sons contracted with Defendant Tri-State to cremate Mr. Schuchman's remains. (Master 1st Am. Class Action Compl. ¶ 88.) Plaintiff Yockel contends that her grandfather, Anthony Schuchman, or Plaintiff Yockel and her grandfather, paid for the cremation. (Yockel's Interrog. Resps. No. 13; Dep. of Paula Yockel at 45.)

In January 1993, Plaintiff Yockel and her grandfather received, through the United States mail, what was represented to be the cremated remains of Mr. Schuchman.

---

[5]

     The Court notes that Defendants vigorously contest Plaintiff Yockel's account of Mr. Schuchman's marital status. The Court need not resolve that issue at this time.

(Yockel's Interrog. Resps. No. 17.)  Plaintiff Yockel's grandfather kept the remains at his home until June 1993, when the remains were buried in a cemetery plot.  (Id.)

In March 2002, the remains were exhumed and tested by Pennsylvania coroner Cyril Wecht, M.D.  (Yockel's Interrog. Resps. No. 17.)  The coroner found that the ashes were human, but could not extract DNA from the remains.  (Id. No. 18; Yockel Dep. at 59, 62.)  Plaintiff Yockel has no proof that her father's remains were mishandled.  (Yockel Dep. at 44.)  As a result of her uncertainty as to whether the remains she received are her father's remains, Plaintiff Yockel claims that she has suffered "much emotional distress."  (Yockel's Interrog. Resps. No. 26.)

c.   Plaintiff Webb

Plaintiff Naomi Webb is a resident of Florida.  (Master 1st Am. Class Action Compl. ¶ 6.)  Webb's daughter, Samantha Webb Swinney, died on August 31, 2000.  (Id. ¶ 91.)  At the time of her death, Ms. Swinney was married to Jason Swinney, a resident of Georgia.  (Pl. Webb's Resps. Funeral Home Defs.' 1st Master Interrogs. ("Webb's Interrog. Resps.") No. 10.)  Mr. Swinney signed all the documents with Defendant Buckner-Rush Funeral Home to handle the funeral arrangements for Ms. Swinney.  (Dep. of Naomi Webb at 50-51, 53.)  Plaintiff Webb and her husband paid the costs for the funeral arrangements. (Id. at 52.)  Defendant Buckner-Rush contracted with Defendant Tri-State to cremate Ms. Swinney's remains.  (Webb's Interrog. Resps. No. 14.)

Sometime later, at a date uncertain, Mr. Swinney picked up what were represented to be the cremated remains of Ms. Swinney from Defendant Buckner-Rush.  (Webb's Interrog. Resps. No. 17.)  Mr. Swinney spread those cremated remains in the ocean.  (Id.)

After learning about the discovery of bodies at Tri-State, Plaintiff Webb gave a

sample of her DNA and her daughter's medical and dental records to the Georgia Bureau of Investigation ("GBI"). (Webb Dep. at 69-72.) Ms. Swinney has not been identified as one of the bodies found on the Tri-State property. (Id. at 112-13.) Plaintiff Webb has no evidence to suggest that the cremated remains received were not those of her daughter or that Defendant Buckner-Rush mishandled the cremated remains. (Id. at 99-105.) Plaintiff Webb states, however, that because of these events she has been depressed, but she has not received any treatment or counseling. (Pl. Webb's Interrog. Resps. No. 26.) Mr. Swinney, widower of Ms. Swinney, does not want to be part of this litigation. (Webb Dep. at 90.)

d.    Plaintiff Conyers

Plaintiff Thomas G. Conyers is a resident of Ohio. (Master 1st Am. Class Action Compl. ¶ 7.) Plaintiff Conyers represents the proposed subclass of families whose decedents' uncremated remains were recovered from Defendant Tri-State's property. (Id. ¶ 66.) Plaintiff Conyers' father, Thomas J. Conyers, died on August 24, 2001. (Id. ¶ 92.)

Plaintiff Conyers contracted with Defendant Franklin-Strickland Funeral Home to handle the funeral arrangements for his father. (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. Ex. M; Pl. Conyers' Resps. Funeral Home Defs.' 1st Master Interrogs. ("Conyers' Interrog. Resps.") No. 13.) Plaintiff Conyers understood that his father's body would be cremated at Defendant Tri-State. (Dep. of Thomas Conyers at 32.) Plaintiff Conyers testified he has no information that Defendant Franklin-Strickland mishandled his father's body prior to Defendant Franklin-Strickland providing the body to Tri-State. (Id. at 102.)

In late February 2002, the GBI notified Plaintiff Conyers that his father's body had

been identified as one of the bodies located on the property of Defendant Tri-State. (Conyers Dep. at 89.) In March 2002, Plaintiff Conyers requested that Heritage Funeral Home cremate the body the GBI had identified as his father's body. (Conyers' Interrog. Resps. No. 18.) According to Plaintiff Conyers, these events have caused him emotional distress and renewed grief. (Id. No. 26.)

### 3.    Plaintiffs' Claims

Plaintiffs seek equitable relief and damages on behalf of the families of all decedents whose remains were consigned to Defendant Tri-State. (Master 1st Am. Class Action Compl. ¶ 3.) The suit alleges breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraudulent concealment, negligence, intentional mishandling of a corpse, negligent mishandling of a corpse, intentional infliction of emotional distress, negligent infliction of emotional distress, and unjust enrichment. Id.

### C.    Procedural Background

On February 19, 2002, Plaintiff Eleanor Kitter Dent filed suit against the Tri-State Defendants in the Northern District of Georgia, Rome Division. (Dent Compl.) On February 26, 2002, Plaintiffs Carol A. Bechtel, Paula Yockel, and Anthony Schuchman filed a lawsuit against the Tri-State Defendants and numerous Funeral Home Defendants in the Northern District of Georgia, Rome Division. (Bechtel Compl.) On March 6, 2002, Plaintiffs Lorie Ann Walley, Carlton Dale Rice, Timothy Todd Rice, Damian Walley, and Virginia Rice Ellington filed suit in the Southern District of Alabama, Southern Division. (Walley Compl.)

On March 19, 2002, Plaintiffs in the Bechtel proceedings filed a Motion for Transfer and Coordination or Consolidation pursuant to 28 U.S.C.A. § 1407. On June 21, 2002, the Judicial Panel on Multidistrict Litigation issued a Transfer Order, transferring the Dent,

Bechtel, and Walley actions to this Court for coordinated or consolidated pretrial proceedings. (June 21, 2002, Transfer Order.) On August 8, 2002, the Court held an Initial Conference for the consolidated proceedings. On August 16, 2002, the Court memorialized certain oral Orders issued at the Initial conference, including the appointment of lead and liaison counsel for Plaintiffs and Funeral Home Defendants and the identification of lead counsel for the Tri-State Defendants. (Order of Aug. 16, 2002.)

On September 27, 2002, Plaintiffs filed Plaintiffs' Master First Amended Class Action Complaint. In the Master First Amended Complaint, Plaintiffs identified Carol A. Bechtel, Paula Yockel, Naomi Webb, and Thomas G. Conyers as the class representatives for the consolidated proceedings. (Master 1st Am. Class Action Compl. ¶¶ 4-7.) Plaintiffs also amended the list of named Defendants. (Id. ¶¶ 9-62.) On October 15, 2002, Defendants filed their Answers. (Answer by Defs. T. Ray Brent Marsh & Tri-State Crematory; Answer by Clara C. Marsh, Rhames L. Marsh & Tommy Ray Marsh; Answer by Funeral Home Defs.)

On October 15, 2002, Plaintiffs filed an Amended Motion to Certify Class Action. Plaintiffs seek to certify a class defined as:

> All those who presently possess or who may subsequently acquire the right to control the disposition of the remains of any decedents delivered for cremation to Defendant Tri-State Crematory, Inc.; all persons who were parties to any contract with any of the defendants regarding funeral arrangements for a decedent who was delivered for cremation to Defendant Tri-State Crematory, Inc.; and the estates of the decedents and the representatives thereof; and a subclass defined as those families whose decedents' uncremated or otherwise desecrated remains have been recovered from the Tri-State Crematory property.

(Master 1st Am. Class Action Compl. ¶ 66.) Plaintiffs Bechtel, Yockel, and Webb will serve as named Plaintiffs for members of the proposed class, and Plaintiff Conyers will serve as

a named Plaintiff for members of the proposed subclass. (Id.)

On December 16, 17, and 18, 2002, the Court conducted a class certification hearing. Having considered all of the extensive pre- and post-hearing briefing submitted by the parties, the Court now finds that the Motion for Class Certification is ripe for resolution.

II.   Standing

"'[A]ny analysis of class certification must begin with the issue of standing.'" Prado-Steiman v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000) (quoting Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987)). "[T]he 'constitutional threshold [of standing] must be met before any consideration of the typicality of claims or commonality of issues required for procedural reason by Fed. R. Civ. P. 23.'" Prado-Steiman, 221 F.3d 1280 (alteration in original) (quoting Brown v. Sibley, 650 F.2d 760, 771 (5th Cir. Unit A, July 1981)). "'Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others.'" Id. (quoting Griffin, 823 F.2d at 1482)).

The Court therefore addresses individual, threshold standing in this Part of the Order, and then addresses the additional criteria of Rule 23 infra Parts III.-IV. Accordingly, the Court analyzes individual standing in two sub-parts: (A) the named Plaintiffs' standing to raise each claim; and (B) standing between the named Plaintiffs and each named Defendant.

A.    Named Plaintiffs' Standing to Raise Each Claim

1.    Standard for Determining Whether the Named Plaintiffs Have Standing in a Class Action

"Prior to certification of a class, and before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." Prado-Steiman, 221 F.3d at 1279.  "It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert." Id. at 1280.  "Rather, 'each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.'" Id. (quoting Griffin, 823 F.2d at 1483).

Subsequently, for each claim, to satisfy the standing requirements of Article III, at least one named Plaintiff:

> [first,] must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quotation marks, ellipses, and citations omitted).  In order to analyze whether an "invasion of a legally protected interest" has occurred, see id., the Court must first resolve what law applies to Plaintiffs' claims, using the applicable choice of law rules.

2.    Choice of Law

123968.1                                    20

a.      Choice of Law for Contract Claims

Funeral Home Defendants "contend that all fifty states' laws are going to become involved in this case." (Dec. 18, 2002, Hr'g Tr. at 54.)  Funeral Home Defendants further argue that the overwhelming complexity of applying the law of many states to Plaintiffs' claims would overwhelm the Court and therefore strongly counsels against certifying a class.  (Id. at 36-60.)

"A federal court faced with the choice of law issue must look for its resolution to the choice of law rules of the forum state." Frank Briscoe Co., Inc. v. Ga. Sprinkler Co., Inc., 713 F.2d 1500, 1503 (11th Cir. 1983) (citing Klaxon Co. v. Stenton Elec. Mfg. Co., 313 U.S. 487 (1941); Erie R.R. v. Tompkins, 304 U.S. 64 (1938)).  Georgia, the forum state in this case, adheres to the traditional rule of lex loci contractus in cases involving conflicts of law. Gen. Tel. Co. of Southeast v. Trimm,  252 Ga. 95, 95, 311 S.E.2d 460, 461 (1984). "Under this approach, [contracts] are to be governed as to their nature, validity and interpretation by the law of the place where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made, in which case . . . the laws of that sister State will be applied." Trimm, 252 Ga. at 95, 311 S.E.2d at 461 (alterations in original).

Georgia's choice of law system, however, has an unusual characteristic:  "the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes." Frank Briscoe, 713 F.2d at 1503 (citing Budget Rent-A-Car Corp. v. Fein, 342 F.2d 509 (5th Cir. 1965) and White v. Borders, 104 Ga. App. 746, 123 S.E.2d 170 (1961)).  "When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law." Id. (citing Budget Rent-A-Car, 342 F.2d at 509;

Motz v. Alropa Corp., 192 Ga. 176, 15 S.E.2d 237 (1941); and White, 104 Ga. App. at 746, 123 S.E.2d at 170); accord Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 n.6 (11th Cir. 1987) ("If a particular state does not have a controlling statute, however, the Georgia choice of law rule requires application of the common law as construed by the courts of Georgia."); Briggs & Stratton Corp. v. Royal Globe Ins. Co., 64 F. Supp. 2d 1340, 1343-44 (M.D. Ga. 1999) (gathering post-Frank Briscoe cases from appellate courts of Georgia and concluding that rule from Frank Briscoe remains valid Georgia choice of law rule).

Although Plaintiffs' position on choice of law has not been a model of clarity over the course of this litigation, Plaintiffs now propose that the Court apply Georgia law to all Plaintiffs' claims. (Dec. 18, 2002, Hr'g Tr. at 130.) The Court, bound by case law from the Supreme Court of Georgia and the United States Court of Appeals for the Eleventh Circuit, finds that if no foreign statutes are "involved," then the Court must apply Georgia law, Frank Briscoe, 713 F.2d at 1503; Motz, 192 Ga. at 176, 15 S.E.2d at 238, unless the application of Georgia law would be inconsistent with due process, Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985); Kirkpatrick, 827 F.2d at 725 n.6.

Neither Plaintiffs, Funeral Home Defendants, nor the Tri-State Defendants have referred the Court to any statutes of foreign States pertinent to Plaintiffs' claims for breach of contract.[6] The Court finds that the choice of law rules of the State of Georgia require the

---

[6]

The Eleventh Circuit has stated that Georgia's choice of law rules require a trial court--rather than the parties--to survey the law of the relevant foreign states to determine whether those foreign states have a controlling statute before applying Georgia law. Kirkpatrick, 827 F.2d at 725 n.6. The Eleventh Circuit further has indicated that if the trial court must survey the law of all fifty states, then class action treatment is rendered unmanageable. Id. at 725.

The Supreme Court of Georgia, however, stated in a subsequent decision that a

Court to apply Georgia law, unless such application is inconsistent with due process. The Court therefore now turns to the issue of due process.

"[I]f Georgia law would require application of its own common law rules to some claims involving purchases in other states, the law of Georgia could be applied consistent with due process only if the particular transaction had some significant relation to Georgia." Kirkpatrick, 827 F.2d at 725 (citing Phillips Petroleum Co., 472 U.S. at 797 (1985)). The forum state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair." Phillips Petroleum Co., 472 U.S. at 821-22 (quoting Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981)).

---

Georgia trial court shall presume that the law of Georgia applies "'where no statute of the foreign State is pleaded.'" Avnet, Inc. v. Wyle Labs., Inc., 263 Ga. 615, 621, 437 S.E.2d 302, 306 (1993) (quoting Slaton v. Hall, 168 Ga. 710, 714, 148 S.E. 741 (1929)) (emphasis added). When a federal court in a diversity case is confronted with a conflict between a ruling by a federal court on an issue of state law, and a more recent decision by a state court on the same issue of state law, the federal court must follow the more recent state court decision. Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1451 (11th Cir. 1991); Briggs & Stratton Corp., 64 F. Supp. 2d at 1343. The Court must follow the Georgia Supreme Court's decision in Avnet. Consequently, because the parties have not directed the Court's attention to statutes of foreign States in their pleadings, the Court presumes the law of the State of Georgia applies.

Here, each contract for cremation entered into by a respective Funeral Home Defendant, regardless of the location or primary place of business of the respective Funeral Home Defendant, has one common element: at least a portion of the contract was to be performed in Georgia, at Tri-State Crematory. The Funeral Home Defendants' interactions with Tri-State Crematory create a significant aggregation of contacts with the State of Georgia. The Court concludes that the contracts at issue have a significant relation with Georgia such that the choice of Georgia law is not arbitrary or unfair. The Court therefore will apply Georgia law in its analysis of Plaintiffs' claim for breach of contract.

b.    Choice of Law for Tort Claims

The Court's choice of law analysis for Plaintiffs' tort claims is similar to the analysis discussed supra Part II.A.2.a. for Plaintiffs' contract claims. "A federal court faced with the choice of law issue must look for its resolution to the choice of law rules of the forum state." Frank Briscoe, 713 F.2d at 1503 (citing Klaxon Co., 313 U.S. at 487; and Erie R.R., 304 U.S. at 64). The Georgia conflicts of law rule governing tort actions is lex loci delecti, or the place of the wrong. Velten v. Lippert, 985 F.2d 1515, 1521 (11th Cir. 1993) (citing Risdon Enters. v. Colemill Enters., 172 Ga. App. 902, 903, 324 S.E.2d 738, 740 (1984)). "The place of the wrong is the jurisdiction where the harm was suffered or where the last event necessary to make an actor liable for the alleged tort takes place." Id. (citing Risdon, 172 Ga. App. at 903, 324 S.E.2d at 740).

Again, however, in Georgia, "the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes. When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law."

123968.1                                    24

<u>Frank Briscoe</u>, 713 F.2d at 1503 (citations omitted).[7]  The appellate courts of Georgia apply this choice of law limitation to tort claims as well as to contract claims.  <u>Slaton</u>, 168 Ga. at 710, 148 S.E. at 741 (applying rule in negligence case); <u>Risdon</u>, 172 Ga. App. at 905, 324 S.E.2d 741 (stating rule in wrongful death case).        Plaintiffs  propose  that  the  Court apply Georgia law to all Plaintiffs' claims.  (Dec. 18, 2002, Hr'g Tr. at 130.)  The Court agrees that, if the parties have not directed the Court's attention to  statutes of foreign States, the Court must apply Georgia law,  <u>Frank Briscoe</u>, 713 F.2d at 1503; <u>Motz</u>, 192 Ga. at 176, 15 S.E.2d at 238, unless the application of Georgia law would be inconsistent with due process, <u>Phillips Petroleum Co.</u>, 472 U.S. at 797 (1985); <u>Kirkpatrick</u>, 827 F.2d at 725 n.6.  <u>See also</u> discussion <u>supra</u> note 1.  With one exception, discussed in the next section <u>infra</u> Part II.A.2.c., the parties have not directed the Court's attention to controlling statutes of foreign states.[8]

---

[7]

See <u>supra</u> Part II.A.2.a. for omitted citations and additional citations.

[8]

Funeral Home Defendants do make reference to "different regulations regarding crematories which must be applied at different time periods and applicable in three different states, Georgia, Tennessee[,] and Alabama."  (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. at 74.)  The Court has reviewed the statutes cited by Funeral Home Defendants and finds that those statutes are related to licensing of

funeral establishments in Tennessee.  The Court does not find that these statutes are controlling for any of Plaintiffs' claims evaluated <u>infra</u>.

26

For the following reasons, the Court finds that the application of Georgia law is not inconsistent with due process.  The State of Georgia "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [Georgia] law is not arbitrary or unfair."  Phillips Petroleum Co., 472 U.S. at 821-22 (quoting Allstate Ins. Co., 449 U.S. at 312-13) (alterations added).  Here, each of the torts alleged by the named Plaintiffs has a significant contact with the State of Georgia: namely, the alleged acts that occurred in Noble, Georgia, on Defendant Tri-State's property, that led to this litigation.  The Court consequently will apply Georgia law in analyzing Plaintiffs' tort claims.

                    c.      Controlling Statutes of Foreign States

        Funeral Home Defendants have prepared a chart that shows the standards for recovery of punitive damages in twenty-four of the states where members of the proposed class reside.  (Funeral Home Defs. Post-Hearing Br. Opposition to Pls. Mot. Certify Class Ex. A.)  At least nineteen of those twenty-four states have statutes that control the award of punitive damages.  (Id.)  The statutes vary in legal standard for recovery of punitive damages.[9]

---

[9]

        For example, below are the relevant portions of the punitive damages statutes for the States of Mississippi and Alabama.  The statutes show, inter alia, that Mississippi allows punitive damages to be awarded upon proof of grossly negligent conduct, whereas Alabama requires a greater degree of culpability.

Thus, under Georgia's choice of law doctrine, the Court would be required to interpret, apply, and instruct a jury on the law of at least nineteen states in the area of punitive damages. The Court finds this task unmanageably complicated. Accord In re Telectroinics Pacing Sys., 172 F.R.D. 271, 294 (S.D. Ohio 1997). The Court therefore rules

---

Mississippi's punitive damages statute states:

Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code Ann. § 11-1-65(a) (2002).

Alabama's punitive damages statute provides:

Punitive damages may not be awarded in any civil action . . other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.

Ala. Code § 6-11-20(a) (1987).

that punitive damages are not appropriate for class action certification in this case.

        d.     Choice of Law for <u>Walley et al. v. Tri-State Crematory, Inc., et al.</u>

In Multi-District litigation, "the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." <u>In re Temporomandibular Joint Implants Prod. Liab. Litig.</u>, 97 F.3d 1050, 1055 (8th Cir. 1996) (citing <u>In re Air Crash Disaster Near Chicago, Ill.</u>, 644 F.2d 594, 610 (7th Cir. 1981) (holding transferee court must apply the "choice-of-law rules of the states where the actions were originally filed"), cert. denied, 454 U.S. 878 (1981)). The Court's choice of law analysis, <u>supra</u> Part II.A.2.a. & b., therefore only applies to cases in this consolidated action that were originally filed in Georgia.

The <u>Walley</u> case was originally filed in the United States District Court for the Southern District of Alabama.[10]  The Court must therefore apply the choice of law rules for the State of Alabama to the <u>Walley</u> action.  <u>Walley</u> is not a proposed class action.  The case involves five Plaintiffs, who all are residents and citizens of Alabama.  (<u>Walley</u> Compl. ¶¶ 1-5.)  Those five Plaintiffs are suing Defendant Tri-State, Defendant T. Ray Brent Marsh, Defendant Covenant Funeral Services, and Defendant Walter L. Crox and Defendant Barbara Crox.  (<u>Id.</u> ¶ 6-10.)

Defendant Tri-State is a Georgia corporation with its principal place of business in

---

[10]

     The <u>Bechtel</u> and <u>Dent</u> cases were both filed in the United States District Court for the Northern District of Georgia.

Noble, Georgia. (Master 1st Am. Class Action Compl. ¶ 9.) Defendant T. Ray Brent Marsh is a natural person who is a resident of Walker County, Georgia. (Id. ¶ 10.) Defendant T. Ray Brent Marsh is the operator and secretary of Defendant Tri-State. (Id.)

Defendant Covenant Funeral Service has its principal place of business in Chattanooga, Tennessee. (Walley Compl. ¶ 10.) Defendant Walter L. Crox is a citizen and resident of Tennessee, and co-owner and operator of Defendant Covenant Funeral Services. (Id. ¶ 8.) Defendant Barbara Crox is a citizen and resident of Tennessee, and co-owner and operator of Defendant Covenant Funeral Services. (Id.).

The Alabama courts employ the traditional rules of lex loci contractus for contract claims, Am. Nonwovens, Inc. v. Non Wovens Eng'g, S.R.L., 648 So.2d 565, 567 (Ala. 1994), and lex loci delecti for tort claims, Fitts v. Minnesota Min. & Mfg. Co., 581 So.2d 819, 823 (Ala. 1991). Although the Court has not performed a rigorous choice of law analysis for the Walley claims, the Court believes that use of Alabama's choice of law rules will probably result in the application of Alabama or Tennessee law to the Walley Plaintiffs' claims. The Court will nevertheless allow the Walley claims to remain a part of these consolidated proceedings through the completion of discovery. If the Walley litigation proceeds to trial, or if parties to the Walley litigation wish to file dispositive motions with respect to the Walley claims, the Court will promptly take measures to ensure that the Judicial Panel on Multidistrict Litigation remands the Walley case back to the Southern District of Alabama. 28 U.S.C.A. 1407(a).

3.    Evidentiary Standard to Establish Standing at Class Certification
Stage

"The amount of proof required to establish standing varies depending on the stage of the litigation at which the standing issue arises." In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 609 (N.D. Ga. 1997) (citing Lujan, 504 U.S. at 561). "At the motion to dismiss stage, the party seeking standing may rely on the facts alleged in the complaint, whereas at the summary judgment stage, the party must adduce evidence sufficient to create a question of fact on the standing issue." Id. (citing Lujan, 504 U.S. at 561.) "The class certification stage is a hybrid of these two stages, in that the court looks beyond the pleadings but does not inquire into the merits of the case." Id. (citing General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982)).

"The Court therefore will examine the evidence necessary to resolve the standing issue, viewing the evidence in a light most favorable to Plaintiffs." In re Polypropylene Carpet, 178 F.R.D. at 609. Using this evidentiary standard, the Court will evaluate each of Plaintiffs' claims to determine whether "'at least one named plaintiff has suffered the injury that gives rise to that claim.'" Prado-Steiman, 221 F.3d at 1280 (quoting Griffin, 823 F.2d at 1483).

4.    Analysis of Standing for Each Claim

a.    Equitable Claim (Injunctive/Declaratory Relief)

"In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." Malowney v. Fed. Collection Deposit Group, 193 F.3d 1342, 1346 (11th Cir. 1999) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)). Plaintiffs may only seek injunctive relief against future conduct by Defendants if Plaintiffs allege "'a real and immediate-as opposed to a merely conjectural or hypothetical-threat of future injury.'" Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) (quoting Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001)).

Further, to seek injunctive relief, "a substantial continuing controversy between two adverse parties" must exist. Malowney, 193 F.3d at 1347 (citing Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985)). "'The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred.'" Id. (quoting Emory, 756 F.2d at 1552). Finally, "[t]he emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." Lyons, 461 U.S. 95, 107 n.8 (1983).

Aside from Plaintiffs' breach of contract claims, the injury alleged by Plaintiffs Bechtel, Yockel, and Webb is the "uncertainty" related to the disposition of their loved ones' remains. (Dec. 18, 2002, Hr'g Tr. at 138.) The injury alleged by Plaintiff Conyers relates to the identification of his father as one of the bodies discovered at Tri-State Crematories in 2002. (Id. at 30.) Neither Plaintiff Bechtel, Plaintiff Yockel, Plaintiff Webb, nor Plaintiff

Conyers have alleged facts that indicate that any "real and immediate" "threat of future injury" exists.  See Wooden, 247 F.3d at 1284.

Nor have Plaintiffs alleged the existence of a continuing controversy between the named Plaintiffs and any Defendant for which injunctive or declaratory relief would prevent further injury.  The Court finds that all of the named Plaintiffs lack standing to seek "forward-looking relief" and that the named Plaintiffs therefore "cannot represent a class seeking that relief."  See Wooden, 247 F.3d at 1288.  The Court consequently dismisses without prejudice Plaintiffs' claims for equitable relief.

     b.  Breach of Contract

In order to maintain a suit on a contract, privity of contract must exist between parties to the contract.  Sofet v. Roberts, 185 Ga. App. 451, 452, 364 S.E.2d 595, 596 (1987) (citing Stein Steel & Supply Co. v. Goode Constr. Co., 83 Ga. App. 821, 822, 65 S.E.2d 183 (1951)).  Plaintiffs have adduced evidence that Plaintiff Conyers was a party to a contract for funeral services with a Funeral Home Defendant.  (Funeral Home Defendants' Br. Opposition Pls.' Renewed Mot. Class Certif. Ex. M.)  Plaintiffs have also produced evidence that Plaintiff Bechtel was a party to a contract for funeral services with a Funeral Home Defendant.  (Id.)

Funeral Home Defendants, however, have argued that Plaintiff Bechtel's breach of contract claim is barred by the expiration of the applicable period of limitation.  "All actions upon promissory notes, drafts, or other simple contracts in writing shall be brought within six years after the same become due and payable."  O.C.G.A. § 9-3-24.  "'Under Georgia law, the statute of limitations runs from the time the contract is broken and not at the time the actual damage results or is ascertained.'"  Owen v. Mobley Const. Co., Inc., 171 Ga.

App. 462, 462, 320 S.E.2d 255, 256 (1984) (quoting Space Leasing Assoc. v. Atlantic Bldg.

Systems, 144 Ga. App. 320, 241 S.E.2d 438 (1977)) (internal citations omitted); accord

Moore v. Dept. of Human Resources, 220 Ga. App. 471, 472, 469 S.E.2d 511, 512-13

(1996).  "The discovery rule is not applicable to a cause of action based on breach of

contract."  Id. (citing Owen, 171 Ga. App. at 462, 320 S.E.2d at 255).

Plaintiff Bechtel's pre-need contract for cremation services for Willie Florence

Swofford was executed in May 1994.  (Funeral Home Defendants' Br. Opposition Pls.'

Renewed Mot. Class Certif. Ex. M.) Ms. Swofford died on April 30, 1995.  (Id.) Any alleged

breach of the contract for cremation services therefore occurred in 1995.  The expiration of

the statute of limitations consequently took place in 2001.  Because this lawsuit was not

filed until 2002, Plaintiff Bechtel's breach of contract claim is time barred.[11]

---

[11]

Plaintiffs argue that the statute of limitations should be tolled for fraudulent

concealment. (Pls.' Reply Mem. Supp. Class Certification at 61-63.) Under O.C.G.A. § 9-3-96, the statute of limitations applicable to a plaintiff's claim my be tolled if the plaintiff can show "'(1) actual fraud on the part of the defendant involving moral turpitude, (2) which conceals the existence of the cause of action from the plaintiff, and (3) plaintiff's reasonable diligence in discovering his cause of action, despite his failure to do so within the time of the applicable statute of limitations.'" Gropper v. STO Corp., 250 Ga. App. 820, 824, 552 S.E.2d 118, 123 (Ga. App. 2001) (quoting McClung Surveying v. Worl, 247 Ga. App. 322, 324, 541 S.E.2d 703 (2000) (citations omitted)).

   The Court does not agree with Plaintiffs.  First, Plaintiffs have not alleged "actual fraud" involving "moral turpitude" on the part of Funeral Home Defendants, as required by Georgia appellate decisions, see Gropper, 250 Ga. App. at 824, 552 S.E.2d at 123; instead, Plaintiffs allege that Funeral Home Defendants were "negligently complicit in, and vicariously liable for, the fraudulent concealment by the Tri-State [D]efendants." (Master 1st Am. Class Action Compl. ¶ 124; Pls.' Reply Mem. Supp. Class Certification at 62.) Second, with respect to allegations of fraud on the part of the Tri-State Defendants, the Court concludes that those allegations fail to satisfy the predominance requirement of Rule 23(b)(3). See infra Part IV.B.1.b. (discussing lack of predominance of common issues over individual issues for Plaintiffs' claim of fraud against the Tri-State Defendants).

The Court concludes, however, that Plaintiff Conyers has met the requirements for standing for Plaintiffs' breach of contract claim. Plaintiffs therefore may assert their breach of contract claim on behalf of the class.

c.     Breach of the Covenant of Good Faith and Fair Dealing

During the Class Certification Hearing, counsel for Plaintiffs informed that Court that Plaintiffs were not pursuing a claim for breach of the covenant of good faith and fair dealing. (Dec. 18, 2002, Hr'g Tr. at 146.) The Court therefore dismisses this claim, and will not consider it further.

d.     Breach of Fiduciary Duty or Special Duty

(1)     Breach of Fiduciary Duty

To establish standing for this claim, Plaintiffs must show the existence of a fiduciary relationship between Funeral Home Defendants and Plaintiffs. Plaintiffs have not cited any Georgia case or statute recognizing the existence of a fiduciary duty between a funeral home and those seeking funeral arrangements for their loved one. (Dec. 18, 2002, Hr'g Tr. at 142.) The Court's own research also has not uncovered the existence of such an explicit fiduciary duty.

Plaintiffs argue, however, that the relationship between Funeral Home Defendants and Plaintiffs is governed by O.C.G.A. § 23-2-58, and therefore should be deemed a fiduciary relationship.[12] That statute provides:

---

[12]

The Georgia Court of Appeals has indicated that it considers the terms "fiduciary relationship" and "confidential relationship" to be synonymous. Bowen v. Hunter, Maclean, Exley & Dunn, 241 Ga. App. 204, 207, 525 S.E.2d 744, 748 (1999).

23-2-58 Confidential relations defined.
Any relationship shall be deemed confidential, whether arising from nature,

created by law, or resulting from contracts, where one party is so situated as

to exercise a controlling influence over the will, conduct, and interest of

another or where, from a similar relationship of mutual confidence, the law

requires the utmost good faith, such as the relationship between partners,

principal and agent, etc.

O.C.G.A. § 23-2-58.

The Court does not agree with Plaintiffs that the relationship between Plaintiffs and

Funeral Home Defendants is a fiduciary relationship or a confidential relationship as

defined by O.C.G.A. § 23-2-58. While it is true that persons seeking funeral services

necessarily must trust and have confidence in the funeral homes they choose, "[t]he mere

fact that one reposes great trust and confidence in another does not serve to create a

confidential relationship." Walsh v. Campbell, 130 Ga. App. 194, 199, 202 S.E.2d 657,

662-62 (1973) (citing Dover v. Burns, 186 Ga. 19, 196 S.E. 785 (1938)). Further, although

the first codification of O.C.G.A. § 23-2-58 occurred in 1863, the Court has found no

Georgia decision citing that statute in the context of funeral home duties. The Court

therefore finds that Georgia law does not recognize a fiduciary duty between funeral homes

and persons contracting for the services of funeral homes. Plaintiffs consequently lack

standing to pursue a claim for breach of fiduciary duty.

### (2)    Breach of Special Duty

The Court is uncertain whether Plaintiffs consider their claim for breach of special duty as a separate claim, or whether Plaintiffs use the phrase "special duty" simply as another term for fiduciary duty. Out of an abundance of caution, the Court will briefly consider breach of special duty as a separate claim.

To demonstrate standing for breach of special duty, Plaintiffs must first establish the existence of a special duty that the Funeral Home Defendants owe Plaintiffs. Plaintiffs have not cited any Georgia case or statute recognizing the existence of a "special duty" between a funeral home and those contracting for funeral arrangements for their loved one. (Dec. 18, 2002, Hr'g Tr. at 142.) The Court's own research also has not uncovered the existence of such an explicit "special duty" in this context.[13] The Court finds that Georgia does not recognize the existence of a special duty owed by funeral homes to those contracting for their services. Plaintiffs therefore lack standing to pursue a claim for breach of special duty.

### (3)    Summary

The Court concludes that Georgia law does not recognize a fiduciary, or special, duty owed by funeral homes to those with whom the funeral home contracts. The Court therefore finds that Plaintiffs have no standing to bring claims based on breach of those duties, and those claims are dismissed.

---

[13]

The Court notes however, that, under Georgia law, "the duty of ordinary care" is a relative term. See, e.g., Lunsford v. Childs, 107 Ga. App. 210, 212, 129 S.E.2d 398, 400 (1963) ("Ordinary care . . . requires the exercise of due care under the circumstances, which involves a degree of caution commensurate with the danger involved."); Swope, Christian, Powell. See also infra Part III.A.4.f. (addressing Plaintiffs' negligence claim).

e.      Fraudulent Conduct as to the Tri-State Defendants[14]

To bring a fraud action, Plaintiffs must demonstrate that Plaintiffs' injuries are the proximate result of false representations that were made by the Tri-State Defendants, were known by the Tri-State Defendants to be false, and were made by the Tri-State Defendants with the intention of deceiving the Plaintiffs. Martin Burks Chevrolet v. McMichen, 136 Ga. App. 845, 847, 222 S.E.2d 633, 635 (1975). Privity between Plaintiffs and the Tri-State Defendants is not required. Ramey v. Leisure, Ltd., 205 Ga. App. 128, 130-31, 421 S.E.2d 555, 558 (1992).

Plaintiffs have adduced evidence that Plaintiff Conyers was given cremation remains that were represented to be the cremation remains of his father, and that the remains of his father later were discovered at Defendant Tri-State Crematory. (Conyers Dep. at 34, 39-41.)   The Court finds this evidence is sufficient to demonstrate the type of injury contemplated by the Georgia courts for a claim of fraud. Plaintiffs therefore possess standing to assert a fraud claim as to the Tri-State Defendants on behalf of the class.

---

[14]

Plaintiffs are not pursuing a fraud claim against the Funeral Home Defendants. (Master 1st Am. Class Action Compl. ¶ 126; Dec. 18, 2002, Hr'g Tr. at 145.) The Court therefore will only consider Plaintiffs' fraud claim as it pertains to the Tri-State Defendants.

f.     Negligence

A negligence claim may only be brought by a person who has suffered an injury caused by another who owes a legal duty to the first person.  Wilson v. Mallard Creek Holdings, 238 Ga. App. 746, 747, 519 S.E.2d 925, 926 (1999).  Plaintiffs have alleged the existence of facts that may state two types of negligence claims:  (1) a negligence claim based on the existence of a contract; and (2) a negligence claim based on interference with the right to burial.

(1)     Existence of a Contract

The existence of a contract between parties may give rise to a legal duty actionable in tort.  O.C.G.A. § 51-1-8.  As stated supra Part III.A.4.b., Plaintiffs have produced evidence that Plaintiff Conyers and Plaintiff Bechtel were parties to contracts with Funeral Home Defendants.  Plaintiff Conyers and Plaintiff Bechtel therefore have standing to assert claims for negligence on behalf of absent class members based on the existence of a contract.

(2)     Interference with Right to Burial

Further, the Georgia appellate courts recognize a legal interest in the deceased body of a relative.  Welch v. Welch, 269 Ga. 742, 743, 505 S.E.2d 470 (1998); Louisville & Nashville R.R. Co. v. Wilson, 123 Ga. 62, 51 S.E. 24 (1905).  The legal interest belongs to the husband or wife of the deceased, and, if neither are alive, to the next of kin.  Welch, 269 Ga. at 743, 505 S.E.2d at 470; Wilson, 123 Ga. at 62, 51 S.E. at 24.  Interference with this right, specifically interference with the right of burial or disposition of the deceased, is a tort.  See, e.g., Wilson, 123 Ga. at 62, 51 S.E. at 24; Pyle v. Pyle, 243 Ga. App. 398, 400, 531 S.E. 2d 738, 740 (2000).

Plaintiffs have adduced evidence that Plaintiff Yockel is the next of kin of decedent Gilbert Schuchman.  (Yockel Dep. at 23, 25-26.)  Plaintiffs have also adduced evidence that Plaintiff Bechtel, along with her siblings, is the next of kin of decedents Robert Gladstone Swofford and Willie Florence Swofford.  (Bechtel Dep. at 12-13, 27-28, 31.) Plaintiff Yockel and Plaintiff Bechtel therefore have standing to assert claims for interference with the right of burial.

(3)    Summary

For the reasons given above, the Court concludes that Plaintiff Conyers, Plaintiff Bechtel, and Plaintiff Yockel each have standing to assert a claim for negligence. Therefore, Plaintiffs may assert their negligence claim on behalf of the class.

g.    Willful Interference with Remains and Intentional Mishandling of a Corpse

For the reasons given supra Part III.A.4.f.(2), the Court concludes that Plaintiffs have standing to assert claims for willful interference with remains and intentional mishandling of a corpse.

h.    Negligent Interference with Remains and Mishandling of a Corpse

Likewise, for the reasons given supra Part III.A.4.f.(2), the Court concludes that Plaintiffs have standing to assert claims for negligent interference with remains and mishandling of a corpse.

i.    Intentional Infliction of Emotional Distress

To pursue a claim for intentional infliction of emotional distress under Georgia law, Plaintiffs must allege that Plaintiffs were injured by some "malicious, wilful or wanton"

conduct "'directed toward the plaintiff.'" Hall v. Carney, 236 Ga. App. 172, 174, 511 S.E.2d 271, 274 (1999) (quoting Ryckeley v. Callaway, 261 Ga. 828, 829, 412 S.E.2d 826, 826 (1992)). To show wilful or wanton conduct, Plaintiffs must demonstrate that Funeral Home Defendants' behavior, or the Tri-State Defendants' behavior, evidenced a wilful intention to inflict Plaintiffs' injury, or a reckless disregard for the rights of Plaintiffs equivalent to an intentional violation of them. Jacobus v. Congregation of the Children of Israel, 107 Ga. 518, 33 S.E. 853, 855 (1899); Pyle v. Pyle, 243 Ga. App. 398, 400, 531 S.E. 2d 738, 740 (2000); McNeal Loftis, Inc. v. Helmey, 218 Ga. App. 728, 729, 462 S.E.2d 789, 790 (1995).

Plaintiffs have adduced evidence that Plaintiff Conyers was given cremation remains that were represented to be the cremation remains of his father, and that the remains of Plaintiff Conyers' father later were discovered at Tri-State Crematory. (Conyers Dep. at 34, 39–41.) The Court finds that this evidence is sufficient to demonstrate the type of injury contemplated by the Georgia courts for a claim of intentional infliction of emotional distress. Plaintiffs thus have standing to assert this claim on behalf of the class.

                j.      Negligent Infliction of Emotional Distress

Pursuant to Georgia law, to pursue a claim for negligent infliction of emotional distress, Plaintiffs must allege "some impact on the plaintiff, and that impact must be a physical injury." Ryckeley, 261 Ga. at 828, 412 S.E.2d at 826 (1992) (citing OB-GYN Assoc. v. Littleton, 259 Ga. 663, 386 S.E.2d 146 (1989)). Plaintiffs have not alleged any impact that has led to physical injury. The Court therefore concludes that Plaintiffs do not have standing to bring a claim for negligent infliction of emotional distress, and dismisses that claim.

### k.     Unjust Enrichment

During the Class Certification Hearing, counsel for Plaintiffs informed that Court that Plaintiffs were not going to pursue a claim for unjust enrichment. (Dec. 18, 2002, Hr'g Tr. at 147.) The Court therefore will not consider this claim, and dismisses it.

### 5.     Summary of Named Plaintiffs' Standing to Raise Each Claim

In sum, the Court concludes that the named Plaintiffs have standing to assert claims on behalf of the class for: (1) breach of contract; (2) fraudulent conduct as to the Tri-State Defendants; (3) negligence; (4) willful interference with remains and intentional mishandling of a corpse; (5) negligent interference with remains and mishandling of a corpse; and (6) intentional infliction of emotional distress. The Court now turns to the issue of whether the named Plaintiffs have standing to sue each named Defendant.

### B.     Standing Between Named Plaintiffs and Each Named Defendant

Funeral Home Defendants have correctly pointed out to the Court that the four named Plaintiffs were engaged in funeral arrangements with only three of the Funeral Home Defendants, but Plaintiffs have brought this suit against approximately fifty-six funeral home entities. (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. at 24; Master 1st Am. Class Action Compl. ¶¶ 15-62, 88-92.) The named Plaintiffs appear to have no cause of action against the Funeral Home Defendants with which they did not do business. The Court must consider, however, two procedural devices that may allow Plaintiffs to state a claim against Funeral Home Defendants, even those Funeral Home Defendants with which Plaintiffs have not had contact: (1) whether juridical relations exist between all Defendants such that a single resolution of the issues would be expeditious; or (2) whether joinder of all Defendants under Rule 20 of the Federal Rules of

Civil Procedure is appropriate.  The Court now turns to an examination of those procedural devices.

        1.    Juridical Relations

The court in La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973), provided a framework for analyzing the instant situation, where every named Plaintiff has not suffered an injury at the hands of every Defendant.  The court first stated:

> a plaintiff who has no cause of action against the defendant can not 'fairly and adequately protect the interests' of those who do have such causes of action. This is true even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant and even though his attorney is excellent in every material respect.

La Mar, 489 F.2d at 466.  The La Mar court then went on to describe two exceptions to this rule:

> Obviously this position does not embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury.  Nor is it intended to apply in instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious.

La Mar, 489 F.2d at 466 (footnotes omitted).

The Eleventh Circuit has not explicitly endorsed the La Mar framework, but has discussed it favorably in dicta.  Moore v. Comfed Sav. Bank, 908 F.2d 834, 838 (11th Cir.

44

1990).[15] Plaintiffs have not alleged the existence of a "conspiracy or concerted scheme;" therefore, the Court confines its discussion of La Mar and Moore to whether all Defendants are "juridically related [or 'linked'] in a manner that suggests a single resolution of the dispute would be expeditious." Moore, 908 F.2d at 838; La Mar, 489 F.2d at 466.

"A juridical link has been defined as a 'legal relationship' which sufficiently relates all the defendants so that a single action is preferable." Turpeau v. Fid. Fin. Servs., Inc., 936 F. Supp. 975, 978 (N.D. Ga. 1996), aff'd, 112 F.3d 1173 (11th Cir. 1997) (quoting Thillens, Inc. v. Cmty. Currency Exch. Ass'n, 97 F.R.D. 668, 676 (N.D. Ill. 1983)); accord La Mar, 489 F.2d at 470. "Juridical links are most often found in cases involving a defendant class whose members are 'officials of a single state [who] are charged with enforcing or uniformly acting in accordance with a state statute, or common rule or practice of a state-wide application, which is alleged to be unconstitutional.'" Turpeau, 936 F. Supp. at 978 (quoting Mudd v. Busse, 68 F.R.D. 522, 527-28 (N.D. Ind. 1975), aff'd, 582 F.2d 1283 (7th Cir. 1978), cert. denied, 439 U.S. 1078 (1979)); accord La Mar, 489 F.2d at 470; Doss v. Long, 93 F.R.D. 112, 120 (N.D. Ga. 1981).

Federal courts have also found juridical links in a variety of other contexts. See,

---

15

The Ninth Circuit opinion discussed juridical links in the context of a Rule 23 typicality analysis, La Mar, 489 F.2d at 465-68, whereas the Eleventh Circuit decision addressed juridical links under the rubric of standing, Moore, 908 F.2d at 837-39. This Court will follow the analytical structure used by the Eleventh Circuit.

e.g., Bromley v. Mich. Educ. Ass'n-NEA, 178 F.R.D. 148, 163 (E.D. Mich. 1998) (juridical link found where all defendants had some union affiliation); Heffler v United States Fid. & Guar. Ins. Co., 1992 WL 50095, at *4 (E.D. Pa. Mar. 10, 1992) (common form provided by industry trade group was valid juridical link); Barker v FSC Secs. Corp., 133 F.R.D. 548, 553 (W.D. Ark. 1989) (common corporate ownership was valid juridical link); In re Computer Memories Sec. Litig., 111 F.R.D. 675, 681 (N.D. Cal. 1986) (defendant underwriters were found to be juridically linked because defendants entered into agreement among themselves concerning relevant underwriting and were thereby bound to common course of conduct); United States v. Trucking Emp., Inc. 75 F.R.D. 682, 689 (D.D.C. 1977) (juridical link found where "each member of the defendant class provides an identical service, requires employees who possess identical skills, and utilizes identical job classifications").

However, "[n]o juridical link can be said to exist between unrelated businesses simply because they engage in similar conduct." Canady v. Allstate Ins. Co., 1997 WL 33384270, at *6  (W.D. Mo. June 19, 1997) (citing La Mar, 489 F.2d at 470). "A juridical link sufficient to justify class certification generally must stem from an independent legal relationship." Id.; see also Angel Music, Inc. v. ABC Sports, Inc., 112 F.R.D. 70, 75 (S.D. N.Y. 1986) (the "juridical link" exception is limited to cases where the defendants' conduct "is standardized by a common link to an agreement, contract or enforced system which acts to standardize the factual underpinnings of the claims and to insure the assertion of defenses common to the class.") Those latter cases seem in line with the limited available Eleventh Circuit jurisprudence related to juridical links in contexts outside of state officials being charged with unconstitutional conduct. Moore, 908 F.2d at 838 ("While all of these

cases [cited by plaintiffs] support plaintiffs' view that in the event there is a juridical link, it is appropriate to join as a defendant a party with whom the named class representative did not have a direct contact, each of them presents a situation in which there was either a contractual obligation among all defendants or a state or local statute requiring common action by the defendants."); Turpeau, 936 F. Supp. at 978-79 (no juridical link among defendant lenders and life insurance companies although each allegedly violated same state statute in same manner; defendants were not state officials charged with enforcing state statute or common rule or practice).

Even accepting Plaintiffs' allegations as true, the Court finds that Funeral Home Defendants were simply unrelated, parallel businesses that engaged in the similar conduct of doing business with Defendant Tri-State.  While it is true that each Funeral Home Defendant engaged in contractual relations with Defendant Tri-State, here, as in Moore, no "contractual relation among all defendants" exists so as to support a finding of juridical links between Defendants in this case.  908 F.2d at 838.  Plaintiffs therefore may not proceed against all Defendants under this theory.

      2.     Permissive Joinder

Having found no juridical relations between all Defendants, the Court now considers whether joinder of Defendants is appropriate under the provisions of the Federal Rules. Rule 20(a) provides in relevant part:

> (a) Permissive Joinder. All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any

.

> question of law or fact common to all defendants will arise in the action. A
> plaintiff or defendant need not be interested in obtaining or defending against
> all the relief demanded.

Fed. R. Civ. Proc. 20(a).  In <u>Moore</u>, the Eleventh Circuit held that ample basis existed for the district court to join defendants under Rule 20(a).  908 F.2d at 839.

The facts in <u>Moore</u> were as follows:  plaintiffs borrowed money at allegedly usurious rates from a lender.  908 F.2d at 836.  One of the several named defendants purchased from the lender, on the secondary market, the notes and contracts of each of the named plaintiffs.  <u>Id.</u> at 837.  After the lender filed bankruptcy, the named plaintiffs brought a class action against the specific financial institutions that held the named plaintiffs' notes and contracts.  <u>Id.</u>  Plaintiffs sought to represent all persons who had borrowed money from the lender.  <u>Id.</u>  The district court <u>sua sponte</u> joined as defendants other financial institutions that had purchased notes and contracts from the lender.  <u>Id.</u> at 836.  All of the newly joined defendants that did not hold any note or contract signed by any of the named class plaintiffs complained that they had been improperly joined.  <u>Id.</u> at 837.

The Eleventh Circuit discussed the juridical link doctrine, but did not expressly rule on that doctrine.  908 F.2d at 838.  Rather, the court found that defendants were properly joined pursuant to Federal Rule of Civil Procedure 20(a).  <u>Id.</u> at 839.  The court reasoned that joinder was appropriate because all of the plaintiff class's claims "arose out of a series of transactions or occurrences initiated by [the lender] and that all of the claims involved the same question of law or fact."  <u>Id.</u>

Similarly, in the instant case, all of Plaintiffs' claims arose out of a series of transactions or occurrences that have a question of law or fact common to all Defendants.

123968.1                                    48

The series of transactions that have a common question of law or fact is the series of contracts between Plaintiffs and Funeral Home Defendants that were to be performed in part by a common entity, Defendant Tri-State.  The series of occurrences that have a common question of law or fact are the alleged events at a common locale, Defendant Tri-State's property, involving mishandling of Plaintiffs' decedents' remains.

Plaintiffs' claims all arose out of a series of transactions and occurrences involving a common entity, Defendant Tri-State, just as the claims in Moore all arose out of a series of transactions and occurrences involving a common entity, the lender.  Moore, 908 F.2d at 834.  The Court finds that the argument for joinder of Funeral Home Defendants here is even more persuasive than the argument for joinder of the financial institutions in Moore, because the plaintiffs in Moore had no direct contact with the financial institution, whereas here Plaintiffs dealt directly with Funeral Home Defendants.

For these reasons, the Court finds that joinder of all Funeral Home Defendants is proper under Federal Rule of Civil Procedure 20(a).  The Court therefore concludes that the named Plaintiffs have standing to sue all named Defendants.

C.     Summary: Standing

In summary, the Court concludes that the named Plaintiffs have standing to bring claims on behalf of the class members for: (1) breach of contract; (2) fraudulent conduct as to the Tri-State Defendants; (3) negligence; (4) willful interference with remains and intentional mishandling of a corpse; (5) negligent interference with remains and mishandling of a corpse; and (6) intentional infliction of emotional distress.  The Court further concludes that the named Plaintiffs have standing to sue all named Defendants, including both Funeral Home Defendants and the Tri-State Defendants.

III.    Standard for Class Certification

A request to proceed as a class action is governed by Federal Rule of Civil Procedure 23. Plaintiffs have the burden of establishing that they have satisfied each of Rule 23's certification requirements. See In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 683 (N.D. Ga. 1991). When assessing a motion for class certification, the Court does not inquire whether Plaintiffs have adduced sufficient evidence to prevail on the merits of their claims. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974); Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 456 (11th Cir. 1996), cert. denied, 519 U.S. 1149 (1997). Nonetheless, the Court performs a "rigorous analysis" of the arguments offered in support of certifying the class. Gilchrist v. Bolger, 733 F.2d 1551, 1556 (11th Cir. 1984). When performing this analysis, the Court is not limited solely to the substance of the parties' pleadings; indeed, the Court should allow--and has allowed in this case--the parties to conduct discovery and adduce evidence relevant to the class certification issue. See Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1570-71 (11th Cir. 1992). As pointed out by the Supreme Court, the need for such discovery varies depending on the circumstances presented by each case:

> The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. [Coopers & Lybrand v. Livesay, 437 U.S.] at 469 (quoting Mercantile Nat. Bank v. Langdeau, 371 U.S. 555, 558). Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and

sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982); Hudson, 90 F.3d at 457.

Consistent with Eleventh Circuit authority, the Court will "scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." Domestic Air, 137 F.R.D. at 684; Telecomm Technical Serv., Inc. v. Siemens Rolm Communications, Inc., 172 F.R.D. 532, 542-43 (N.D. Ga. 1997) ("[Rule 23] analysis often mandates that the Court look to the law and facts which comprise the plaintiffs' class action claims"). "This means ensuring through information submitted outside of the pleadings that the requirements of Rule 23 are met, not whether plaintiffs' claims are viable." Telecomm Technical, 172 F.R.D. at 543. In other words, the Court will examine whether sufficient evidence exists to reasonably conclude that Plaintiffs may proceed in the manner proposed, not whether the evidence can withstand any and all factual challenges leveled by Defendants.

IV. Class Action Certification Under Rule 23

Before certifying a class, the Court first determines whether Plaintiffs have satisfied the requirements of Rule 23(a), and then proceeds to verify that the proposed class falls within one of the categories described in Rule 23(b). Blue Bird, 573 F.2d at 315; Domestic Air, 137 F.R.D. at 697. Rule 23(a) requires Plaintiffs to show:

> (1) the class is so numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the class,
> (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class, and
(4) the representative parties will fairly and adequately protect the interests of

the class.

Fed. R. Civ. P. 23(a).  Plaintiffs contend they have satisfied these requirements, and further

allege that the resulting class fits within Rule 23(b)(3), which requires: (1) questions of law

or fact common to members of the class to predominate over questions affecting only

individual members, and (2) a class action to be superior to other available methods for the

fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  The Court first

considers Plaintiffs' showing under Rule 23(a), and afterward addresses the requirements

contained in Rule 23(b)(3).[16]

      A.     Rule 23(a) Analysis

           1.     Numerosity

The numerosity requirement is satisfied if the proposed class is so numerous that

joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  The requirement that

joinder is impracticable does not mandate that joinder is impossible; rather, Plaintiffs "need

only show that it would be extremely difficult or inconvenient to join all members of the

class." Domestic Air, 137 F.R.D. at 698.  Plaintiffs "generally must proffer some evidence

---

[16]

     Plaintiffs also contended that Plaintiffs' claims for injunctive and declaratory relief
met the requirements of Rule 23(b)(2), but because the Court has determined that Plaintiffs
had no standing to bring those claims, the Court need not conduct a Rule 23(b)(2) analysis.

or a reasonable estimate of the number of members comprising the purported class." In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524, 529 (M.D. Fla. 1996).

> Plaintiffs seek to create a class consisting of:
>
> All those who presently possess or who may subsequently the right to control the disposition of the remains of any decedents delivered for cremation to Defendant Tri-State Crematory, Inc.; all persons who were parties to any contract with any of the defendants regarding funeral arrangements for a decedent who was delivered for cremation to Defendant Tri-State Crematory, Inc.; and the estates of the decedents and the representatives thereof; and a subclass defined as those families whose decedents' uncremated or otherwise desecrated remains have been recovered from the Tri-State Crematory property.

(Master 1st Am. Class Action Compl. ¶ 66.)  Plaintiffs have attempted to meet the numerosity requirement by offering evidence of:  (1) approximately 228 present clients who have engaged the services of Plaintiffs' Lead and Liaison Counsel in this litigation (Pls.' Class Certification Bench Book Tab 1); (2) approximately 675 decedents delivered to Defendant Tri-State by Funeral Home Defendants over the time period that Defendant Tri-State was in operation (id. Tab 7); (3) 211 identified human remains, found on the property of Defendant Tri-State, that have been identified by forensic identification methodology (2d Aff. of Kris Sperry, M.D. ¶ 8); and (4) 128 unidentified human remains, found on the property of Defendant Tri-State (id. ¶¶ 7-8).  The Court therefore finds that the class is sufficiently numerous to satisfy Rule 23(a)(1).  A second element of the numerosity requirement is that the proposed class meet a minimal standard of identifiability.  Although

"[i]t is not necessary that the members of the class be so clearly identified that any member can be presently ascertained . . . [Plaintiffs] must establish that there exists a legally definable 'class' that can be ascertained through reasonable effort." Earnest v. General Motors Corp., 923 F. Supp. 1469, 1473 & n.4 (N.D. Ala. 1996) (quotations and citations omitted). The class simply must meet a "minimum standard of definiteness which will allow the trial court to determine membership in the proposed class." Id.; see also Telecomm Technical, 172 F.R.D. at 543-44 (all members of class need not be specifically identified and may be dispersed geographically).

Plaintiffs' proposed class definition specifies two legally definable classes. The Court thus concludes that Plaintiffs' proposed class meets the numerosity requirement of Rule 23(a).

### 2.    Commonality

To satisfy the commonality requirement, Plaintiffs must show the presence of questions of law or fact common to the entire class. Fed. R. Civ. P. 23(a)(2). "[W]hile it is not necessary that every question of law or fact is common to every class member, commonality will not exist as long as there is a predominance of individual issues." Domestic Air, 137 F.R.D. at 699 (citing 3 Herbert B. Newburg, Newburg on Class Actions § 18.09, at 464 (2d ed. 1985)).

Plaintiffs have listed numerous questions of law or fact common to the entire class, including: (1) whether the Tri-State Defendants mishandled, or failed to carry out the proper cremation of remains delivered to them for cremation; (2) if the Tri-State Defendants mishandled, or failed to carry out the proper cremation of remains delivered to them for cremation, over what time period did these acts take place; (3) whether Funeral Home

Defendants are directly liable for their own action and inaction; (4) whether Funeral Home Defendants are vicariously liable for the actions of the Tri-State Defendants; and (5) whether Funeral Home Defendants have breached any contracts with Plaintiffs. (Pls.' Class Certification Bench Book Ex. 91.) The Court finds that Plaintiffs have satisfied the minimal showing required to establish commonality of the legal and factual questions raised in this action.

### 3.   Typicality

The typicality requirement is satisfied if the claims and defenses of the representative parties are typical of the claims and defenses of the class. Fed. R. Civ. P. 23(a)(3). A representative plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and her or his claims are based on the same legal theory." Domestic Air, 137 F.R.D. at 698 (quoting 3 Newburg, supra, § 18.08 at 462). In other words, the Court simply inquires whether the named representatives' claims "have the same essential characteristics as the claims of the class at large." Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985) (quoting 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1764 (1st ed. 1972)). The requirement may be satisfied "even though varying fact patterns support the claims or defenses of individual class members, or there is a disparity in the damages claimed by the representative parties and the other members of the class." Domestic Air, 137 F.R.D. at 698 (quoting 7A Wright, Miller, & Kane, Federal Practice and Procedure: Civil at § 1764).

The Court has analyzed each of Plaintiffs' claims to determine whether the named Plaintiffs have standing to bring those claims, and for the reasons set forth supra Part II.B.,

123968.1                                    55

the Court concludes that the named Plaintiffs' remaining claims arise from the same events and legal theories that give rise to the claims of the class members. In sum, the Court finds that Plaintiffs' claims satisfy the typicality requirement of Rule 23(a)(3).

    4.  Adequacy of Representation

To satisfy the adequacy requirement, Plaintiffs must show they, as class representatives, will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). This requirement involves a two-part inquiry: (1) whether Plaintiffs possess interests that are antagonistic to the interests of other class members, and (2) whether the proposed class' counsel possesses the qualifications and experience to conduct the litigation. Kirkpatrick, 827 F.2d at 726; Telecomm Technical, 172 F.R.D. at 543-44.

    a.  Whether Plaintiffs Have Interests Antagonistic to the Interests of Other Class Members

Funeral Home Defendants' only challenge as to whether the named Plaintiffs' interests are antagonistic to the interests of the class members is a challenge to the named Plaintiffs' standing. The Court addressed those arguments supra Part II.B. and concluded that the named Plaintiffs possess standing. The Court therefore finds that the named Plaintiffs do not have interests antagonistic to the absent class members.

b.      Whether the Proposed Class' Counsel Possesses the

Qualifications and Experience to Conduct the Litigation

Defendants do not challenge the qualifications of Plaintiffs' counsel. The Court has

reviewed the resumes of Plaintiffs' class counsel. The Court has also read several

decisions of other jurisdictions with similar facts to this case in which Plaintiffs' class

counsel were involved. The Court has further had the opportunity to observe and hear

from Plaintiffs' class counsel in several hearings, and has read numerous briefs submitted

by Plaintiffs' class counsel. The Court consequently concludes that Plaintiffs' counsel

possess the necessary qualifications and experience to serve as class counsel.

B.      Rule 23(b)(3) Analysis

The Court next examines each of Plaintiffs' legal claims to determine if those claims

meet the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure. Rule

23(b)(3) raises two questions: (1) whether issues of law or fact common to members of the

class predominated over questions affecting only individual members, and (2) whether a

class action is superior to other available methods for the fair and efficient adjudication of

the controversy. Fed. R. Civ. P. 23(b)(3).

Before reaching those issues, however, "[i]n order to make the findings required to

certify a class action under Rule 23(b)(3) (that common issues predominate, etc.), one

must initially identify the substantive law issues which will control the outcome of the

litigation." Alabama v. Blue Bird Body Co., Inc., 573 F.2d 309, 316 (5th Cir. 1978).[17] Thus,

---

17

Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the
creation of the Eleventh Circuit, are binding precedent on this Court. See Bonner v. City of
Prichard, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

the Court will begin its predominance analysis by setting forth the elements of the substantive law for each cause of action.  Then, after analyzing the predominance requirements of Rule 23(b)(3) for each claim, the Court will determine whether the class action is the superior procedural vehicle for all those claims meeting the predominance requirement.

           1.    Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v. Windsor,  521 U.S. 591, 623 (1997).  A plaintiff may satisfy this requirement by showing that issues subject to class-wide proof predominate over issues requiring proof that is unique to the individual class members.  Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997).

In deciding this question, the Court must keep in mind two related purposes of class action litigation:  (1) promoting economies of time, effort, and expense; and (2) providing individuals with relatively small claims the opportunity to assert their rights.  Fed. R. Civ. P. 23(b) advisory committee's notes to the 1966 Revision of Rule 23(b)(3); Amchem, 521 U.S. at 617 ("the Advisory Committee [in drafting Rule 23(b)(3)] had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'").  If common questions do not predominate, however, no economies will be achieved through the use of the class action device. Fed. R. Civ. P. 23(b)(3) advisory committee's notes to the 1966 Revision of Rule

23(b)(3).[18]

The predominance requirement "does not require that all issues be common to all parties," rather, it mandates that "'resolution of the common questions affect all or a substantial number of the class members.'" Watson v. Shell Oil Co. 979 F.2d 1014, 1022 (5th Cir. 1992) (quoting Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986)). "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Rutstein v. Avis Rent-A-Car Sys., Inc. 211 F.3d 1228, 1234 (11th Cir. 2000) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). The Eleventh Circuit has warned that "'serious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability vel non, turn upon highly individualized facts.'" Id. at 1235-36 (quoting McCarthy, 741 F.2d at 1415). Using this standard, the Court evaluates each of Plaintiffs' claims.

---

[18]

At the outset of the predominancy determination, the Court notes that Defendants have raised numerous arguments concerning Plaintiffs' alleged failure to satisfy the predominancy requirement. For the sake of brevity, and in the interest of issuing an Order in a timely fashion, the Court cannot provide a separate analysis of each of Defendants' arguments in this Order. The Court, however, has considered each of Defendants' arguments, and addresses those arguments that are essential to the predominancy determination.

a.    Breach of Contract

(1)    Substantive law

"The elements for a breach of contract claim in Georgia are merely 'the breach and the resultant damages to the party who has the right to complain about the contract being broken.'" Odem v. Pace Acad., 235 Ga. App. 648, 654, 510 S.E.2d 326, 331-32 (1998) (quoting Budget Rent- A-Car of Atlanta v. Webb, 220 Ga. App. 278, 279, 469 S.E.2d 712 (1996)). Therefore, to prevail on a breach of contract claim under Georgia law, Plaintiffs must prove that Funeral Home Defendants breached an enforceable agreement and that Plaintiffs suffered damage as a result of Funeral Home Defendants' breach.

(2)    Predominance Analysis

Breach of contract claims are certifiable as appropriate for class action. Upshaw v. Ga. Catalog Sales, Inc., 206 F.R.D. 694, 700-01 (M.D. Ga. 2002); Mick v. Level Propane Gases, Inc., 203 F.R.D. 324, 330-31 (S.D. Ohio 2001); Collins v. Int'l Dairy Queen, Inc., 168 F.R.D. 668, 676 (N.D. Ga. 1996); Kleiner v. First Nat'l Bank of Atlanta, 97 F.R.D. 683, 691-93 (N.D. Ga. 1983). "'[T]he fact that not all contracts are identical is not sufficient to overcome the apparent commonality of issues that they present.'" Collins, 168 F.R.D. at 676 (quoting Kleiner 97 F.R.D. at 694-95).    Breach of contract issues subject to class-wide proof include  a number of issues pertaining to Defendants' liability.  Examples of those issues include:  (1) whether Funeral Home Defendants owed a contractual duty to anyone other than the contract signatory; (2) whether it was a breach of Funeral Home Defendants' contractual duty to Plaintiffs to send Plaintiffs' decedents to the Tri-State Defendants for cremation; (3) whether Funeral Home Defendants should be liable in contract for any alleged mishandling of Plaintiffs' decedents by the Tri-State Defendants;

and (4) for what duration of time any alleged mishandling occurred.[19] The Court finds that these common issues predominate over the issues--primarily those related to damages--that require individual proof.[20]

---

19

    This issue assumes that Plaintiffs can prove the existence of mishandling by the Tri-State Defendants.

20

    The requirement of determination of damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class. Upshaw, 206 F.R.D. at 701 ("Variations in the amount of damages suffered by individual class members will not preclude a finding of predominance or defeat certification of the class."); Braxton v. Farmer's Ins. Group, 209 F.R.D. 654, 661 (N.D. Ala. 2002) (same, quoting Upshaw, 206 F.R.D. at 701). See also Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988); Sala v. Nat'l R.R. Passenger Corp., 120 F.R.D. 494, 499 (E.D. Pa.,1988) ("'it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate'") (quoting Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977)).

b.      Fraudulent Conduct as to the Tri-State Defendants

(1)      Substantive law

Under Georgia law, "[t]he tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." Crawford v. Williams, 258 Ga. 806, 806, 375 S.E.2d 223, 224 (1989).

(2)      Predominance Analysis

For two reasons, the Court concludes that Plaintiffs have failed to satisfy the predominancy requirement with respect to Plaintiffs' fraud claims. First, Plaintiffs' fraud claims will require proof of reliance from each individual class member. Courts ordinarily have refused to certify class actions where the actions involve fraud claims that will require individual proof of reliance. Andrews v. Am. Tel. & Tel. Co., 95 F.3d 1014, 1025 (11th Cir. 1996) (reversing decision certifying class action where fraud claims required individual proof of reliance); Mack v. Gen. Motors Acceptance Corp., 169 F.R.D. 671, 678 (M.D. Ala. 1996) (refusing to certify class action where, among other things, claims required individual proof of reliance); see also Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341-42 (4th Cir. 1998) (finding plaintiffs' fraud claims did not present suitable basis for class-wide relief because claims required proof of individual reliance); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996) ("a fraud class action cannot be certified when individual reliance will be an issue"). Because the Court must receive proof from each putative class member regarding reliance, individual issues predominate over the common issues presented by the putative class members.

Plaintiffs apparently argue that the Court simply can presume reliance in this case.

Plaintiffs' argument, however, ignores the fact that this case presents no special circumstances allowing the Court to presume reliance.[21]   Moreover, the "theory of presumptive reliance 'has generally been limited to the securities market where the courts can presume a nearly perfect market in information.'" In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 374 (E.D. La. 1997) (quoting Maguire v. Sandy Mac, Inc., 138 F.R.D. 444, 451 (D.N.J. 1991), vacated, 145 F.R.D. 50 (D.N.J. 1992)) (internal quotation marks omitted).  This case, however, involves state law fraud claims rather than federal securities fraud claims.  A presumption of reliance therefore is inappropriate for this case. Id.

Second, Plaintiffs' fraud allegations include claims that Funeral Home Defendants "held themselves out to be reputable, experienced and trustworthy entities in the business of funeral cremation and related service."  (Master 1st Am. Class Compl. ¶ 128.)  This allegation implies that employees and agents of Funeral Home Defendants made oral or written misrepresentations to Plaintiffs.  Any oral misrepresentations, by their very nature, would differ from putative class member to putative class member, and would require individual proof.  Additionally, the written misrepresentations to the putative class members

---

[21]

To the extent that Plaintiffs claim that a fiduciary relationship exists between Plaintiffs and Defendants, the Court  rejected this argument supra Part II.A.4.d.  In any event, Plaintiffs have pointed to no authority, and the Court's own research has uncovered no such authority, supporting a finding of a fiduciary relationship between parties in positions similar to those of Plaintiffs and Defendants.

emanated from any one of the Funeral Home Defendants, and very likely also differed from putative class member to putative class member. Under these circumstances, common issues do not predominate over individual issues. See, e.g. Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973) ("[C]ourts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action. Similarly, if the writings contain material variations, emanate from several sources, or do not actually reach the subject investors, they are no more valid a basis for a class action than dissimilar oral representations.") (citations omitted); Mack, 169 F.R.D. at 678 (declining to certify class where court would be required to "examine the representations made by each dealer and his/her employees to each claimant").

For the reasons given above, Plaintiffs' fraud claims fail to satisfy the predominancy requirement of Rule 23(b)(3). The Court therefore cannot certify those claims pursuant to Rule 23(b)(3).

### c. Negligence

#### (1) Substantive law

"To state a cause of action for negligence in Georgia, the following elements are essential: '(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.'" Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982) (quoting Lee St. Auto Sales, Inc. v. Warren, 102 Ga. App. 345, 116

123968.1                                64

S.E.2d 243 (1960)); accord Wilson v. Mallard Creek Holdings, 238 Ga. App. 746, 747, 519 S.E.2d 925, 926 (1999).

        (2)     Predominance Analysis

            (a)     Issues Common to All Plaintiffs

With respect to negligence, the issues that are common to all Plaintiffs are primarily issues related to Defendants' conduct.  Those issue include: (1) the nature and duration of Defendant Tri-State's alleged mishandling of human remains; (2) the standard of care in the funeral industry--alleged to apply to all Defendants--for providing and supervising cremation services; (3) the nature of Defendants' alleged breach of that standard of care, either by action or inaction; and (4) whether "uncertainty" is an actionable injury.  (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. at 6.)

            (b)     *Issues Unique to Each Plaintiff*

The negligence claim issues that will require individual proof include:  (1) whether a given Plaintiff's claim is for "uncertainty" with respect to that Plaintiff's decedent's remains, or commingling of that Plaintiff's decedent's remains, or failure to cremate that Plaintiff's decedent's remains; (2) the date each Plaintiff's decedent's body was sent to Defendant Tri-State; (3) the familial relationship between each Plaintiff and that Plaintiff's decedent; and (4) the extent of the injury, if any, each Plaintiff suffered.  (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. at 82-85.)

            (c)     Predominance of Common Issues over Individual Issues

For the following four reasons, the Court finds that issues subject to class-wide proof predominate over issues requiring proof that is unique to the individual class members. First, "[w]hether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Rutstein, 211 F.3d at 1234 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 139 (2d Cir. 2001), cert. denied, 122 S. Ct. 2382 (2002) (citing Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir. 2001)); accord Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988) ("where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy") (quoted in In re Telectronics Pacing Sys., Inc., 172 F.R.D. 271, 288 (S.D. Ohio 1997)).[22]   The Court is of the opinion that resolving the common issues of

---

[22]

In their brief, Funeral Home Defendants argue that in Rutstein "the Eleventh Circuit refused to grant class certification because damages must be individually proved, the same situation as this case." (Funeral Home Defs.' Br. Opposition Pls.' Renewed Mot. Class Certif. at 77.) Funeral Home Defendants quote this passage from Rutstein:

To establish that they are entitled to compensation, plaintiffs will have to prove that they actually suffered some injury, whether it be emotional or otherwise. The idea that individual injury could be settled on a class-wide basis is preposterous. Plaintiffs' claims for damages must "focus almost entirely on facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to[, and] how did it affect each plaintiff emotionally and physically, at work and at home."

Defendants' conduct listed <u>supra</u> Part IV.B.1.c.(2)(a), will be of great value in the ultimate resolution of each class member's underlying cause of action.  The Court therefore finds that those common issues can best be assessed on a class wide basis.[23]  <u>Rutstein</u>,  211 F.3d at 1234.

Second, although "the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3) . . . '[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.'"

<u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting 7A Charles Alan

---

<u>Rutstein</u>, 211 F.3d at 1239-40 (quoting  <u>Allison v. Citgo Petroleum Corp.</u>, 151 F.3d 402, 419 (5th Cir. 1998)).  The Court does not agree that <u>Rutstein</u> stands for the proposition that whenever plaintiffs must prove damages on an individual basis, class certification is improper.  In <u>Rutstein</u>, a civil rights case under 42 U.S.C.A. § 1981, the plaintiffs' claims "must focus almost entirely on facts and issues specific to individuals rather than the class as a whole."  <u>Id.</u> (quoting <u>Allison</u>, 151 F.3d at 419).  In the instant case, however, Plaintiffs' claims focus on facts and issues common to Defendants' behavior, which in turn affected Plaintiffs in an allegedly similar manner.  The Court thus concludes that Funeral Home Defendants' reliance on <u>Rutstein</u> is inappropriate in this action with respect to the issue of predominance.

[23]

    <u>See also infra</u> Part IV.B.2. (analyzing Rule 23(b)'s superiority requirement).

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986)); accord Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 626 (5th Cir. 1999) ("'In order to 'predominate,' common issues must constitute a significant part of the individual cases.'" (quoting Jenkins v. Raymark Indus., 782 F.2d 468, 472 (5th Cir. 1986))). The Court finds that the common questions related to Defendants' conduct are unquestionably a very significant aspect--in fact, a pivotal aspect, of this case.

Third, this litigation does not present the type of individuated issues that most frequently lead to denial of class status for lack of predominance of common issues in diversity jurisdiction class action negligence claims. The two types of cases that typically fail the requirement are: (1) cases where variations in state law overwhelm the common issues,[24] and (2) cases where variations in operative facts--often variations in the interactions between the defendant and a given plaintiff--defeat predominance of common issues.[25]

---

[24]

See, e.g. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997) (Supreme Court found that common issues did not predominate where class members were from variety of states requiring application of multitude of different legal standards); Kirkpatrick, 827 F.2d at 725 ("the differing standards of liability required by the laws of the various states would render class action treatment unmanageable"); Castano v. Am. Tobacco Co., 84 F.3d 734, 741-45 (5th Cir. 1996) (finding predominance requirement not met where complex choice-of-law issues present).

[25]

See, e.g. Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24 (finding predominance lacking where members of plaintiff class were exposed to asbestos-containing products from different sources over different time periods, and some of class members were asymptomatic while others had developed illnesses); Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 149 (4th Cir. 2001) (vacating district court's class certification in action against seller of stucco siding, in part due to failure of plaintiffs to show predominance of common issues, because liability analysis would require plaintiffs to prove individualized details of applicator and contractor behavior with respect to each siding

installation); In re American Med. Sys., Inc., 75 F.3d 1069, 1085 (6th Cir. 1996) (holding that common issues did not predominate over those affecting only individual members of class so as to support class certification in negligence action against product manufacturer where plaintiffs had used ten different models of product, where each had a unique complaint, and each had received different information and assurances from his treating physician).

Because of Georgia's choice of law rules, this case has little variation in state law for the Court to consider. Where Georgia's choice of law rules would require the Court to consider the laws of a large number of states, the Court has eliminated claims or potential remedies. See supra Part II.A.2. (analyzing choice of law and eliminating claims for punitive damages from class action); accord Teletronics, 172 F.R.D. at 294-95. Variations in state law therefore do not overwhelm the common issues in the case at bar.

Further, the facts of this case do not vary greatly from one Defendant to another or from one Plaintiff to another. The facts of this case are essentially identical for every Plaintiff: Plaintiffs allege that each and every Plaintiff relied on a Funeral Home Defendant to handle the cremation of Plaintiff's loved one. Each and every Plaintiff claims that a Funeral Home Defendant failed to perform that service in a manner that conformed to the standard of care for the funeral home industry, and the Plaintiff suffered emotional injury because the Funeral Home Defendant failed to perform to the standard of care. The Court concludes that variations in conduct from one Plaintiff to another do not predominate over the overwhelming common issues related to Defendants' conduct.

Fourth, while the Court observes that negligence claims are not the most common type of claim certified under Federal Rule of Civil Procedure 23, the Court has found ample support in federal decisions for granting certification of negligence claims. See, e.g. Mullen, 186 F.3d at 626 (Fifth Circuit affirming decision wherein "district court held that the issues to be tried commonly--seamen status, vessel status, negligence, and seaworthiness--were significant in relation to the individual issues of causation, damages, and contributory negligence"); Watson v. Shell Oil Co., 979 F.2d 1014, 1023 (5th Cir. 1992)

(affirming class certification for negligence claim in mass tort litigation and noting that "this litigation differs markedly from toxic tort cases . . . in which numerous plaintiffs suffer varying types of injury at different times and through different causal mechanisms, thereby creating many separate issues"); In re Telectronics, 172 F.R.D. at 288 (finding common issues predominated where common issues for all negligence claims seek to resolve whether defendant is legally responsibly for product failure, and individual issues pertain to causation and damages); In re Copley Pharm., Inc., 158 F.R.D. 485, 492 (D. Wyo. 1994) (finding common issues predominate plaintiffs' claims for, inter alia, negligence where "issues, surrounding the Defendant's liability for the contaminated [drug], may be tried to a single jury in a unified trial. Then, if the Plaintiffs are successful, class members may pursue their individual cases in separate trials to determine if they suffered an injury from the contaminated [drug], and if so, the proper measure of any damages."); Sala v. Nat'l R.R. Passenger Corp., 120 F.R.D. 494, 499 (E.D. Pa. 1988) (concluding common issues predominate where "each of the members of the class will base their liability claim on the same common nucleus of operative facts . . . each class member will offer precisely the same proof to establish defendant['s] alleged liability towards and breach of duty to [plaintiffs]"); Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558, 561 (S.D. Fla. 1974), aff'd, 507 F.2d 1278 (5th Cir. 1975) (unpublished) (certifying common issue of whether defendants were negligent in preparing either drinking water or food that was available for consumption by passengers as subject to a uniform determination, although issues of proximate cause of each passenger's illness, contract liability, the adequacy of medical treatment afforded each passenger, and damages are individual in nature).

(3)     Conclusion

The Court concludes that certain negligence issues are appropriate for class treatment. Those issue include: (1) the nature and duration of Defendant Tri-State's alleged mishandling of human remains; (2) the standard of care in the funeral industry--alleged to apply to all Defendants--for providing and supervising cremation services; (3) the nature of Defendants' alleged breach of that standard of care, either by action or inaction; and (4) whether "uncertainty" is an actionable injury. The Court therefore exercises its power under Rule 23(c)(4)(A) and Rule 23(b)(3) to certify those issues related to Defendants' duty to Plaintiffs and whether Defendants breached that duty.

>
> d. Willful Interference with Remains and Intentional Mishandling of a Corpse
>
> (1) Substantive law

As stated supra Part II.A.4.f.(2), Georgia recognizes a quasi property right in the deceased body of a relative, belonging to the husband or wife, and, if neither, to the next of kin. Welch, 269 Ga. at 743, 505 S.E.2d 470; Wilson, 123 Ga. 62, 51 S.E. 24. "In a very scholarly opinion authored by Justice Lumpkin, the Supreme Court held that there exists a legal duty, enforceable by the next of kin, which requires that a party contractually obligated to handle a corpse, do so non-negligently and with utmost dignity." Mayer v. Turner, 142 Ga. App. 63, 64-65, 234 S.E.2d 853, 855 (1977) (citing Wilson, 123 Ga. at 62, 51 S.E. 24).

In this cause of action, Plaintiffs claim that Defendants' alleged misconduct was intentional. Where, as in this case, the only injury claimed is to the peace, happiness, or feelings of the plaintiff, the plaintiff may recover damages, pursuant to O.C.G.A. § 51-12-

6,[26] if defendant's behavior is a malicious, wilful or wanton desecration of the body. <u>See, e.g.</u>, <u>Bauer v. N. Fulton Med. Ctr.</u>, 241 Ga. App. 568, 574, 527 S.E.2d 240, 246 (1999) (collecting cases). To show wilful or wanton conduct, a Plaintiffs must demonstrate that Defendant's behavior evidenced a wilful intention to inflict injury, or else was so charged with indifference to the consequences as to justify finding a wantonness equivalent in spirit to actual intent. <u>See, e.g.</u>, <u>Pyle</u>, 243 Ga. App. at 400, 531 S.E.2d at 740; <u>accord</u> <u>McNeal Loftis, Inc. v. Helmey</u>, 218 Ga. App. 628, 629 & 629 n.1, 462 S.E.2d 789, 790 (1995) (collecting cases). "Damages [for mental suffering alone] may be recovered in those cases where the plaintiff has suffered at the hands of the defendant a wanton, voluntary, or intentional wrong the natural result of which is the causation of mental suffering and wounded feelings." <u>Dunn v. Western Union Telegraph Co.</u>, 2 Ga. App. 845, 846, 59 S.E. 189 (1907) (quoted in <u>Clark v. West</u>, 196 Ga. App. 456, 461, 395 S.E.2d 884, 888 (1990) (Beasley, J., concurring specially). The measure of damages is "the enlightened

---

[26]

      O.C.G.A. § 51-12-6 provides in relevant part:

      51-12-6 Damages for injury to peace, happiness, or feelings.
      In a tort action in which the entire injury is to the peace, happiness, or feelings of the plaintiff, no measure of damages can be prescribed except the enlightened consciences of impartial jurors.

O.C.G.A. § 51-12-6.

consciences of impartial jurors."  O.C.G.A. § 51-12-6.

          (2)     Predominance Analysis

      The predominance analysis for this claim is nearly identical to the predominance analysis for Plaintiffs' negligence claim, discussed supra Part IV.B.1.c.(2).  Two additional common issues, critical to this claim for intentional misconduct are: (1) whether Defendants' behavior evidenced a wilful intention to inflict Plaintiffs' injuries, or was so charged with indifference to the consequences as to justify finding a wantonness equivalent actual intent, see Pyle, 243 Ga. App. at 400, 531 S.E.2d at 740; and (2) whether Defendants' behavior would naturally cause mental distress and wounded feelings, see Dunn, 2 Ga. App. at 846, 59 S.E. at 189.     These issues, much like the issues discussed supra Part IV.B.1.c.(2)(a), focus on Defendants' behavior.  For the reasons given in the predominance analysis for Plaintiffs' negligence claims supra Part IV.B.1.c.(2)(c), as well as the additional common issues listed in the previous paragraph, the Court finds the predominance requirement is satisfied for Plaintiffs' claim for willful interference with remains and intentional mishandling of a corpse.

          e.     Negligent Interference with Remains and Mishandling of a Corpse

          (1)     Substantive law

      Here, Plaintiffs claim that Defendants' alleged misconduct was negligent with respect to handling decedents' remains.

> [A] claim for negligent mishandling of a corpse is premised upon the presence of two elements. The first is the 'quasi-property' right that exists in the dead body of a relative. The second is the negligent breach of a contract to carry out the expressed wishes of the next of kin regarding the disposition of that dead body[, i.e., burial, cremation, or anatomical donation].

          

Wages v. Amisub of Ga., 235 Ga. App. 156, 157-58, 508 S.E.2d 783, 784-85 (1998) (emphasis added) (internal quotation marks omitted); accord McCoy v. Ga. Baptist Hosp., 167 Ga. App. 495, 497, 306 S.E.2d 746, 747-48 (1983); Mayer, 142 Ga. App. at 64-65, 234 S.E.2d at 855; Wilson, 123 Ga. at 62, 51 S.E. 24.

(2)    Predominance Analysis

For the reasons given in the predominance analysis for Plaintiffs' negligence claims supra Part IV.B.1.c.(2)(c), the Court finds the predominance requirement is satisfied for Plaintiffs' claim for negligent interference with remains and mishandling of a corpse.

f.    Intentional Infliction of Emotional Distress

(1)    Substantive law

In Georgia, a plaintiff must prove four elements to sustain a claim of intentional infliction of emotional distress: "'(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe.'" Hill v. City of Fort Valley, 251 Ga. App. 615, 616, 554 S.E.2d 783, 785 (2002) (quoting Northside Hosp., Inc. v. Ruotanen, 246 Ga. App. 433, 435, 541 S.E.2d 66, 68-69 (2000)); accord Phinazee v. Interstate Nationalease, 237 Ga. App. 39-40, 514 S.E.2d 843 (1999).

Georgia courts have further characterized the requisite defendant conduct by stating that defendant's conduct must be "malicious, wilful or wanton," Hall v. Carney, 236 Ga. App. 172, 174, 511 S.E.2d 271, 274 (1999), and that wilful or wanton conduct may be evidenced by a wilful intention to inflict injury, or by a reckless disregard for the rights of

plaintiff equivalent to an intentional violation of those rights, Jacobus v. Congregation of the Children of Israel, 107 Ga. 518, 33 S.E. 853, 855 (1899). Accord Pyle v. Pyle, 243 Ga. App. 398, 400, 531 S.E. 2d 738, 740 (2000); McNeal Loftis, Inc. v. Helmey, 218 Ga. App. 728, 729, 462 S.E.2d 789, 790 (1995). A final requirement with respect to defendant's conduct is that it must be "'directed toward the plaintiff.'" Hall, 236 Ga. App. at 174, 511 S.E.2d at 274 (quoting Ryckeley v. Callaway, 261 Ga. 828, 829, 412 S.E.2d 826, 826 (1992)); accord Hill, 251 Ga. App. at 617; 554 S.E.2d at 786.

(2)    Predominance Analysis

To sustain Plaintiffs' claim for intentional infliction of emotional distress, therefore, Plaintiffs must prove that the conduct of Funeral Home Defendants or the Tri-State Defendants was directed toward Plaintiffs.[27]  Such a showing will be highly individualized and unique to each individual class member.  Proof that Defendants' conduct was directed toward each individual class member thus would predominate over issues subject to class wide proof for this claim.

The Court therefore finds that Plaintiffs' claim for intentional infliction of emotional distress fails to meet the predominance requirement of Rule 23(b)(3).  The Court consequently cannot certify that claim pursuant to Rule 23(b)(3).

2.    Superiority of the Class Action

"That common questions predominate is not itself sufficient to justify a class action

---

27

In making this predominance determination, the Court is not expressing an opinion as to the likelihood of Plaintiffs' ability to produce such proof.

under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages." Fed. R. Civ. P. 23, Advisory Committee Note to the 1966 Amendment. Plaintiffs must also demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  "'The rule asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication.'"  In re Telectronics, 172 F.R.D. at 290 (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd 521 U.S. 591 (1997)).

At the class certification hearing, Funeral Home Defendants argued against the superiority of class certification, asserting that individual lawsuits against the various Funeral Home Defendants would be fairer and more efficient:

> From all the [funeral home defendants'] lawyers: let me deal with my funeral home.  Let the decedent who wants to sue my funeral home sue us.  Let us deal with our defenses, statute of limitations, let us deal with the jurisdictional problems, but let us take them one at a time and not be lumped in with fifty-five or fifty other funeral homes having to deal with what their situation was with a specific plaintiff.

(Dec. 18, 2002, Hr'g Tr. at 171-72.)  The Court does not agree with Funeral Home Defendants that individual lawsuits would be superior to a class action.

The overarching fact that leads the Court to this conclusion is this:  at one time or another, all the Funeral Home Defendants used the services of the Tri-State Defendants. For this reason, the Court finds that resolution of certain fundamental issues--whether and over what time period misconduct occurred at Defendant Tri-State, and what Funeral Home Defendants knew or should have known about it--in one forum, is the superior judicial alternative for Plaintiffs, Funeral Home Defendants, the Tri-State Defendants, and

for the judicial system itself.  Otherwise, federal and state courts in Alabama, Georgia, Tennessee, and elsewhere will have to listen to the same evidence about those fundamental issues again and again.  See Mullen, 186 F.3d at 628 (approving district court's bifurcated-trial plan where the district court found that the class action would "promote judicial economy and avoid the wasteful, duplicative litigation which would inevitably result if these cases were tried individually") (quoting district court).

The Court also finds that the lack of complex choice-of-law issues, and the fact that the Plaintiff class numbers in the hundreds, not thousands or millions, supports a conclusion that the class action is the superior litigation vehicle.  Mullen, 186 F.3d at 627. The Court foresees that this case can proceed in two phases.  In the first phase, the Court would try the common issues related to Defendants' duty or duties to Plaintiffs and Defendants' alleged breach of that duty or those duties.  During the second phase, the Court would try the unique issues of causation and damages for each Plaintiff individually.[28]

---
28

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over

The Fifth Circuit has discussed bifurcated class actions in claims somewhat similar to the claims now before the Court:

> [Mullen] is akin to other bifurcated class actions this Court has approved. See Watson v. Shell Oil Co., 979 F.2d 1014 (5th Cir. 1992) (finding no abuse in the district court's certification of a bifurcated class action arising from an oil refinery explosion where liability and punitive damages would be resolved commonly and injury, causation, and actual damages would be resolved individually); Jenkins, 782 F.2d [at] 468 (finding no abuse of discretion in district court's certification of a bifurcated class action where asbestos producers' "state of the art defense" as well as product identification, product defectiveness, negligence, and punitive damages would be resolved commonly and causation, actual damages, and comparative fault would tried individually); Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558 (S.D. Fla. 1973), aff'd, 507 F.2d 1278-79 (5th Cir. 1975) (unpublished) (certifying bifurcated class action on behalf of 350 passengers who were fed contaminated food aboard cruise ship where negligence would be tried

individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001).

commonly and causation and damages would be tried individually).

Mullen, 186 F.3d at 628 (approving bifurcation where issues of seamen status, vessel status, negligence, and seaworthiness to be tried commonly and issues of causation, damages, and contributory negligence to be tried individually).

The Court has identified one specific problem with bifurcation of a class action, however, that deserves special attention. A class action cannot be the superior method of adjudicating a controversy if the bifurcation of the class action violates the Seventh Amendment of the United States Constitution.[29] "The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues." Castano, 84 F.3d at 750. "The Seventh Amendment does not prohibit bifurcation of trials as long as the 'the judge [does] not divide issues between separate trials in such a way that the same issue is reexamined by different juries.'" Mullen, 186 F.3d at 628 (quoting Rhone-Poulenc, 51 F.3d at 1303); see also Blue Bird Body Co., 573 F.2d at 318 (limiting use of bifurcation because of "a recognition of the fact that inherent in the Seventh Amendment guarantee of a trial by jury is the general right of a litigant to have only one jury pass on a common issue of fact.") The Court believes that the "risk [of Seventh Amendment problems] has been avoided here by leaving all issues of causation for the phase-two jury." Mullen, 186 F.3d at 620.

In many appellate opinions on Seventh Amendment issues for bifurcated class

---

[29]

"[N]o fact tried by jury, shall be otherwise re-examined in any Court of the United States . . ." United States Const. amend. VII.

actions, the entangling topic of comparative negligence arises.  No general consensus has been reached in the Circuits with respect to the effect of comparative negligence on the Seventh Amendment and bifurcation. <u>Compare</u> <u>Rhone-Poulenc</u>, 51 F.3d at 1303 (Seventh Circuit holding district court's trial plan contravenes Seventh Amendment because issues of comparative negligence and proximate causation could not be determined in phase two of trial without re-examining, and in some cases effectively re-deciding, underlying negligence decision from phase one); <u>Castano</u>, 84 F.3d at 734 (Fifth Circuit finding that bifurcating defendant's conduct from comparative negligence results in risk of running afoul of Seventh Amendment) <u>with</u> <u>Valentino v. Carter-Wallace</u>, 97 F.3d 1227, 1232 (9th Cir. 1996) (declining to endorse reasoning of Seventh Circuit in <u>Rhone-Poulenc</u>, 51 F.3d at 1303,  because reasoning in <u>Rhone-Poulenc</u> may not be in line with Ninth Circuit law); <u>Mullen</u>, 186 F.3d at 629 (Fifth Circuit holding no Seventh Amendment problem exists where defendant's negligence tried in phase one and issues of plaintiff's comparative negligence, causation, and damage tried in phase two, because focus of comparative negligence is on causation and all issues of causation tried by one jury in phase two).

The Court finds, however, that it need not decide whether the issue of comparative negligence results in a trial plan in contravention of the Seventh Amendment.  Although Funeral Home Defendants have pleaded comparative negligence as a defense, (Funeral Home Defs.' Answer Master 1st Am. Class Action Compl., Eighteenth Defense), they have adduced no evidence in support of their pleading.  The Court must look beyond the pleadings at the class certification stage of a lawsuit. <u>Falcon</u>, 457 U.S. at 160.  Because Defendants have produced no evidence of negligence on the part of Plaintiffs, the Court finds that bifurcation of this litigation does not present any Seventh Amendment

problems.[30]

In summary, the Court finds that a bifurcated class action is the fairest and most efficient method by which to adjudicate this controversy. The Court therefore concludes that the superiority requirement of Rule 23(b)(3) is met.

### 3.    Summary of Rule 23(b)(3) Analysis

In sum, the Court finds that Plaintiffs' claims for (1) breach of contract; (2) negligence; (3) willful interference with remains and intentional mishandling of a corpse; and (4) negligent interference with remains and mishandling of a corpse satisfy the predominance and superiority requirements of Rule 23(b)(3). The Court therefore certifies those claims for class action treatment.

### V.    Class Definition

Plaintiffs seek to certify a class defined as:

All those who presently possess or who may subsequently acquire the right to control the disposition of the remains of any decedents delivered for cremation to Defendant Tri-State Crematory, Inc.; all persons who were parties to any contract with any of the defendants regarding funeral arrangements for a decedent who was delivered for    cremation        to Defendant Tri-State Crematory, Inc.; and the estates of the decedents and the representatives thereof; and a subclass defined as those families whose

---

[30]

If, at some future stage of this litigation, Defendants produce evidence of Plaintiffs' negligence, the Court will take  remedial measures as required.

> decedents' uncremated or otherwise desecrated remains have been
>
> recovered from the Tri-State Crematory property.

(Master 1st Am. Class Action Compl. ¶ 66.)  For reasons explained in more detail above,

the Court makes several observations with respect to the class definition: (1) the Court

finds no support in Georgia law that allows Plaintiffs' tort claims to be possessed by any

person other than the decedent's next of kin,[31] see supra Part IV.B.1.c.-IV.B.1.e.

(discussing substantive law for Plaintiffs' tort claims that meet predominance analysis); (2)

the Court finds that Plaintiffs have produced no evidence of misconduct related to Plaintiffs'

claims for any year prior to 1988, supra Part I.B.1.b.; and (3) the Court notes that the

Plaintiff class may not include those seeking to bring claims for breach of contract that are

barred by Georgia's six-year statute of limitations, see supra Part II.A.4.b. (citing and

discussing O.C.G.A. § 9-3-24).

> The Court therefore certifies a Plaintiff class defined as follows:

> All those who are or were next of kin of any decedents delivered for
>
> cremation to Defendant Tri-State Crematory from the years 1988 to 2002; all
>
> persons or entities who were parties to any contract with any Defendant

---

[31]

At the Class Certification hearings, Plaintiffs cited Wright v. Hollywood Cemetery
Corp., 112 Ga. 884, 38 S.E. 94 (1901) for the proposition that Georgia law allows recovery
in tort for relatives of the decedent other than the next of kin in an interference with the
right of burial case.  (Dec. 17, 2002, Hr'g Tr. at 44-45.)  In Wright, the court allowed
recovery for the next of kin, a sibling. 38 S.E. at 96.  Because the sibling was a minor,
however, the court stated that the "right and duty" of giving the decedent a burial "devolved"
upon the grandmother as "the next of kin of full age." Id.  The Wright case adheres to the
familiar rule that the Court follows in this case: "Except where the decedent leaves a
husband or wife surviving, the right to properly dispose of the dead body belongs to the
next of kin." Id. at 95.  The Court concludes that under Georgia law the right in tort does
not extend to close family members beyond the next of kin.

regarding funeral arrangements for a decedent who was delivered for cremation to Defendant Tri-State Crematory from 1988 to 2002 whose claim is not barred by the applicable statute of limitations; and a subclass defined as the next of kin of decedents whose uncremated or otherwise desecrated remains have been recovered from the property of Defendant Tri-State Crematory or the property surrounding Defendant Tri-State.

## VI.   Conclusion

ACCORDINGLY, the Court **DENIES AS MOOT** Plaintiffs' Motion to Certify Class Action [176], **GRANTS** Plaintiffs' Motion for Designation of Additional Proposed Class Representative [177], and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Amended Motion to Certify Class Action [271].

IT IS SO ORDERED, this the ___ day of March, 2003.


UNITED STATES DISTRICT JUDGE